| | | |
|---|---|---|
| Jane Doe, individually and on behalf of all others similarly situated, | ) ) ) ) | **CLASS ACTION COMPLAINT** |
| Plaintiff, | ) ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | Case No.: |
| Bank of America, N.A., | ) ) | |
| Defendant. | ) ) | |

<u>**INDIVIDUAL AND CLASS ACTION COMPLAINT**</u>

Plaintiff Jane Doe files this individual and civil class action complaint for damages and other relief under (among other provisions of law) the United States federal anti-sex trafficking statute, 18 U.S.C. § 1591, *et seq.*—the Trafficking Victim Protection Act ("TVPA")—and for common-law tort claims under New York law.  The suit arises from Defendant Bank of America, N.A.'s ("Bank of America") participating in and financially benefitting from Jeffrey Epstein's widespread and well-publicized sex-trafficking operation, as well as the direct financial benefits it received therefrom.  Doe makes the following allegations on information and belief and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**PRELIMINARY STATEMENT**

1.     Jeffrey Epstein, the world's most infamous sexual predator, ran an international sex-trafficking operation and abused thousands of women and girls for decades.  Epstein committed these crimes by means of not only his own extraordinary wealth and power, but through access to funding and financial support from both individuals and institutions, including Bank of

America.  Egregiously, Bank of America had a plethora of information regarding Epstein's sex trafficking operation but chose profit over protecting the victims.

2.     Recently, the U.S. government's investigation into Epstein's operation uncovered "actionable information on more than $1 billion worth of transactions that flowed in and out of Epstein's accounts"[1] at large financial institutions. "[O]ne of the documents in the Treasury Department's Epstein file indicates that between 2003-2019, there were more than 4,725 wire transfers totaling $1.08 billion involving Jeffrey Epstein and his associates, including Darren Indyke, Harry Beller, Richard Kahn and Erika Kellerhals."[2] These transactions included "wire transfers from wealthy figures over the sales of artwork, fees paid to Epstein, and payments to several women."[3]  Investigation has revealed "hundreds of millions in payments to Epstein from Wall Street financiers."[4]

3.     Bank of America for years provided banking services in connection with Epstein and his sex-trafficking organization, as well as accounts for Epstein's co-conspirators, associates, and victims at Epstein's direction.  It knowingly provided the financial support and the veneer of institutional legitimacy for Epstein and his co-conspirators to fuel their international sex-trafficking organization under the guise of non-criminal business activities.  In exchange for that crucial financial support, Bank of America knowingly and intentionally benefited and received things of value from Epstein and his co-conspirators.  And because the Bank failed to timely file

---

[1] July 21, 2025, Letter ("Wyden Letter"), United States Senate Committee on Finance, https://www.finance.senate.gov/imo/media/doc/wyden_letter_to_doj_-_follow_the_money_on_jeffrey_epstein_7-21-25pdf.pdf/, at 1.

[2] *Ibid.*

[3] Alex Woodward, *Top Democrat demands Trump's IRS investigate Epstein bank records in sprawling probe: 'Follow the money'*, The Independent, https://www.the-independent.com/news/world/americas/us-politics/epstein-bank-records-ron-wyden-leon-black-b2799888.html (Jul. 31, 2025).

[4] Wyden Letter at 1.

suspicious activity reports ("SARS") as to any of these transactions, it failed to alert law enforcement as to Epstein's crimes before it was far too late.

## JURISDICTION, VENUE, AND TIMELINESS

4. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Jane Doe—individually and on behalf of the other Class members—proceeds under the federal TVPA statute, 18 U.S.C. § 1589 through § 1595.

5. The Court also has supplemental jurisdiction over the state law claims recounted below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

6. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the acts, events, and omissions giving rise to this cause of action occurred in this District. Epstein, his co-conspirators, and Bank of America all conducted substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through actions that originated in this District. In addition, Epstein sexually abused and trafficked Jane Doe and members of the Class in this District.

7. This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1) because it is filed within ten years after the cause of action arose.[5]

## 8. PARTIES

---

[5] Any statute of limitations applicable to Jane Doe's and the putative Class's claims, if any, is tolled due to the Bank's affirmative concealment of the facts that make up Doe's and the Class's claims, as well as the continuous and active deception, duress, threats of retaliation, and other forms of misconduct that Epstein and his co-conspirators used to silence his many victims, including Doe. Bank of America strategically and fraudulently covered up its conduct and it was not until recently when Congress focused its investigation on Epstein's financial institutions that the Bank's conduct was revealed. For these reasons, Defendant is equitably estopped from asserting a statute-of-limitations defense.

9. Plaintiff Jane Doe is a citizen of Florida and was at all relevant times a resident of and domiciled in the State of New York.

10. Jane Doe is using a pseudonym to protect her identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

11. Jane Doe is also at serious risk of retaliatory harm because the co-conspirators who participated in the Epstein sex-trafficking venture had—and continue to possess—tremendous wealth and power and have demonstrated a clear ability to cause her serious harm.

12. Jane Doe's safety, right to privacy, and security outweigh the public interest in her identification and any prejudice to Defendant by allowing her to proceed anonymously.

13. As discussed below, many other women are similarly situated to Jane Doe and also need to proceed anonymously for the same reasons. The identities of most of these other women are known to Defendant.

14. Defendant Bank of America, N.A., is a global financial institution headquartered in Charlotte, North Carolina, and operating in this District.

15. Bank of America is responsible, under United States law and otherwise, for the acts of its officers, directors, employees, and agents, including the acts described in this complaint. The acts alleged were committed by Bank of America's officers, directors, employees, and agents within the scope of their employment and with the intention, at least in part, to benefit Bank of America.

**BACKGROUND**

16. Jeffrey Epstein's sex-trafficking venture operated in many respects as a sex-themed cult designed to ensnare vulnerable young women and indoctrinate them into Epstein's carefully constructed world in which Epstein was their messiah.

17.     Once in Epstein's clutches, each victim was taught and understood that she must be completely compliant with every demand Epstein had for her; otherwise, she would certainly suffer serious reputational, financial, and psychological harm. By using these and other means of force, threats of force, fraud, threats of abuse of the legal process and coercion, Epstein and his co-conspirators sexually trafficked and sexually abused Jane Doe and the other members of the Class.

18.     The Epstein sex-trafficking venture was well-structured from the beginning and grew increasingly more complex and powerful as it victimized more young women and as its relationship with complicit financial institutions like Bank of America grew.

19.     Epstein's sex-trafficking venture was not possible without the assistance and complicity of financial institutions—specifically, banks—which provided special treatment to Jeffrey Epstein, his co-conspirators, and the sex-trafficking venture, thereby ensuring its continued operation and sexual abuse and sex-trafficking of young women and girls. But for this financial support, Epstein's sex-trafficking scheme could not have existed and flourished.

20.     To access the financial services needed to maintain his active sexual abuse of young women, it was essential that the financial institution where he banked be complicit in his operation, and more specifically that Epstein bank at a financial institution that would allow him to constantly withdraw cash from his accounts and other Epstein-related accounts without following anti-money laundering and reporting laws.

## THE TRAFFICKING VICTIMS' PROTECTION ACT

21.     The Trafficking Victims Protection Act (TVPA) outlaws sex trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States. It is to be construed broadly because it serves a remedial purpose and uses intentionally broad language.

22.     The TVPA forbids the following sex-trafficking conduct:

(a) Whoever knowingly—

> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

> knowing, or, except where the act constituting the violation of paragraph is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b). 18 U.S.C. § 1591(a).

23.     The TVPA also contains an explicit "civil remedy" provision which allows an individual who is a victim of a violation of Chapter 77 of Title 18 (e.g., violation of 18 U.S.C. §§ 1591-94) to bring a civil action against the perpetrator and any person or entity who knowingly benefits, financially or by receiving anything of value from participation in an illegal sex-trafficking venture. 18 U.S.C. § 1595(a).

24.     Unlike the criminal penalties provisions in the TVPA, the civil remedies provision contains a "constructive knowledge" provision. This provision allows a civil action to be brought not only against a person or entity who participated in a venture known to have engaged in illegal sex trafficking but also against a person or entity who participated in a venture that the person or entity should have known had engaged in illegal sex trafficking. 18 U.S.C. § 1595(a).

## FACTUAL ALLEGATIONS

### A.     The Epstein Sex-Trafficking Venture

25.     Beginning in the early 1990s and continuing through the summer of 2019, Jeffrey Epstein knowingly established and ran a sex-trafficking venture in violation of 18 U.S.C. §§ 1591–

95. As part of the venture, Epstein used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young women and girls from all over the world to engage in commercial sex acts and to sexually abuse them.

26. In creating and maintaining this network of victims in multiple states and in other countries to sexually abuse and exploit, Epstein worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, recruiting victims, coercing victims, and scheduling their sexual abuse by Epstein at his New York mansion, his Palm Beach mansion, and his island in the U.S. Virgin Islands.

27. Among other things, Epstein sexually abused his many victims and caused his victims to engage in commercial sex acts, specifically sex acts for which his victims received things of value, including money, promises of educational and career advancement, a place to live, and promises that Epstein would provide various forms of assistance.

28. As one means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators threatened that harm would come to victims if they did not comply with his demands that they perform commercial sex acts.

29. As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands. These promises were a quid pro quo for the sex acts that occurred.

30. As one means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators would give his victims money to stay quiet about the assault or as a "finder's fee" for bringing other young women. Epstein would also provide them with living accommodations, clothing, education, or other necessities, exploiting the vulnerabilities of his

often poor and underprivileged victims.

31.     In 2006, Jeffrey Epstein was arrested in Florida after state and federal law enforcement discovered that he had sexually abused more than 30 children in his Palm Beach, Florida mansion.  During that investigation, the government concluded that Epstein and his co-conspirators had committed federal criminal acts constituting violations of the TVPA and other federal laws, including 18 U.S.C §§ 2422(b), 2423(f), 2423(b), 2424 (e); 18 U.S.C § 371; 18 U.S.C §§ 1591(c)(1), 1591(a)(1), 1591(a)(2); as well as state crimes in violation of Florida Statute §§ 796.07 and 796.03, against dozens of young women.

32.     As a consequence of the Florida investigation, Epstein pled guilty to two felonies, was permanently labeled a "Registered Sex Offender," and was jailed in 2008. Epstein also entered into a non-prosecution agreement with the U.S. Attorney's Office for the Southern District of Florida barring his prosecution (and prosecution of his known and unknown co-conspirators) for violations of the TVPA and other sex offenses in Florida. When the U.S. Attorney's Office entered into that non-prosecution agreement with Epstein, it had not received reports from Bank of America about Epstein, nor did Bank of America provide any other assistance in the investigation.

33.     Epstein's criminal case in Florida and the many related news reports left no doubt about Jeffrey Epstein and his extraordinary penchant for sex abuse and trafficking of young females.  For instance, it was reported that up until the time of his Florida arrest, Epstein had been sexually abusing *three to four young females per day*; it was a full-time job for him.

34.     The Epstein sex-trafficking venture transported victims across state boundaries between New York, Florida, New Mexico, New Jersey, Massachusetts, the U.S. Virgin Islands, and elsewhere, and in foreign commerce between the United States and Europe, especially Eastern Europe.

35.     At all times relevant to this complaint, the Epstein sex-trafficking venture was a group of two or more individuals associated in fact, even if they were not a formal legal entity. Indeed, members of the Epstein sex-trafficking venture referred to it as an "organization." Epstein was continuously at the hub of this sex-trafficking organization, which operated throughout the times indicated in this complaint.

36.     The Epstein organization used its in-house attorney, Darren Indyke, for services related to Epstein's trafficking operation and other illegal activities, which allowed inter-organization communications to be protected from discovery by the attorney-client privilege.  Any time Epstein needed legitimate legal work performed, including defending his criminal investigations and defending all civil lawsuits, he hired legitimate high-end legal teams and firms.

37.     Likewise, while Epstein hired outside accounting firms to service his and his corporate taxes, he utilized a company providing exclusive accounting and in-house financial services for Epstein—HBRK—to pay victims, withdraw and hold large amounts of cash for hush money payments and illegal payments to sex trafficking victims, create false companies and maintain accounts for the purpose of causing sex trafficking victims to remain entrapped by the organization and to otherwise develop false schemes to protect the operation and control the victims.  "HBRK" stands for "Harry Beller Richard Kahn," referring to its founding members and longtime Epstein associates and accountants, Harry Beller and Richard Kahn.  Kahn serviced the taxes of numerous Epstein victims and devised schemes to entrap them, and often had to communicate with financial institutions on behalf of victims (including Jane Doe and other trafficking victims which should have raised other red flags).

38.     On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a sealed, two-count Indictment against Epstein, including one count of Sex

Trafficking Conspiracy and one count of Sex Trafficking for violations of 18 U.S.C. §1591, in part due to Epstein's criminal activities in his New York Mansion located at 9 East 71st Street. *See United States v. Jeffrey Epstein*, Case No. 1:19-cr-480 (S.D.N.Y.).

39.     On July 8, 2019, Jeffrey Epstein was arrested pursuant to the New York Indictment.

40.     On August 10, 2019, prison guards found Epstein unresponsive in his Metropolitan Correctional Center jail cell, where he was awaiting trial on the federal sex trafficking charges. He was later pronounced dead from apparent suicide.

41.     In July 2020, Epstein's co-conspirator in the sex-trafficking venture, Maxwell, was arrested on federal sex-trafficking charges filed in the Southern District of New York. The charges alleged that she had assisted, facilitated, and contributed to Epstein's abuse of sex-trafficking victims, helping Epstein to recruit, groom, and ultimately abuse his victims. *See United States v. Maxwell*, Case No. 1:20-cr-00330 (S.D.N.Y.).

42.     On December 29, 2021, after a weeks-long jury trial during which witnesses testified about Epstein's sex-trafficking operation in painstaking detail, Maxwell was found guilty on five federal sex-trafficking counts and is now serving nearly 20 years in federal prison for these crimes.

**B.      Consistent With Epstein's Uniform Pattern and Practice, Jane Doe Was Forced to Engage in Commercial Sex Acts with Epstein by Means of Force, Fraud, and Coercion.**

43.     Jane Doe was living in Russia when she met Jeffrey Epstein in 2011.

44.     Epstein and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Jane Doe.  Epstein and his co-conspirators constantly reminded Jane Doe how powerful and important Epstein was.

45. The well-oiled Epstein sex abuse and trafficking venture included frequent statements to Jane Doe and other victims by Epstein and his co-conspirators that: (1) Epstein possessed extraordinary wealth, power and influence; (2) Epstein's business and political friends, including world leaders, also included some of the most powerful people in the world; (3) Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise; (4) medical and other life necessities would be denied victims if they failed to perform commercial sex acts for Epstein; and (5) Epstein could take away Jane Doe's and other victims' life necessities such as shelter or housing if she or they failed to perform those acts.

46. Jane Doe was exceptionally vulnerable to being victimized by Epstein. His sex-trafficking venture targeted vulnerable young women and Jane Doe was soon indoctrinated and unable to extricate herself. Jane Doe was sexually abused and trafficked by Epstein for several years. Having been conditioned that the sexual abuse was "normal" and knowing that everyone surrounding Epstein, including accountants, lawyers, and other important people, were aware of the sex abuse, Jane Doe was coerced into a cult-like life controlled and manipulated by Epstein and others doing Epstein's bidding.

47. Over the ensuing years, from 2011 through 2019, Epstein sexually abused Jane Doe on at least 100 occasions, including but not limited to, forcibly touching her, forcibly raping her, and forcing her to engage in sexual acts with other women for his own depraved sexual gratification.

48. Epstein used means of force, threats of force, fraud, coercion, abuse of process, and a combination of such means to cause Jane Doe to engage in commercial sex acts.

49. Epstein recruited Jane Doe to cause her to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including use of cellular telephones

and means of interstate transportation (such as aircraft that he owned or controlled).

50.     Epstein transported Jane Doe from New York to other states to cause her to engage in commercial sex acts.

51.     Jane Doe wanted to escape from the Epstein sex-trafficking venture, yet Epstein and his supporting team of co-conspirators increased the tactics of fraud, force, or coercion to cause her to remain compliant in fulfilling Epstein's sexual demands.

52.     Jeffrey Epstein controlled Jane Doe financially, emotionally, and psychologically. He used his knowledge of Jane Doe's aspirations, fears and problems to manipulate her until she was completely controlled by and dependent upon him.

53.     From 2011 through 2019, Jane Doe was paid repeatedly by Jeffrey Epstein in furtherance of his sex trafficking operation.

54.     On May 15, 2013, Jane Doe opened a bank account at Bank of America at the direction of Richard Kahn and immigration attorney Arda Beskardes, as part of an Epstein/ Kahn/Indyke plan to defraud immigration officials.

55.     As soon as the account was opened, Kahn wired $14,073.00 into the account.

56.     Thereafter, Epstein and Kahn began to utilize the account without explanation to Jane Doe. For example, on July 24, 2013, Kahn's assistant, Bella Klein, informed Jane Doe that Epstein wanted to wire $12,000 into her account. Jane Doe was unaware of any reason for the transfer as well as whether or not the money was being wired for her own use or for some other purpose.

57.     Kahn and Klein also utilized the account to provide Jane Doe with money from Epstein for monthly rent to create documentation to be provided to immigration. Another account at Bank of America was created in the name of Jane Doe in order to do so.

58.     In May 2015, Jane Doe was informed by Klein that Epstein was adding her to the payroll for a sham company and that payments would be made to her through one of the Bank of America accounts opened in Jane Doe's name. Jane Doe was completely unaware of what that meant or why she was being added to payroll.

59.     In December 2015, Klein and Epstein transferred seven months of rent into one of the Bank of America accounts in Jane Doe's name.

60.     In April 2016, Kahn completed Jane Doe's taxes and ensured that she had enough of Epstein's money to pay taxes from one of the Bank of America accounts in Jane Doe's name.

61.     In addition to depositing money into one of Jane Doe's Bank of America accounts for rent, payroll, and taxes, for immigration purposes, Kahn and Klein also used the account to regularly provide Jane Doe with reimbursement money, all from accounts (typically at Deutsche Bank) in known sexual predator Jeffrey Epstein's name.

62.     By October 2016, Epstein was still making transfers through Kahn from accounts in his name at Deutsche Bank into one of the accounts held by Jane Doe at Bank of America—all of which should have raised concern to Bank of America.

63.     In March 2017, Darren Indyke instructed Jane Doe to contact Klein at the direction of Kahn to transfer $725 from Epstein into one of Jane Doe's Bank of America accounts so that she could write a check for $725 to her immigration attorney.

64.     In addition to the obvious red flags that should have arisen from the banking transactions in Jane Doe's accounts related to Jeffrey Epstein, monthly rent payments were being made from one of her Bank of America accounts to 301/66 Owners Corp with an address of 301 East 66th Street, an address known to be affiliated with sexual predator Epstein.

65.     Furthermore, a review of Jane Doe's account history will show incredibly alarming and erratic banking behavior, as Epstein, through one of his loyal employees, would utilize Jane Doe's account, often without her knowledge, to conduct business in amounts that were not typical for Jane Doe, and that would have in fact been impossible based on Jane Doe's income or typical pattern of deposit. When Jane Doe questioned Epstein or Kahn about irregularities with her account, she was told not to worry about it, as the account was being used to serve Epstein, not Jane Doe. Jane Doe was a victim of international sex trafficking who knew better than to question Epstein, Kahn, Indyke, or any of those working for and at Epstein's direction.

66.     At least one of Jane Doe's bank accounts at Bank of America continued to be utilized by Epstein and Kahn through Epstein's death in 2019 for activities unknown and unexplained to Jane Doe.

67.     Epstein and his co-conspirators continued to coerce Jane Doe in various ways, including by holding his control over her immigration status over her head, until her ultimate escape when Jeffrey Epstein died.

68.     Epstein and his co-conspirators continued to coerce Jane Doe to engage in commercial sex with Epstein, through the use of Epstein's force, fraud, and coercion, through 2019.

**C.     Bank of America's Role in the Sex-Trafficking Venture**

**1. Banking laws and regulations exist to prevent funding of criminal ventures.**

69.     The Federal Bank Secrecy Act ("BSA") requires financial institutions to have adequate anti-money laundering ("AML") policies and systems in place. New York state law also requires financial institutions to devise and implement systems reasonably designed to identify and report suspicious activity and block transactions prohibited by law.

70.     All regulated institutions are expected to configure systems based on their unique risk factors, incorporating parameters such as institution size, presence in high-risk jurisdictions, and the specific lines of business involved, and the institutions have an affirmative duty to ensure that their systems run effectively.

71.     In addition to having effective AML controls in place, it is also necessary for financial institutions to monitor their customers for the purpose of preventing their customers from facilitating criminal activity using the institutions' facilities.

72.     As part of preventing criminal activity, Know Your Customer ("KYC") and customer due diligence are critically important, and financial institutions must collect customer information at the time of establishing new relationships with clients, including as necessary to assess the risks associated with the client. To properly consider these risks, financial institutions must consider relevant factors such as the nature of the client's business, the purpose of the client's accounts, and the nature and duration of the relationship.

73.     Financial institutions must also conduct KYC reviews for each client relationship at intervals commensurate to the AML risks posed by the client, including reviewing account activity to determine whether such activity fits with what would have been expected given the nature of the account. Each client's AML risk should also be re-assessed if material new information or unexpected account activity is identified.

74.     Financial institutions must also establish criteria for determining when a client relationship poses too high of a risk and therefore must be terminated. A financial institution may be liable under applicable laws if it maintains such a relationship despite repeated indications of facilitation of improper transactions.

**2.  Bank of America participated in Epstein's sex-trafficking venture.**

75.     Bank of America knowingly and intentionally participated in the Epstein sex-trafficking venture by providing the underpinnings for Epstein to have ready and reliable access to financial resources to recruit, lure, coerce, and entice young women and girls to cause them to engage in commercial sex acts and other degradations.

76.     In furtherance of his rapidly growing sexual abuse and sex trafficking operation, Epstein realized that he needed reliable banking institutions that would provide the necessary legitimate appearance for his operation, allow him to open many accounts for illegitimate companies, ignore red flags and relevant state and federal banking laws, permit him to transfer money without questioning, allow him access to abundant cash, and to otherwise knowingly facilitate the commercial aspect of his commercial sex trafficking venture.

77.     On July 6, 2020, a Consent Order penalizing Deutsche Bank $150 million was entered in favor of the NY Department of Financial Services finding violations against Deutsche Bank for violations of KYC laws.  The Order detailed criminal activity committed by Epstein's top loyalists, Darren Indyke and Richard Kahn, identified respectively in the consent order as "ATTORNEY-1" and "ACCOUNTANT-1," who were carrying out suspicious financial actions in furtherance of Epstein's sex-trafficking operation. Epstein, through these individuals, was carrying out similar suspicious activity through Bank of America as well.  Indyke and Kahn, the two main Epstein organization employees responsible for carrying out the financial, immigration, and logistics work for the sex-trafficking operation, communicated with Bank of America directly in highly suspicious manners.  Given their suspicious roles and actions related to Epstein-related accounts Indyke and Kahn are likely personally identified in the Bank's internal monitoring and untimely reporting.

78.     For years, Bank of America knowingly and intentionally participated in the Epstein

sex-trafficking venture by (among other things) providing the essential financial underpinnings for the venture. It also financially benefitted from that participation and was financially incentivized to retain Epstein as a client due to his connections and referrals of other high-net-worth clients to the Bank.

79. Epstein could not expand his operation to the level it ultimately reached without complicit financial banking institutions that would ignore red flags and assist him in his sex-trafficking scheme. He could not risk having a typical banking relationship where the bank might uncover something suspicious and report him to law enforcement. The essential ingredient Epstein needed to expand his sexual abuse of young women and sex trafficking venture was a financial institution that would know—but not care—that Epstein was sexually abusing women on a daily basis and paying out millions in hush money. Epstein needed an institution that would in fact assist and participate in that activity, and that would support his venture and conceal it if he was ever caught.

80. Rather than merely providing routine banking services to Epstein, Bank of America went far beyond what a non-complicit bank would have done and instead assisted Epstein in setting up the necessary financial structure to operate his sex-trafficking venture.

81. Bank of America also failed to follow routine banking practices of reviewing Epstein-related accounts against the backdrop of the public information outing him as a serial sex abuser and reporting Epstein for what was obviously a sex trafficking operation he was running. Bank of America, for example, purposely and deliberately failed to timely file required Suspicious Activity Reports ("SARs") for Epstein's suspicious activities. In short, instead of behaving as an ordinary provider of routine banking services, Bank of America instead assisted Epstein in covering up his past crimes and committing new ones.

82.     Recent investigation into Epstein's crimes has revealed that billionaire Wall Street financier Leon Black paid Epstein including $170 million for purported "tax and estate planning advice" from his Bank of America account.[6] As a recent letter to the U.S. Treasury Department explains, this $170 million amount, "far more than other professional attorneys and advisors involved in Black's estate planning," is "an abnormal amount to pay for tax advice, yet no satisfactory explanation has been provided as to why Black paid Epstein such extraordinary sums without a written contract or agreement."[7]

83.     A $62 million settlement between Black and the U.S. Virgin Islands that gave Black immunity from sex trafficking charges in the USVI includes an admission that "Epstein used the money Black paid him to partially fund his operations in the Virgin Islands."[8] This means that one of the most powerful billionaires on Wall Street financed Epstein's trafficking operations in the USVI with impunity.

84.     Rather than do their due diligence and file a SAR as to these highly suspicious transactions, Bank of America sat idly by while Epstein and his co-conspirators trafficked and abused women. Bank of America's failure to timely file SARs about Epstein's sex-trafficking venture, in spite of numerous red flags, was wrongful and purposeful.

85.     Indeed, Bank of America chose not to cooperate with law enforcement and other investigations into Epstein's sex trafficking at any time, because it knew it would be exposed as assisting in Epstein's scheme.

86.     With Bank of America's complicity, Epstein was free to sexually abuse hundreds of women without the fear of detection by law enforcement. Epstein used the support of a reputable

---

[6] Wyden Letter at 1.
[7] *Ibid.* at 2.
[8] *Ibid.* at 3.

institution—Bank of America —to help cover up his sex-trafficking venture.

87.    Bank of America cared about one thing—profit—and showed absolute loyalty to Epstein, including a willingness to violate banking laws, ignore multiple red flags of criminality, and participate directly in sex trafficking to enable Epstein to fulfill his abusive sexual appetite at the expense of countless vulnerable young women.

88.    Epstein only offered his business to Bank of America because it was knowingly aiding Epstein's sex trafficking operation and the concealment thereof.  Bank of America knew that if it stopped aiding the operation, it would lose the Epstein-related accounts and the financial benefits attached to handling those accounts.

89.    Bank of America assisted and participated in Epstein's sex-trafficking venture by knowingly providing financial services which enabled him to make payments to victims, including directly or indirectly Jane Doe, and others similarly situated.

90.    Ultimately, Bank of America financially benefitted in the form of profits, high-net-worth clients, and other financial incentives, for its participation in the Epstein sex-trafficking venture.

91.    Throughout its relationship with Epstein, Bank of America violated numerous banking laws and regulations in order to conceal and continue its lucrative venture facilitating the Epstein sexual abuse and sex-trafficking scheme.

92.    In taking the steps described immediately above, Bank of America obstructed, attempted to obstruct, and interfered with the federal government's enforcement of the TVPA.

**3.  Bank of America knew about Epstein's sex-trafficking venture.**

93.    Bank of America directly aided Epstein's sex trafficking venture by allowing Epstein to engage in structuring violations and other financial maneuvers required to maintain and

conceal his criminal venture.

94.    In 2006, Epstein was publicly exposed for sexually abusing dozens of young women and girls, several as young as 14 years old. There were hundreds of pages of police reports and news articles revealing that Epstein was a serial sexual abuser and trafficker, and that his operation depended on his accessing nearly unlimited cash to use as payments to his victims.

95.    The criminal investigation also publicly revealed that Epstein was paying countless recruiters to constantly bring him more victims.

96.    The money trail into the Epstein-related accounts was a dead giveaway that Epstein was engaging in crimes and the recipients of his money exposed the type of crimes.

97.    As of this point, Bank of America knew that Jeffrey Epstein was an international sex trafficker. Indeed, everyone knew or should have known at least after 2006 that Epstein was running a sex-trafficking scheme paying many victims with enormous amounts of cash as well as suspicions wire transfers, and that he was using loyal employees to do so.  To the extent Bank of America could publicly feign plausible deniability before Epstein's arrest in 2006, thereafter its ability to play dumb was eviscerated, as the details of his daily sexual abuse of young females came to public light and when he ultimately was required to register as a sex offender.

98.    Because Epstein was so publicly exposed as a sex trafficker and abuser, one of his primary financial engines, Les Wexner, abandoned him and separated himself from Epstein.

99.    In the summer of 2008, Epstein's non-prosecution agreement ("NPA") with the U.S. Department of Justice was made public when it was unsealed in connection with a challenge to the NPA by two of his victims. Among other things, the agreement outlined the possible federal sex offense charges that could have resulted from the investigation, including TVPA charges.

100.    Epstein's legal team also garnered significant publicity between 2006 and 2008,

not only because of their well-known names but also the unusual number of them. Epstein hired Alan Dershowitz, Roy Black, Ken Starr, Jay Lefkowitz, Guy Lewis, Michael Tien, Lily Ann Sanchez, Gerald Lefcourt, Guy Fronstein, Jack Goldberger, and more. All of these lawyers were now on Epstein's payroll and millions of dollars were being shelled out to these attorneys to pay for his legal defense of the most heinous of sexual abuse allegations from accounts at complicit financial institutions like Bank of America.

101.    As this point in time in 2008, Jeffrey Epstein was a registered sex offender accused of maintain inordinate amounts of cash to pay underage victims and hush money for witnesses and paying attorneys and investigators to harass same. With indisputable publicly available knowledge that Epstein was a sexual offender who was using his wealth to run a sexual abuse and trafficking operation, any responsible bank providing only routine banking services would have cut ties with Epstein.

102.    Court proceedings against the government involving the challenge to Epstein's NPA also continued beyond 2008 and attracted significant media attention. Indeed, for years, hundreds of press reports outlined the allegations underlying the NPA and to varying degrees detailed the involvement of Epstein's alleged co-conspirators, including Lesley Groff.

103.    Additionally, press reports during this time noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped develop with his friend and known sexual abuser, Jean-Luc Brunel, brought "young girls . . . often from Eastern Europe" to the U.S. on Epstein's private jets.

104.    For Bank of America, a sophisticated financial institution legally responsible for complying with Know Your Customer laws and other banking obligations, the details of Epstein's sexual abuse and trafficking were not a surprise. Even so, Bank of America never cooperated in

any civil or criminal case against Epstein, because to do so would reveal Bank of America's complicity in Epstein's operation.

105. Despite knowledge of Epstein's illegal trafficking operation, Bank of America continued to aid Epstein in his sex trafficking venture.

106. Bank of America through its agents and employees, had knowledge that Epstein was operating a sex-trafficking venture and that he needed extraordinary banking services from Bank of America to successfully operate that illegal venture.

107. Bank of America also knew from the press that Epstein was a registered sex offender who was always surrounded by young girls. Even so, Bank of America still set up an operation where Epstein could operate the financial aspects of the trafficking scheme.

**4. Epstein uses Bank of America accounts for the sex-trafficking venture, and Bank of America directly benefits from the venture.**

108. Over the course of the relationship, Epstein and his associates used Bank of America accounts and the bank's financial services in furtherance of the sex-trafficking scheme.

109. Bank of America was aware that known associates of Epstein also had Bank of America accounts, including Ghislaine Maxwell and Leon Black.

110. Given Bank of America's knowledge about Epstein's past sex trafficking, its continuation of its financial relationship with Epstein was, at a minimum, in reckless disregard of the fact that Epstein was using means of force, threats of force, fraud, coercion (and a combination of such means) to cause Epstein's victims to engage in commercial sex acts.

111. If a financial institution decides to do business with a high-risk client, that institution is required to conduct due diligence commensurate with that risk and to tailor its transaction monitoring to detect suspicious or unlawful activity based on what the risk is. Bank of America knowingly, intentionally, deliberately, and maliciously failed to do so with regard to its

relationship with Epstein.

112. Bank of America knowingly and intentionally benefitted financially and in other ways from its participation in Epstein's sex-trafficking venture with knowledge, or with reckless disregard to the fact, that Epstein used means of force, threats of force, fraud, and coercion (and combinations thereof) to force young women and girls into engaging in commercial sex acts.

113. By facilitating and financing Epstein's commercial sex acts in interstate and foreign commerce, Bank of America earned interest, commissions, service fees, and other financial benefits directly from its connection with Epstein, Epstein-related entities, and others acting in concert with Epstein. Epstein provided those financial benefits to Bank of America precisely because it was facilitating his sex-trafficking venture—and Bank of America knew that was the reason that Epstein was providing them with those financial benefits.

114. Bank of America benefitted by receiving things of value from its participation in the Epstein sex-trafficking venture, including (1) connections with Jeffrey Epstein, his co-conspirators, and his wealthy friends and associates; (2) additional deposits from Epstein, his co-conspirators, and his wealthy friends and associates; (3) the opportunity to earn financial benefits from the funds that had been deposited with it. Bank of America knowingly and intentionally received these things of value as a direct result of its participation in the Epstein sex-trafficking venture and because it was furthering Epstein's sex-trafficking venture.

## CLASS ACTION ALLEGATIONS

115. Jane Doe brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class:

All women who were sexually abused or trafficked by Jeffrey Epstein or Epstein's co-conspirators during the time when Bank of America maintained bank accounts for Epstein,

Epstein's co-conspirators, Epstein related-entities, and/or Epstein-related accounts (the "Class Period").

116. Jane Doe reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

117. **Numerosity:** The Class consists of dozens of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual Class members are ascertainable through records maintained by the Epstein Estate and Defendant, including but not limited to records for Epstein-related accounts (e.g., account ledgers reflecting payments from Epstein to Class members).

118. **Typicality:** Jane Doe's claims are typical of the claims of the other Class members she seeks to represent. The claims of Jane Doe and the other Class members are based on the same legal theories and arise from the same unlawful pattern and practice of Defendant's participation in and funding of the Epstein's sexual abuse and Epstein's sex-trafficking venture.

119. **Commonality:** There are many questions of law and fact common to the claims of Jane Doe and the other Class members, and those questions predominate over any questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

120. **Common Questions of Fact and Law affecting Class Members** include, but are not limited to, the following:

    a. Whether Epstein ran a sex-trafficking venture;

    b. Whether the Epstein sex-trafficking venture caused its victims to engage in commercial sex acts in violation of Trafficking Victims Protection Act, 18

24

U.S.C. § 1591(a)(1);

c. Whether the Epstein sex-trafficking venture recruited, enticed, solicited, harbored, provided, obtained, and transported victims in ways that were in or affecting interstate or foreign commerce;

d. Whether Epstein and his co-conspirators used means of force, fraud, coercion, and abuse of legal process, or a combination of such means, to sexually abuse the victims and to cause victims to engage in commercial sex acts;

e. Whether Bank of America knew or recklessly disregarded the existence of the Epstein sex-trafficking venture;

f. Whether Bank of America participated in the Epstein sex-trafficking venture;

g. Whether Bank of America knowingly and intentionally assisted, facilitated, and supported the Epstein sex-trafficking venture's pattern and practice of coercively forcing victims to engage in commercial sex acts;

h. Whether Bank of America benefitted financially or by receiving things of value from its participation in a venture which has engaged in sex trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1);

i. Whether Bank of America knew or should have known that the Epstein sex-trafficking venture had engaged in violations of the TVPA, 18 U.S.C. § 1591(a);

j. Whether Bank of America obstructed the enforcement of the TVPA with respect to Jeffrey Epstein's sex-trafficking venture;

k. Whether Bank of America owed a duty to Epstein's victims; and

l. Whether Bank of America breached its duty to Epstein's victims by providing banking services to Epstein and his associates.

121. Absent a class action, most of the Class members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

122. **Adequacy:** Jane Doe will fairly and adequately represent and protect the interests of the other Class members she seeks to represent. Jane Doe has retained counsel with substantial experience in prosecuting complex litigation and class actions. Jane Doe and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Jane Doe nor her counsel have any interests adverse to those of the other Class members.

123. This action has been brought and may properly be maintained as a class action against Bank of America pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from Bank of America's records.

124. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

a. Joinder of all Class Members is impracticable;

b. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Bank of America and result in the impairment of Class Member's rights and the disposition of their interests through

actions to which they were not parties;

c. Class action treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender;

d. Absent a class action, Class Members will continue to suffer losses and be aggrieved and Bank of America will continue to violate New York and federal law without remedy;

e. Class treatment of this action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured;

f. Jane Doe and her counsel are unaware of any class action brought against any Defendant for the violations alleged in this action;

g. The forum is desirable because Jane Doe conducted the subject business with Jeffrey Epstein in this District and Class Members were consequently trafficked in this District; and,

h. This action presents no difficulty that would impede its management by the Court as a class action.

## VII. CAUSES OF ACTION

### COUNT I
### KNOWING BENEFICIARY IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2), 1595

125.    Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 124, as if fully set forth in this Count.

126.    Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

127.    Bank of America knowingly and intentionally participated in, assisted, supported, and facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2).

128.    Bank of America took many concrete steps to aid Epstein's sex-trafficking venture, as outlined above. Among the concrete steps that Bank of America took to aid Epstein was providing financial services that made the sex-trafficking venture possible. Bank of America's willingness to provide these services was the quid pro quo for it receiving financial benefits from Epstein.

129.    Among the concrete steps that Bank of America took to aid and participate in the Epstein sex-trafficking venture were opening up accounts at Bank of America for Epstein, his related entities, and associates. By opening these accounts, Bank of America received many benefits from participating in Epstein's venture. The opening of these accounts was affirmative conduct that caused Bank of America to receive those benefits.

130.    Among the concrete steps that Bank of America took to aid the Epstein sex-trafficking venture, Bank of America willfully failed to timely file required SARs with the federal government, because doing so would imperil its ability to profit from the sex-trafficking venture. Bank of America's concealment of the cash transactions caused it to receive financial benefits through continuation of the Epstein sex-trafficking venture.

131.    Among the concrete steps that Bank of America took to aid the Epstein sex-trafficking venture were its failure to follow AML requirements. This failure was not just passive facilitation, but a deliberate omission by Bank of America. This omission was a specific act of

concealment, which allowed Epstein to continue funding his sex-trafficking venture through suspicious transactions that would have otherwise been prevented.

132.     By taking the concrete steps outlined above (along with the others alleged in this complaint), Bank of America knowingly participated in sex trafficking and furthered the Epstein sex-trafficking venture. The concrete steps above constituted taking part in the sex-trafficking venture and were necessary for its success.   The concrete steps above constituted active engagement by Bank of America in Epstein's sex-trafficking venture.

133.     Bank of America knowingly and intentionally benefited financially from, and received value for, its participation in the sex-trafficking venture, in which Epstein, with Bank of America's knowledge, or its reckless disregard of the fact, that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

134.     Bank of America helped to conceal the names of Epstein's victims from the public and from law enforcement and prosecuting agencies by helping to conceal the existence of the sex-trafficking venture. Among the ways in which Bank of America helped to conceal the venture's existence was by providing services to avoid leaving a visible "paper trail."

135.     Bank of America's concealment included failing to follow through on enhanced monitoring that was required for someone like Epstein.  Bank of America failed to implement that enhanced monitoring specifically to help conceal Epstein's ongoing sex-trafficking.

136.     Bank of America's concealment included failing to file required SARs for Epstein's suspicious transactions.

137.     In addition to having actual knowledge that it was participating in Epstein's sex

trafficking venture, Bank of America had constructive knowledge that it was participating in Epstein's sex trafficking venture. Bank of America also had constructive knowledge that Jane Doe, as well as other Members of the Class, were being coercively sex trafficked by Epstein. Its constructive knowledge extended to the names of Epstein's victims, because Epstein and his associates knew the names of the victims.

138.    Bank of America had constructive knowledge of Epstein's sex-trafficking venture because of specific acts by Epstein that put it on notice of a particular and ongoing sex trafficking venture.

139.    Bank of America benefited from Epstein's sex trafficking venture. Among the financial benefits it received were the deposit of funds that Epstein and Epstein-controlled entities made to Bank of America.

140.    Bank of America knowingly received financial benefits in return for its assistance, support, and facilitation of Epstein's sex-trafficking venture.

141.    Bank of America knew, and was in reckless disregard of the fact, that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and transport young women and underage girls for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

142.    Bank of America and its employees had actual knowledge that they were facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

143.    Despite such knowledge, Bank of America intentionally paid for, facilitated, and

participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which Bank of America knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe, as well as other Members of the Class, to engage in commercial sex acts.

144. In addition to actual knowledge that it was participating in and facilitating the Epstein sex-trafficking venture, Bank of America also should have known that it was participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C. § 1595(a).

145. By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, Bank of America is liable to Jane Doe and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

146. By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1595, Bank of America is liable to Jane Doe and other members of the Class for punitive damages.

<u>COUNT II</u>
**PARTICIPATING IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT,
18 U.S.C. §§ 1591(a)(1), 1595**

147. Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 124, as if fully set forth in this Count.

148. Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

149. Bank of America knowingly and intentionally participated in, perpetrated, assisted, supported, facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

150. Among other things, Bank of America knowingly and intentionally recruited, enticed, provided, obtained, advertised, and solicited by various means Jane Doe, as well as other

Class Members, knowing that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

151.     Bank of America and its officers and employees had actual knowledge that they were perpetrating and facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

152.     Despite such knowledge, Bank of America intentionally paid for, facilitated, perpetrated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which Bank of America knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe, as well as other Members of the Class, to engage in commercial sex acts.

153.     As part of perpetrating TVPA violations, Bank of America willfully failed to file required Suspicious Activity Reports (SARs) with the federal government.

154.     Bank of America's affirmative conduct was committed knowing, and in reckless disregard of the facts, that Epstein would use cash and the financial support provided by Bank of America as a means of defrauding, forcing, and coercing sex acts from Jane Doe as well as other Members of the Class. Bank of America's conduct was outrageous and intentional.

155.     Bank of America's knowing and intentional conduct has caused Jane Doe and the other Members of the Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

156.     Bank of America's knowing and intentional conduct has caused Jane Doe and the other Members of the Class harm that is sufficiently serious, under all the surrounding

circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

157.   This case does not involve mere fraud. Instead, Bank of America's conduct in perpetrating TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Bank of America's conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Bank of America's conduct was directed specifically at Jane Doe and other members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

158.   By virtue of its knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Bank of America is liable to Jane Doe and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

159.   By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, Bank of America is liable to Jane Doe and other members of the Class for punitive damages.

## COUNT III
### AIDING, ABETTING, AND INDUCING A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595

160.   Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 124, as if fully set forth in this Count.

161.   Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

162.   Acting through its officers and employees, Bank of America aided, abetted, and induced Epstein's sex-trafficking venture that was in and affecting interstate and foreign

commerce, together and with others, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

163.    Under 18 U.S.C. § 2, Bank of America is punishable as a principal under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, when it aided, abetted, and induced Epstein's sex-trafficking venture and sex trafficking of Jane Doe, as well as other Class Members.

164.    Under 18 U.S.C. § 2, Bank of America committed and perpetrated crimes in violation of 18 U.S.C. §§ 1591(a)(1) & (a)(2) by aiding, abetting, and inducing Epstein's sex-trafficking venture and sex trafficking of Jane Doe, as well as other Class Members.  As a consequence, Jane Doe, as well as other members of the Class, are victims of Bank of America's criminally aiding, abetting, and inducing Epstein's violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2).

165.    Acting through its officers and employees, Bank of America itself directly committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding, abetting, and inducing a sex-trafficking venture and the sex trafficking of Jane Doe, as well as other Class Members. Bank of America itself directly violated Chapter 77 by committing and perpetrating these violations.

166.    Among other things, Bank of America aided, abetted, and induced Epstein's sex-trafficking venture and sex trafficking of Jane Doe, as well as other Class Members, knowing that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

167.    By aiding, abetting, and inducing Epstein's sex-trafficking venture and sex trafficking of Jane Doe, as well as other Class Members, Bank of America knowingly benefitted, both financially and by receiving things of value, from participating in Epstein's sex-trafficking

venture.

168.    Bank of America and its officers and employees had actual knowledge that they were aiding, abetting, and inducing Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion. Bank of America knew, and should have known, that Epstein had engaged in acts in violation of the TVPA.

169.    Despite such knowledge, Bank of America intentionally paid for and aided, abetted, and induced Epstein's violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), which constituted perpetrating violations of those laws under 18 U.S.C. § 2. Bank of America knew, and acted in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe, as well as other Class Members, to engage in commercial sex acts.

170.    Bank of America's affirmative conduct of aiding, abetting, and inducing Epstein's violations was committed knowingly, and in reckless disregard of the facts, that Epstein would use cash and financial support provided by Bank of America as a means of defrauding, forcing, and coercing sex acts from Jane Doe as well as other Class Members. Bank of America's conduct was outrageous and intentional.

171.    Bank of America's knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Jane Doe and the other Class Members serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

172.    Bank of America's knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Jane Doe and the other Class Members harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the

same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

173.     This case does not involve mere fraud. Instead, Bank of America's conduct in aiding, abetting, and inducing Epstein's TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  Bank of America's conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Bank of America's conduct was directed specifically at Jane Doe and other members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

174.     By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Bank of America is liable to Jane Doe and the other members of the Class for the damages they sustained and reasonable attorneys' fees.

175.     By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, Bank of America is liable to Jane Doe and other members of the Class for punitive damages.

<u>**COUNT IV**</u>
**OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. § 1591(d)**

176.     Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 124, as if fully set forth in this Count.

177.     Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

178.     Bank of America and its officers and employees knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is hereinafter referred to

collectively simply as "obstruction."

179.    Bank of America's obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and Bank of America thereby violated Chapter 77, Title 18.  Bank of America's obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed Jane Doe, as well as other members of the Class, by directly resulting in them coercively being caused to engage in commercial sex acts and in other ways.

180.    As outlined above, the United States Department of Justice (including the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the Southern District of Florida) was investigating Epstein's federal criminal liability for violating (among other laws) the TVPA up to and following the return of an indictment against Epstein on or about July 8, 2019.  On or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein. The federal criminal investigation of Maxwell included investigation of possible violations of the TVPA.

181.    By providing financing for Epstein's sex trafficking organization, Bank of America obstructed, interfered with, and prevented the federal government's enforcement of the TVPA against Epstein. To the extent that the federal government was able to ultimately charge Epstein with TVPA violations, the filing of those charges was delayed by Bank of America 's actions. Because of that delay, Jane Doe as well as other members of the Class, were coercively caused to engage in commercial sex acts.

182.    Bank of America provided its services to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

183.     As another example of how Bank of America obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, Bank of America did not follow AML and anti-structuring reporting requirements found in the Banking Secrecy Act and other laws.  These requirements included an obligation that Bank of America would review transactions in Epstein's (and his associates') Bank of America accounts for a determination of whether they involved suspicious transactions.  If Bank of America had observed these requirements imposed by law, then it would have prevented many of the subsequent transactions committed by the Epstein sex-trafficking venture. Bank of America knowingly did not follow these requirements because it knew that doing so would have prevented Epstein's secret cash transactions that were necessary to his sex-trafficking operation escaping knowledge of federal investigative and prosecuting agencies.

184.     Bank of America obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, by failing to timely file with the federal government the required SARs that financial institutions must file with the FinCEN whenever there is a suspected case of money laundering or fraud. Timely filing of these reports is required by the Bank Secrecy Act and related laws and regulations.  By failing to timely file the required SARs regarding Epstein's cash and other suspicious transactions, Bank of America obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA by concealing from the federal government's attention Epstein's cash transaction in aid of sex trafficking.

185.     Bank of America's failure to timely file SARs about Epstein's sex-trafficking venture, in spite of numerous red flags, was wrongful and purposeful.

186.     If Bank of America had filed timely SARs, as required, about Epstein's sex-

trafficking venture with the federal government, the appropriate federal agencies would have been well positioned to investigate Epstein's sex-trafficking venture's TVPA violations. Bank of America's failure to timely file the required SARs obstructed the federal government's ability to investigate those TVPA violations, including violations harming Jane Doe and other Class Members. If Bank of America had timely filed the required SARs, it would have prevented the continuation of Epstein's sex trafficking venture, which required the ability to secretly use cash to payoff victims.

187. By providing Epstein and his associates, with banking services, Bank of America intended and knew that Epstein's coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies for some period of time.

188. Bank of America's obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly. For example, Bank of America knew that Epstein was high risk—specifically, high risk to violate the TVPA through continuing criminal sex trafficking activities.

189. Bank of America was well aware that Epstein had pleaded guilty and served prison time for engaging in sex with a minor—a crime closely connected with sex trafficking in violation of the TVPA. Bank of America was also well aware that there were public allegations that his illegal conduct was facilitated by several named co-conspirators. Bank of America's intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by federal investigators and prosecuting agencies.

190. Bank of America's obstruction of the federal government's TVPA and other law enforcement efforts was intentional and willful and, therefore, Bank of America intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Jane Doe and other

Class Members through its obstruction supporting the concealment of Epstein's sex-trafficking venture.

191. Bank of America knew, acted in reckless disregard of the fact, and should have known, that its obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe and other Class Members. Bank of America's obstruction has caused Jane Doe and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

192. Bank of America's obstruction has caused Jane Doe harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

193. This case does not involve mere fraud. Instead, Bank of America's conduct in obstructing enforcement of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Bank of America's obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Bank of America's obstruction was directed specifically at Jane Doe and other members of the Class, who were the victims of Epstein's sex trafficking organization.

194. By virtue of these violations of 18 U.S.C. § 1591(d), Bank of America is liable to Jane Doe and the other Members of the Class for the damages they sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. Bank of America perpetrated an obstruction of

the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

195.     By virtue of its intentional and outrageous obstruction to prevent enforcement of the TVPA, in violation 18 U.S.C. § 1591(d), Bank of America is liable to Jane Doe and other members of the Class for punitive damages by operation of 18 U.S.C. § 1595.

**COUNT V**
**NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE TO PREVENT PHYSICAL HARM**

196.     Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 124, as if fully set forth in this Count.

197.     Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

198.     In addition to any duties that might arise as a financial institution (as alleged in the next Count, below), Bank of America owed a duty to Jane Doe and the Class Members to exercise reasonable care to avoid conduct that created a risk of physical harm to them. Bank of America's duties included a duty to exercise reasonable care to avoid conduct that would combine with Epstein's (and others') crimes, and permit Epstein's crimes, in violation of Chapter 130.

199.     Bank of America's own conduct in providing financial and other support for Epstein's sex trafficking venture set forces in motion that directly and proximately injured and caused physical harm to Jane Doe and the Class Members.  These forces that Bank of America set in motion caused Epstein's intentional tortious conduct and Chapter 130 Crimes against Jane Doe and the Class Members, causing physical harm and in themselves constituted physical harm to Jane Doe and the Class Members. Bank of America owed Jane Doe and the Class Members a duty not to set those forces in motion because they unreasonably created a risk of physical harm.

200.     Bank of America reasonably could foresee, and did in fact foresee, that its negligent

failure to prevent physical harm would result in physical harm to Jane Doe and the Class Members. Bank of America owed a duty to prevent that physical harm.

201.     Bank of America failed to act objectively reasonably in failing to take precautions to prevent Epstein's intentional tortious conduct and sex-trafficking and sex crimes in violation of Chapter 130, which were committed against Jane Doe and the Class Members. If Bank of America had acted reasonably to prevent physical harm, it would not have supported and allowed Epstein's sex-trafficking and sex crimes to occur. Bank of America owed Jane Doe and the Class members a duty to act objectively reasonably.

202.     At the time of Bank of America's own negligent conduct, Bank of America both realized and should have realized the likelihood that it was creating an opportunity for Epstein to commit intentional tortious conduct and Chapter 130 Crimes against Jane Doe and the Class Members. Indeed, Bank of America knew that its own conduct was necessary to create Epstein's and others' opportunities to engage in that conduct and commit those crimes. Bank of America owed Jane Doe and the Class Members a duty not to create those opportunities for Epstein and others.

203.     In aiding, abetting, and facilitating Epstein's tortious conduct and crimes, Bank of America committed intentional torts directed against Jane Doe and the Class Members. Bank of America's aiding, abetting, and facilitating Epstein's tortious conduct and crimes were its own wrongful acts and omissions. Bank of America had a duty not to commit tortious conduct and crimes—specifically aiding, abetting, and facilitating New York sex crimes as described above— directed against Jane Doe and the Class Members.

204.     Bank of America's breaches of its legal duties were the direct—*i.e.*, the but-for— cause of physical and psychological injuries to Jane Doe and the Class Members.  Without Bank

of America's breaches of legal duties, those injuries would not have occurred. The injuries that occurred were readily foreseeable to Bank of America and proximately caused by Bank of America's breaches.

205. Jane Doe and the Class Members were easily within the zone of foreseeable harm from Bank of America's negligent acts and omissions. Bank of America's negligent acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact. Tragically, Jane Doe and the Class Members fell within that zone.

206. Because of Bank of America's negligent failure to prevent physical harm to Jane Doe and the Class Members, it is liable to Jane Doe and the Class Members for damages suffered as a direct and proximate result.

207. As a direct and proximate result of Bank of America's negligent failure to prevent physical harm, Jane Doe and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy. Bank of America's aiding, abetting, and facilitating Epstein's tortious conduct and sex crimes in violation of Chapter 130 directly and proximately caused Epstein's sex crimes.

208. By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Defendant is liable to Jane Doe and other Members of the Class for punitive damages.

## COUNT VI
### NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE AS A BANKING INSTITUTION PROVIDING NON-ROUTINE BANKING

209. Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 124, as if

fully set forth in this Count.

210.    Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

211.    Bank of America owed a duty to Jane Doe and the Class Members not to knowingly provide non-routine banking assistance to Epstein that it knew, and had reason to know, would lead to and support intentional tortious conduct and Chapter 130 Crimes by Epstein (and others) against Jane Doe and the Class Members.

212.    Bank of America participated in, aided and abetted, and facilitating his sex-trafficking venture and his commission of intentional tortious conduct and Chapter 130 crimes. Bank of America also knew, and was willfully blind to the fact, that it was going beyond providing routine banking by facilitating Epstein's sex-trafficking venture and his commission of Chapter 130 crimes.

213.    Bank of America deliberately failed to follow numerous banking requirements in connection with financial dealings with Epstein, including AML rules, KYC rules, and anti-structuring rules. In deliberately ignoring and failing to follow those rules, Bank of America acted in a non-routine way to facilitate and support Epstein's and his co-conspirators' intentional torts, sex-trafficking and commission of Chapter 130 Crimes.

214.    Bank of America failed to act objectively reasonably by failing to comply with relevant banking laws and regulations with regard to its interactions with Epstein and his co-conspirators. Bank of America owed a duty to Jane Doe and the Class Members to act objectively reasonably in its interactions with Epstein and his co-conspirators and to exercise reasonable care to prevent them from engaging in foreseeable intentional torts and criminal activity by using Bank of America's exceptional and non-routine banking assistance.

215.     Bank of America owed a legal duty to Jane Doe and the Class Members to act objectively reasonably and to not deliberately ignore banking obligations, including KYC and AML laws and regulations described above, so as to provide Epstein and others with an opportunity to engage in coercive sex-trafficking and Chapter 130 Crimes.

216.     Under KYC, AML, and related laws and regulations, Bank of America had special duties not ignore crimes being committed by its customers—duties above and beyond any duties that the general public may have. The inquiries that banks must make include duties to inquire about specific individuals who banks know are being harmed. The regulations establish a duty of care that must be followed by banks, including Bank of America. These duties exist at least in situations where a bank is knowingly going beyond offering routine banking to its customers and offering bank accounts, currency, and other assistance specially adapted to facilitate crimes.

217.     Bank of America also owed Jane Doe and the Class Members a duty of care because it knew, and had reason to know, that Epstein and his co-conspirators were using Bank of America to facilitate a sex-trafficking venture, raising a duty to make a reasonable inquiry about suspicious activity.

218.     Bank of America owed Jane Doe and the Class Member a duty not to deliberately and purposely fail to file SARs, which would have alerted federal authorities to Epstein's and his co-conspirators' illegal activities, including committing Chapter 130 Crimes.

219.     Bank of America also owed Jane Doe and the Class Members a duty to prevent physical harm to them when confronted with explicit information that Epstein and his co-conspirators were using Bank of America's non-routine assistance to further a sex-trafficking venture harming Jane Doe and the Class Members.  Once Bank of America had information about Epstein's use of Bank of America for a sex-trafficking venture that was physically harming Jane

Doe and the Class Members, it owed them a duty of care to investigate and prevent Epstein's and his co-conspirators' suspicious and criminal activities.

220.    In the exercise of reasonable care, Bank of America and its employees knew, and should have known, of the dangerous propensities of Jeffrey Epstein to commit violations of article 130 of New York Penal Law against women and girls with whom he was in close proximity, including Jane Doe and the Class Members.

221.    Bank of America breached its legal duties to Jane Doe and the Class Members as described above. Bank of America's breach of its duties led to it failing to prevent Epstein from committing Chapter 130 Crimes against Jane Doe and the Class Members. Bank of America realized that Epstein were committing Chapter 130 Crimes against Jane Doe and the Class Members. The criminal activity that harmed Jane Doe and the Class Members included foreseeable TVPA and Chapter 130 Crimes committed by Epstein.

222.    As a direct and proximate result of the breach of legal duties by Bank of America, Jane Doe and the Class Members repeatedly suffered direct and foreseeable injuries from Epstein and his co-conspirators, including federal and state sexual offenses (including sexual assaults) and resulting emotional distress, mental pain and suffering, and other physical, psychological, and other injuries.

223.    The breaches of legal duties were the direct—*i.e.*, the but-for—cause of these physical and psychological injuries to Jane Doe and the Class Members.  Without Bank of America's breaches of legal duties, those injuries would not have occurred.  The injuries that occurred were readily foreseeable to Bank of America.

224.    The injuries that Plaintiff Jane Doe and the Class Members suffered included injuries directly and proximately suffered while they were adults who were present in this District.

These injuries are permanent in nature and Jane Doe and the other Class Members will continue to suffer these losses in the future.

225.    Bank of America could reasonably foresee that their actions and omissions in facilitating Epstein's sex trafficking venture would lead to intentional torts and sex offenses against Jane Doe and the Class Members. Indeed, Bank of America was aware, and should have been aware, that Epstein was a high risk to commit sex offenses against young women and girls.

226.    Jane Doe and the Class Members were easily within the zone of foreseeable harm from Bank of America's negligent acts and omissions. Bank of America's acts and omissions foreseeably created substantial risk of Jeffrey Epstein committing sex crimes against young women with whom he was in contact. Tragically, Jane Doe and the Class Members fell within that zone.

227.    While the foregoing allegations easily make out a clear case of negligence, this case does not involve mere negligence. Instead, Defendant's tortious conduct in this case evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. It also involved outrageous and intentional acts and omissions, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization. Defendants' tortious conduct was directed specifically at Jane Doe and other Members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

228.    As a result of Bank of America's negligent actions and omissions described in this Count, Jane Doe and the Class Members have sustained both general and specifical damages from physical and psychological injury in substantial amounts.

229.    By virtue of acting intentionally, outrageously, and with a high degree of moral

turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Bank of America is liable to Jane Doe and other Members of the Class for punitive damages.

## REQUEST FOR RELIEF

Jane Doe respectfully requests that the Court enter judgment in her favor, and against Bank of America, as follows:

a. That the Court certify the Class, name Jane Doe as Class Representative, and appoint her lawyers as Class Counsel;

b. That the Court award Plaintiff and the other members of the Class compensatory, consequential, general, nominal, and punitive damages against Defendant in an amount to be determined at trial;

c. That the Court award punitive and exemplary damages against Defendant in an amount to be determined at trial;

d. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e. That the Court award pre- and post-judgment interest at the maximum legal rate; and

f. That the Court grant all such other and further relief as it deems just and proper.

## JURY DEMAND

Plaintiff and the Class demand a trial by jury on all claims so triable.

Dated: October 15, 2025

Respectfully submitted,

By: */s/ David Boies*

David Boies
Boies Schiller Flexner LLP

55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 446-2300
dboies@bsfllp.com

Sigrid McCawley
Boies Schiller Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33316
(954) 356-0011
smccawley@bsfllp.com

Bradley J. Edwards
Brittany N. Henderson
Edwards Henderson
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
(954) 524-2820
brad@cvlf.com
brittany@cvlf.com