**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated, <br><br>     Plaintiff, <br><br>        v. <br><br> BANK OF AMERICA, N.A., <br><br>     Defendant. | Case No. 25-cv-8520 (JSR) |
| JANE DOE, individually and on behalf of all others similarly situated, <br><br>     Plaintiff, <br><br>        v. <br><br> THE BANK OF NEW YORK MELLON CORP., <br><br>     Defendant. | Case No. 25-cv-8525 (JSR) |

**PLAINTIFF JANE DOE'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANT BANK OF AMERICA, N.A.'s MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 3

ARGUMENT ................................................................................................................................ 7

    I.  DOE HAS PROPERLY PLED CLAIMS UNDER THE TVPA ........................................ 7

        A.  The Complaint States a Claim for TVPA Participation Liability (Count I). ............... 8

            1.  Bank of America Participated in Epstein's Sex-Trafficking Venture. ............ 8

            2.  Bank of America Knew or Should Have Known About Epstein's Sex-Trafficking Venture. .................................................................................. 12

            3.  Bank of America Benefited from its Participation in Epstein's Sex-Trafficking Venture. .................................................................................. 14

        B.  The Complaint States a Claim for Obstruction of TVPA Enforcement (Count IV). ........................................................................................................................ 15

    II. DOE HAS PROPERLY PLED HER NEGLIGENCE CLAIMS ..................................... 16

        A.  Doe's Negligence Claims Are Not Time-Barred. ....................................................... 16

        B.  The Complaint States Two Claims for Negligence (Counts V–VI). .......................... 21

            1.  Doe Adequately Alleges a Duty Sufficient to State a Negligence Claim. ...................................................................................................... 21

            2.  Doe Adequately Alleges Causation Sufficient to State a Negligence Claim. ...................................................................................................... 23

CONCLUSION ............................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*A.B. v. Wyndham Hotels & Resorts, Inc.*,
  532 F. Supp. 3d 1018 (D. Or. 2021) ........................................................................... 11

*Abhyankar by Behrstock v. JPMorgan Chase, N.A.*,
  2020 WL 4001661 (S.D.N.Y. July 15, 2020) ............................................................ 23

*Ardolf v. Weber*,
  332 F.R.D. 467 (S.D.N.Y. 2019) ................................................................................. 8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................... 7

*B.J. v. G6 Hosp., LLC*,
  2023 WL 3569979 (N.D. Cal. May 19, 2023) ........................................................... 14

*Bensky v. Indyke*,
  743 F. Supp. 3d 586 (S.D.N.Y. 2024) ......................................................... 8, 16, 17

*Bild v. Konig*,
  2011 WL 666259 (E.D.N.Y. Feb. 14, 2011) ............................................................. 19

*C.S. v. Wyndham Hotels & Resorts, Inc.*,
  538 F. Supp. 3d 1284 (M.D. Fla. 2021) ...................................................................... 8

*Canosa v. Ziff*,
  2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) ............................................................... 8

*Childers v. New York & Presbyterian Hosp.*,
  36 F. Supp. 3d 292 (S.D.N.Y. 2014) ......................................................................... 17

*City of Almaty v. Sater*,
  503 F. Supp. 3d 51 (S.D.N.Y. 2020) ................................................................... 17, 18

*Doe #1 v. Red Roof Inns, Inc.*,
  21 F.4th 714 (11th Cir. 2021) .................................................................................... 11

*Doe 1 v. Apple Inc.*,
  96 F.4th 403 (D.C. Cir. 2024) .................................................................................... 11

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
  671 F. Supp. 3d 387 (S.D.N.Y. 2023) ................................................................. passim

*Doe 3 v. Indyke*,
  2025 WL 2674235 (S.D.N.Y. Sep. 18, 2025) ........................................................... 20

*Dubai Islamic Bank v. Citibank, N.A.*,
126 F. Supp. 2d 659 (S.D.N.Y. 2000) ................................................................ 22, 23

*E.E.O.C. v. Michael Cetta, Inc.*,
2011 WL 5117020 (S.D.N.Y. Oct. 27, 2011) ............................................................ 25

*Ford v. Grand Union Co.*,
197 N.E. 266 (N.Y. 1935) ............................................................................................ 21

*G.G. v. Salesforce.com, Inc.*,
76 F.4th 544 (7th Cir. 2023) ..................................................................................... 8, 10

*Gen. Stencils, Inc. v. Chiappa*,
219 N.E.2d 169 (N.Y. 1966) ....................................................................................... 17

*Hargrave v. Oki Nursery, Inc.*,
636 F.2d 897 (2d Cir. 1980) ........................................................................................ 22

*In re Arqit Quantum Inc. Sec. Litig.*,
774 F. Supp. 3d 505 (E.D.N.Y. 2025) .......................................................................... 3

*In re Nine W. Shoes Antitrust Litig.*,
80 F. Supp. 2d 181 (S.D.N.Y. 2000) ........................................................................... 20

*In re S. Afr. Apartheid Litig.*,
617 F. Supp. 2d 228 (S.D.N.Y. 2009) .......................................................................... 17

*In re Terrorist Attacks on Sep. 11, 2001*,
740 F. Supp. 2d 494 (S.D.N.Y. 2010) .......................................................................... 24

*In re Terrorist Attacks on Sept. 11, 2001*,
349 F. Supp. 2d 765 (S.D.N.Y. 2005) .......................................................................... 24

*J.L. v. Best W. Int'l, Inc.*,
521 F. Supp. 3d 1048 (D. Colo. 2021) ........................................................................... 8

*Kashef v. BNP Paribas S.A.*,
925 F.3d 53 (2d Cir. 2019) ............................................................................................ 7

*Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*,
2025 WL 2825402 (S.D.N.Y. Oct. 6, 2025) ................................................................. 25

*Linde v. Arab Bank PLC*,
384 F. Supp. 2d 571 (E.D.N.Y. 2005) .......................................................................... 25

*Local No. 4, Int'l. Ass'n. of Heat & Frost & Asbestos Workers v. Buffalo Wholesale Supply Co., Inc.*,
49 A.D.3d 1276 (4th Dep't 2008) ................................................................................ 16

iii

*Mueller v. Deutsche Bank Aktiengesellschaft*,
  777 F. Supp. 3d 329 (S.D.N.Y. 2025) ............................................................. 10, 14

*Noble v. Weinstein*,
  335 F. Supp. 3d 504 (S.D.N.Y. 2018) .................................................................. 11

*Ortiz v. Cornetta*,
  867 F.2d 146 (2d Cir. 1989) ................................................................................ 17

*Rahman v. Schriro*,
  22 F. Supp. 3d 305 (S.D.N.Y. 2014) ..................................................................... 3

*Ricchio v. McLean*,
  853 F.3d 553 (1st Cir. 2017) ............................................................................... 10

*Robinson v. Foster*,
  2019 WL 6608842 (W.D.N.Y. Dec. 5, 2019) ......................................................... 3

*Rothstein v. UBS AG*,
  647 F. Supp. 2d 292 (S.D.N.Y. 2009) .................................................................. 25

*S.E.C. v. Jones*,
  2006 WL 1084276 (S.D.N.Y. Apr. 25, 2006) ........................................................ 20

*S.Y. v. Naples Hotel Co.*,
  476 F. Supp. 3d 1251 (M.D. Fla. 2020) ................................................................. 8

*Schneider v. OSG, LLC*,
  2024 WL 1308690 (E.D.N.Y. Mar. 27, 2024) ...................................................... 20

*Sejin Precision Indus. Co., Ltd. v. Citibank, N.A.*,
  235 F. Supp. 3d 542 (S.D.N.Y. 2016) .................................................................. 19

*Simcuski v. Saeli*,
  377 N.E.2d 713 (N.Y. 1978) ............................................................................... 17

*Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*,
  56 Cal. Rptr. 2d 756 (Ct. App. 1996) .................................................................. 25

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ............................................................................. 3, 9

*Twersky v. Yeshiva Univ.*,
  993 F. Supp. 2d 429 (S.D.N.Y. 2014) .................................................................. 19

*Wang v. Enlander*,
  2018 WL 1276854 (S.D.N.Y. Mar. 6, 2018) ........................................................ 17

*Wei Su v. Sotheby's, Inc.*,
  490 F. Supp. 3d 725 (S.D.N.Y. 2020) .................................................................. 17

**Statutes**

18 U.S.C. § 1591 .......................................................................................... 4, 8, 10, 11

18 U.S.C. § 1595 ............................................................................................ 7, 8, 10, 11

**Other Authorities**

Federal Rule of Civil Procedure 9(b) .................................................................. 19, 20

Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 (2010) ................ 21

**Rules**

Alex Woodward, *Top Democrat demands Trump's IRS investigate Epstein bank records in
  sprawling probe: 'Follow the money'*, THE INDEPENDENT (Jul. 31, 2025), https://www.the-
  independent.com/news/world/americas/us-politics/epstein-bank-records-ron-wyden-leon-
  black-b2799888.html .......................................................................................... 2

Caroline Davies, *Court papers put daughter of Robert Maxwell at centre of 'sex slave' claims*,
  THE GUARDIAN (Jan. 4, 2015), https://www.theguardian.com/us-news/2015/jan/04/court-
  papers-robert-maxwell-daughter-sex-slave-claims-prince-andrew ................................ 5

Emily Flitter & Jessica Silver-Greenberg, *JPMorgan Kept Jeffrey Epstein as a Client Despite
  Internal Warnings*, N.Y. TIMES (Aug. 8, 2019), https://www.nytimes.com/2019/08/08/
  business/jeffrey-epstein-jpmorgan.html .................................................................. 14

Financial Crimes Enforcement Network, *Guidance on Recognizing Activity that May be
  Associated with Human Smuggling and Human Trafficking – Financial Red Flags* (Sep. 11,
  2024), https://www.fincen.gov/system/files/advisory/FIN-2014-A008.pdf ...................... 19

███████████████████████████████████████████
███████████████████████████████████████ ................ 4

Matthew Goldstein, *Bank of America Flagged Suspicious Payments to Epstein Only After He
  Died*, N.Y. TIMES (Dec. 13, 2024), https://www.nytimes.com/2024/12/13/business/jeffrey-
  epstein-bank-of-america.html .................................................................................. 18

Paul Lewis & James Ball, *Prince Andrew named in US lawsuit over underage sex claims*, THE
  GUARDIAN (Jan. 3, 2015), https://www.theguardian.com/uk-news/2015/jan/02/prince-andrew-
  named-us-lawsuit-underage-sex-allegations .............................................................. 5

U.S. Department of Justice, Interview of Ghislaine Maxwell Transcript (Jul. 25, 2025),
  https://www.justice.gov/storage/audio-

files/Interview%20Transcript/Interview%20Transcript%20-%20Maxwell%202025.07.25-cft%20(Redacted).pdf ......................................................................................................... 6

U.S. House of Representatives Committee on the Judiciary, *Letter to Bank of America CEO Brian Moynihan from Representative Raskin* (Oct. 8, 2025), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2025-10-08.raskin-to-moynihan-bofa-re-epstein.pdf ................................................ 19

U.S. Senate Committee on Finance, *Letter to Attorney General Bondi from Senator Wyden* (Jul. 21, 2025), https://www.finance.senate.gov/imo/media/doc/wyden_letter_to_doj_-_follow_the_money_on_jeffrey_epstein_7-21-25pdf.pdf .......................................................... 2

U.S. Senate Committee on Finance, *Letter to Attorney General Bondi, Secretary Bessent and Director Patel from Senator Wyden* (Mar. 11, 2025), https://www.finance.senate.gov/imo/media/doc/wyden_letter_to_doj-treasury-fbi_on_epsteinpdf.pdf ............................................................................................................ 19

U.S. Senate Committee on Finance, *Memorandum to Senator Wyden* (Nov. 19, 2025), https://www.finance.senate.gov/imo/media/doc/memorandum_to_senator_wyden_on_jpmc-epstein_redactedpdf.pdf ................................................................................................. 5

Vicky Ward, *Jeffrey and Ghislaine: Notes on New York's Oddest Alliance*, VANITY FAIR (Mar. 8, 2011), https://www.vanityfair.com/news/2011/03/notes-on-new-yorks-oddest-couple-jeffrey-epstein-and-ghislaine-maxwell?srsltid=AfmBOooTsWFbQGmkqTYsUZOsic0cf_hPF756Unfgcbhr73OUU2KAR_3K .................................................................................................................................... 5

Plaintiff Jane Doe ("Doe") submits this memorandum of law in opposition to Defendant Bank of America, N.A.'s ("Bank of America" or the "Bank") Motion to Dismiss the Complaint.

## <u>PRELIMINARY STATEMENT</u>

Bank of America claims that it "opposes trafficking in all its forms" and that it "is sympathetic to all of Epstein's victims." ECF No. 39 ("Mot.") at 3, 19. But these self-serving statements are meaningless and belied by the fact that Bank of America ignored clear red flags concerning Jeffrey Epstein's sex-trafficking enterprise for the decades it banked him, ignored recent Congressional inquiries that would shed light on Epstein's crimes, and (in this case seeking compensation for Epstein's victims) have stonewalled discovery into the Bank's dealings with Epstein. At bottom, Bank of America's motion to dismiss rests on an improper factual denial of Doe's well-pleaded allegations. But that is not the standard for dismissal, and Bank of America's core factual assertion that it did not or could not have known about Epstein's use of the Bank's services in furtherance of sex trafficking is nonsensical given that it ███████████████ ███████████████████████████████ for many years, and continued to do so even after Epstein was publicly exposed as a notorious sex offender.

Bank of America's dealings with Epstein "went well beyond merely providing their usual services." *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 406 (S.D.N.Y. 2023) (Rakoff, J.) ("*Deutsche Bank/JP Morgan*"). For many years, Bank of America provided the funding, financial support, and complicity necessary to run Epstein's international sex-trafficking operation. It knowingly facilitated and sustained Epstein's sex-trafficking operation by, among other things, providing financial support to Epstein and his co-conspirators, opening bank accounts for Epstein, his entities, his associates, and his victims at Epstein's direction, failing to timely file required Suspicious Activity Reports ("SARs") with the federal government, failing to follow anti-

money laundering and reporting laws, and providing special treatment to Epstein and his co-conspirators. For its services to Epstein, Bank of America earned substantial profits.

Recent U.S. government investigations into Epstein's sex-trafficking operation uncovered more than $1 billion in transactions "that flowed in and out of Epstein's accounts" at large financial institutions.[1] Treasury Department records show that between 2003 and 2019, "there were more than 4,725 wire transfers totaling $1.08 billion involving Jeffrey Epstein and his associates, including Darren Indyke, Harry Beller, Richard Kahn and Erika Kellerhals." Wyden Letter, at 1. These transactions included "wire transfers from wealthy figures over the sales of artwork, fees paid to Epstein, and payments to several women."[2]

Nevertheless, Bank of America insists that it was not involved in Epstein's sex trafficking and (unbelievably) contends that it did not know that its customers—which the Bank cannot deny included Epstein himself—were connected to Epstein's sex-trafficking operation. Bank of America's position cannot be reconciled with the Complaint's well-pleaded allegations. The Bank not only participated in Epstein's sex-trafficking scheme; its services were integral to the scheme's success, and a primary reason Epstein was able to continue harming young women and girls for decades. The Court should reject Bank of America's efforts to escape liability for its conduct at this early stage in the litigation and deny the Bank's motion in its entirety.

---

[1] U.S. Senate Committee on Finance, *Letter to Attorney General Bondi from Senator Wyden* (Jul. 21, 2025), https://www.finance.senate.gov/imo/media/doc/wyden_letter_to_doj_-follow_the_money_on_jeffrey_epstein_7-21-25pdf.pdf ("Wyden Letter"), at 2.
[2] Alex Woodward, *Top Democrat demands Trump's IRS investigate Epstein bank records in sprawling probe: 'Follow the money'*, THE INDEPENDENT (Jul. 31, 2025), https://www.the-independent.com/news/world/americas/us-politics/epstein-bank-records-ron-wyden-leon-black-b2799888.html.

## FACTUAL BACKGROUND[3]

For years, Bank of America knowingly and intentionally participated in Jeffrey Epstein's sex trafficking venture by (among other things) providing the essential financial underpinnings for the venture. Compl. ¶ 78. From its inception until Epstein's arrest and death in 2019, Epstein's sex-trafficking venture operated primarily by means of force, threats of force, fraud, coercion, abuse of legal process, and combinations of these means to cause girls and young women (like Doe) to engage in commercial sex acts and commit sexual offenses against them. *Id.* ¶ 25. Epstein's sex-trafficking venture was not possible without the assistance and complicity of financial institutions—specifically, banks—to provide special treatment to Epstein, his co-conspirators, and the sex-trafficking venture, thereby ensuring its continued operation. *Id.* ¶ 19. Particularly, Epstein needed a reliable bank that would provide the necessary "legitimate" appearance for his operation, allow him to open many accounts for illegitimate companies, ignore red flags and banking laws, permit him to transfer money without question, allow him access to abundant cash, and otherwise knowingly facilitate his sex-trafficking venture. *Id.* ¶ 76. Epstein found all those things in Bank of America.

Rather than merely providing routine banking services to Epstein, Bank of America went far beyond what a non-complicit bank would have done and instead assisted Epstein in setting up the necessary financial structure to operate his sex-trafficking venture. *Id.* ¶ 80. It also failed to

---

[3] The Court is permitted to consider news coverage, government publications, and other matters of public records. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (explaining that courts may take judicial notice of press coverage and prior actions in deciding issue of notice); *Rahman v. Schriro*, 22 F. Supp. 3d 305, 311 (S.D.N.Y. 2014); *Robinson v. Foster*, 2019 WL 6608842, at *3 (W.D.N.Y. Dec. 5, 2019) ("Courts may take judicial notice of public documents or matters of public record."). The Court is also permitted to consider "statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit," which includes the Wyden Letter. *See In re Arqit Quantum Inc. Sec. Litig.*, 774 F. Supp. 3d 505, 520 n.10 (E.D.N.Y. 2025).

follow routine banking practices of reviewing Epstein-related accounts against the backdrop of public information outing him as a serial sex abuser and reporting Epstein for running what was obviously a sex-trafficking operation. *Id.* ¶ 81. For example, Bank of America purposely and deliberately failed to timely file required SARs for Epstein's suspicious activities. *Id.*

In 2006, Epstein was arrested in Florida after law enforcement discovered that he had sexually abused more than 30 children. *Id.* ¶ 31. The government concluded that Epstein and his co-conspirators had committed federal criminal acts constituting violations of the Trafficking Victim Protection Act, 18 U.S.C. § 1591, *et seq.* ("TVPA") and other federal laws. *Id.* In 2008, Epstein's non-prosecution agreement with the U.S. Department of Justice was made public when it was unsealed in connection with a challenge to the agreement by two of his victims. *Id.* ¶ 99. Among other things, the non-prosecution agreement outlined the possible federal sex offense charges that could have resulted from the investigation, including TVPA charges. *Id.*

Bank of America ████████████████████████████████████ after Epstein pled guilty to state charges in 2008, and, remarkably, through 2019 after he was charged with sex trafficking of minors. Beginning in ████████████████████ ████████████████████████████████████████ ████████████████████████████████████ *See* Ex. A, Interrogatory Answer No. 3. Bank of America also ████████████████████████ ████████████████████████████ *Id.*[5]



[4] ████████████████████████████████████

[5] This likely just scratches the surface of the ████████████████████████████████████

Bank of America also serviced accounts for Epstein's known associates, including convicted sex trafficker Ghislaine Maxwell and billionaire Wall Street financier Leon Black, both of whom it does not deny had accounts with the Bank. *Id.* ¶ 109. Maxwell, who was arrested in July 2020 on federal sex-trafficking charges in the Southern District of New York, was later found guilty on five federal sex-trafficking charges and is now serving 20 years in prison for her crimes. *Id.* ¶¶ 41–42.[6] A recent memorandum issued by the Senate Committee on Finance reveals that "Jeffrey Epstein paid Ghislaine Maxwell at least $25 million, including a one-time payment of $19 million from his accounts at [JPMorgan Chase]."[7] Black, who admitted that money he paid Epstein was used to "partially fund [Epstein's] operations in the Virgin Islands," paid Epstein $170 million for purported "tax and estate planning advice" from his Bank of America account without any

---

████████████████████████████████████████████ and ████████████████████ Ex. A at 13. In reality, Epstein's employees and co-conspirators often opened accounts in their own names or on behalf of entities that Epstein was not a beneficial owner of that were nonetheless used to facilitate Epstein's sex-trafficking scheme.

[6] Maxwell has been publicly identified as one of Epstein's co-conspirators since long before her arrest and conviction on federal sex-trafficking charges. As early as January 2015, several prominent publications identified Maxwell as a "recruiter" or "madame" for Epstein. *See* Caroline Davies, *Court papers put daughter of Robert Maxwell at centre of 'sex slave' claims*, THE GUARDIAN (Jan. 4, 2015), https://www.theguardian.com/us-news/2015/jan/04/court-papers-robert-maxwell-daughter-sex-slave-claims-prince-andrew (describing Maxwell as a "'madame' for Epstein, supplying a string of underage girls for the American billionaire and his friends"); Paul Lewis & James Ball, *Prince Andrew named in US lawsuit over underage sex claims*, THE GUARDIAN (Jan. 3, 2015), https://www.theguardian.com/uk-news/2015/jan/02/prince-andrew-named-us-lawsuit-underage-sex-allegations (summarizing allegations that Maxwell "was one of the main women whom Epstein used to procure under-aged girls for sexual activities"). Earlier publications referred to Maxwell as a "procurer" of young women for Epstein, while flagging that Epstein solicited minors for sex. Vicky Ward, *Jeffrey and Ghislaine: Notes on New York's Oddest Alliance*, VANITY FAIR (Mar. 8, 2011), https://www.vanityfair.com/news/2011/03/notes-on-new-yorks-oddest-couple-jeffrey-epstein-and-ghislaine-maxwell?srsltid=AfmBOooTsWFbQGmkqTYsUZOsic0cf_hPF756Unfgcbhr73OUU2KAR_3K (alluding to Epstein's relationship with Maxwell and "how she introduced him to young women with whom he had sexual relationships").

[7] U.S. Senate Committee on Finance, *Memorandum to Senator Wyden* (Nov. 19, 2025), https://www.finance.senate.gov/imo/media/doc/memorandum_to_senator_wyden_on_jpmc-epstein_redactedpdf.pdf ("Wyden Memo"), at 2, 17–18.

satisfactory explanation for such an abnormal amount to pay for such services. Compl. ¶¶ 82–83. Rather than do its mandatory due diligence and file SARs for these highly suspicious transactions, Bank of America sat idly by while Epstein and his co-conspirators trafficked and abused women. *Id.* ¶ 84.

One of those women was Jane Doe, who was living in Russia when she met Epstein in 2011. *Id.* ¶ 43. From 2011 through 2019, Epstein sexually abused Doe on at least 100 occasions, using force, threats, fraud, and coercion to compel her to engage in commercial sex acts. *Id.* ¶¶ 47–48. As part of Epstein's scheme to defraud immigration officials and keep Doe in the United States so he could continue sexually abusing her, Doe was directed by immigration attorney Arda Beskardes and Epstein's longtime accountant Richard Kahn to open a Bank of America account in 2013. *Id.* ¶ 54. As soon as the account was opened, Kahn wired $14,073.00 into the account and, thereafter, Epstein and Kahn began using the account without explanation to Doe.[8] *Id.* ¶¶ 55–56. For example, in July 2013, Kahn's assistant, Bella Klein, informed Doe that Epstein wanted to wire $12,000 into her account. *Id.* ¶ 56.

Over the ensuing months and years, Doe's Bank of America accounts were repeatedly used to deposit funds from Epstein for rent, payroll, taxes, and reimbursement, often routed through other accounts (typically at Deutsche Bank) held in Epstein's name, and frequently without Doe's knowledge. *Id.* ¶¶ 57–63. This included monthly rent payments from one of Doe's Bank of America accounts to 301/66 Owners Corp with an address of 301 East 66th Street, an address

---

[8] This is consistent with recent public testimony from Maxwell claiming that accounts in her name were created and "controlled by [Epstein's] accountants," and used without her knowledge. *See* U.S. Department of Justice, *Interview of Ghislaine Maxwell Transcript* (Jul. 25, 2025), https://www.justice.gov/storage/audio-files/Interview%20Transcript/Interview%20Transcript%20-%20Maxwell%202025.07.25-cft%20(Redacted).pdf, at 221:18–223:9.

known to be affiliated with Epstein. *Id.* ¶ 64. A review of Doe's account history shows incredibly alarming and erratic banking behavior, as Epstein, through one of his loyal employees, would utilize Doe's Bank of America account to execute transactions in amounts not typical for her, and often impossible based on her income or typical pattern of deposit. *Id.* ¶ 65.

Despite the obvious red flags these transactions raised, Bank of America never followed routine banking practices of investigating the account or filing timely SARs. *Id.* ¶¶ 81, 84. It also chose not to cooperate with law enforcement and other investigations into Epstein's sex trafficking. *Id.* ¶ 85. Indeed, the Bank's non-routine handling of Epstein-related accounts like Doe's enabled Epstein to continue to abuse Doe and hundreds of other women without fear of detection by law enforcement. *Id.* ¶ 86.

## ARGUMENT

The Court should deny Bank of America's motion to dismiss Doe's claims. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face . . . .. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). The Court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 58 (2d Cir. 2019). Drawing all reasonable inferences in Doe's favor, as the Court must at this juncture, Bank of America has failed to demonstrate that Doe has failed to state a claim.

## I. DOE HAS PROPERLY PLED CLAIMS UNDER THE TVPA

The TVPA provides a civil cause of action for sex-trafficking victims against those who, like Bank of America, participate in a sex-trafficking venture. Section 1595 of the TVPA, as a

remedial provision, requires broad interpretation. *See, e.g.*, *Ardolf v. Weber*, 332 F.R.D. 467, 473 (S.D.N.Y. 2019); *Canosa v. Ziff*, 2019 WL 498865, at *23 (S.D.N.Y. Jan. 28, 2019). Moreover, because this remedial provision "doesn't distinguish between different violations," "if the complaint plausibly alleges one violation, the § 1595 claim survives." *Bensky v. Indyke*, 743 F. Supp. 3d 586, 599 (S.D.N.Y. 2024).[9]

### A. The Complaint States a Claim for TVPA Participation Liability (Count I).

The elements of a participation liability claim under § 1591(a)(2) are: (1) "defendant must have participated in a commercial sex trafficking venture;" (2) "the defendant must have known (or recklessly disregarded) that force, fraud, or coercion would be used in the sex-trafficking venture;" and (3) "the defendant must have benefited from its participation in the venture. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 405. Doe has adequately alleged these elements.

### 1. Bank of America Participated in Epstein's Sex-Trafficking Venture.

Bank of America incorrectly asserts that Count I should be dismissed because the Complaint alleges only passive facilitation through routine banking services. Mot. at 12–15. The Complaint, however, alleges far more than "passive facilitation."

The Complaint contains specific and significant factual allegations that Bank of America was an active participant in Epstein's sex-trafficking venture.[10] Among other detailed factual allegations, the Complaint alleges that Bank of America: (1) allowed and failed to flag transfers

---

[9] While Bank of America raises duplicative arguments under different subheadings for Sections 1591 and 1595, Doe addresses arguments under the sister statutes jointly. *See G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 n.5 (7th Cir. 2023) (organizing the order in a manner consistent with the phrasing of § 1591 and not § 1595 because the former is more logical than the latter).

[10] Most district courts have rejected the argument that an overt act in furtherance of sex-trafficking is required to state a participation liability claim. *See, e.g.*, *C.S. v. Wyndham Hotels & Resorts, Inc.*, 538 F. Supp. 3d 1284, 1296 (M.D. Fla. 2021); *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1062 (D. Colo. 2021); *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1256 (M.D. Fla. 2020).

from Epstein's Deutsche Bank account to Doe's account, Compl. ¶ 62; (2) ignored suspicious activity from Doe's account, including multiple "erratic" transfers that were inconsistent with Doe's disclosed income, including transfers to an Epstein-related entity, *id*. ¶¶ 64–65; (2) facilitated payment in the amount of $170 million from Leon Black—a known associate of Epstein—to Epstein, *id.* ¶¶ 82–83, 109; (3) ignored that Epstein was using Bank of America accounts created in other's names to fund his sex-trafficking venture, *id.* ¶ 54, 56–62; (4) failed to carry out the required due diligence, including failing to timely file necessary SARs, *id.* ¶ 84; (5) opened up accounts for Epstein, his related entities, and associates, *id.* ¶ 129; and (6) chose not to cooperate with law enforcement and other investigations into Epstein's sex-trafficking venture, *id.* ¶ 134. Bank of America also processed transfers in the amount of $25 million from Epstein to Maxwell, his known co-conspirator. *See* Wyden Memo, at 2, 17–18. Bank of America maintained accounts for Epstein and his known affiliates after Epstein pled guilty to state charges for sex crimes in 2008. Compl. ¶ 129.[11] Bank of America answered that ███████████████████████ ███████████████████ *See* Ex. A, Interrogatory Answer No. 3. ████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████ *Id*. These acts go well beyond routine banking services and directly enabled and concealed Epstein's sex-trafficking venture.[12]

---

[11]  The House Committee on Oversight and Government Reform's released thousands of documents related to the Epstein Estate on November 12, 2025, revealing that Bank of America serviced at least one bank account for Epstein as late as 2016. *See Staehr*, 547 F.3d at 425.

[12] Bank of America's related argument that it did not participate in any venture that violated the TVPA is unavailing. Mot. at 15–16. It ignores that Doe alleges that Bank of America provided Epstein and his affiliates, including Maxwell and Black, with non-routine financial services that allowed Epstein to carry out his trafficking ring and avoid drawing attention from the authorities. Compl. ¶¶ 82, 109, 211, 213–14, 219. Additionally, the Complaint alleges that Maxwell and Black were known associates of Epstein. *Id.* ¶ 109.

This Court recently found similar allegations by another Epstein victim against Deutsche Bank sufficient to survive a motion to dismiss. *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 396 (allowing TVPA participation liability claims to proceed). There, the Court held that the plaintiff sufficiently stated that Deutsche Bank had participated in Epstein's sex-trafficking venture where she alleged that Deutsche Bank "concealed its delivery of hundreds of thousands of dollars in cash to Epstein and his associates" by willfully failing to file SARs; "structured" 97 cash withdrawals by Epstein's co-conspirators; failed to implement oversight; and allowed Epstein to use accounts held at the bank "to send dozens of wires, directly and indirectly, including at least 18 wires in the amount of $10,000 or more to then known co-conspirators." *Id*. at 406.

Bank of America's own case, *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017), supports the sufficiency of Doe's allegations. In that case, a hotel owner's enthusiasm, demands for hotel room payments, and general "indifference" to trafficking constituted participation under §§ 1595 and 1591. *Id.* at 555. Likewise, in *Salesforce.com*, 76 F.4th at 560–61, which Bank of America attempts to rely on, the court held that plaintiff had stated a participation claim where the complaint alleged that the defendant provided business support and software to a website that hosted prostitution ads, thereby facilitating the growth of a business built upon systematic violations of the TVPA. As explained above, the Complaint alleges Bank of America's tailored financial support and concealment efforts allowed Epstein's sex trafficking venture to flourish and remain undetected. Compl. ¶¶ 57, 61–62, 82–84.

*Mueller v. Deutsche Bank Aktiengesellschaft*, 777 F. Supp. 3d 329, 339 (S.D.N.Y. 2025) is inapposite. There, the court dismissed a TVPA participation claim because the complaint alleged only the provision of routine financial services to ISIS-connected customers. *Id*. The court explained that the sole allegation that the bank charged higher fees to ISIS-connected customers

10

was insufficient. Conversely, here, Doe alleges that Bank of America provided tailored services to Epstein without which Epstein's sex-trafficking venture was not possible. Bank of America provided financial services which allowed Epstein to pay his victims, *id.* ¶¶ 54–66, 89; failed to follow banking regulations in Epstein-related transactions, *id.* ¶¶ 69–74, 213, 215–16; deliberately failed to timely file SARs in Epstein-related accounts, including for Epstein's known associates like Maxwell and Black, *id.* ¶¶ 81–84, 109; ignored repeated red flags and suspicious activity indicative of sex trafficking, including the erratic transactions in and out of Doe's account, *id.* ¶¶ 54–66, 84; facilitated payments for sham companies owned by Epstein and his co-conspirators, *id.* ¶ 58; failed to cooperate with law enforcement and other investigations into Epstein's venture, *id.* ¶ 85; and opened accounts for Epstein despite knowledge that Epstein was a sex trafficker and abuser, ¶¶ 93–101, 108, 129. Bank of America's remaining cases are easily distinguishable in that they fail to allege sufficient facts to state participation under Sections 1591 and 1595. *See e.g.*, *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 719 (11th Cir. 2021) (dismissing TVPA participation claim because the defendant's involvement was limited to receiving "a percentage of the revenue" and managing room rentals, which was deemed ordinary business activity); *Doe 1 v. Apple Inc.*, 96 F.4th 403, 415 (D.C. Cir. 2024) (dismissing TVPA participation claim because complaint alleged only arms-length transactions); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018) (dismissing TVPA participation claim where defendant merely paid for Harvey Weinstein's travel).

The Bank incorrectly argues that holding it liable could put "the entire service economy . . . on the hook," and would "amount to a general federal statutory duty to prevent sex trafficking." Mot. at 19. (citing *A.B. v. Wyndham Hotels & Resorts, Inc.*, 532 F. Supp. 3d 1018, 1027 (D. Or. 2021) (noting that defendants providing routine services do not have a duty to monitor for sex

trafficking)). This argument overlooks the Complaint's specific and egregious allegations against Bank of America described above, which demonstrate conduct far beyond routine banking services. In addition, unlike non-financial service industries, Bank of America is subject to rigorous legal and regulatory requirements that require it to, among other things, implement appropriate risk-based anti-money laundering ("AML") policies and systems, conduct the required due diligence into its customers, and flag any potential suspicious activity through SARs. Compl. ¶¶ 69–74, 81, 84, 130. At minimum, these requirements obligate banks to investigate when customers engage in suspicious financial activity with a known sex trafficker and his co-conspirators, and to report such suspicious activity.

2. Bank of America Knew or Should Have Known About Epstein's Sex-Trafficking Venture.

Bank of America's argument that Doe has failed to allege that it knew or recklessly disregarded that Doe herself had been trafficked by Epstein is meritless. This Court has already held that knowledge under the TVPA applies to the venture, not to any particular victim. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 406. To satisfy this element, Doe must only show that Bank of America "[knew], or recklessly disregarded, that force, fraud, or coercion was used in the *particular* sex-trafficking venture that it is alleged to have participated in." *Id*. Bank of America provides no basis for the Court to depart from its prior ruling.

The Complaint sufficiently alleges the Bank's knowledge of Epstein's trafficking venture. Bank of America knew or recklessly disregarded Epstein's sex-trafficking venture and knowingly provided banking services to Doe and Epstein's known co-conspirators, Maxwell and Black, thereby funding and concealing the operation and allowing Epstein's crimes to remain hidden for years. *Id*. ¶ 109. By the time the Bank facilitated transfers to and from Epstein into Doe, Black, and Maxwell's accounts, Epstein was publicly known as a convicted sex offender running a sex-

12

trafficking operation. *Id*. ¶¶ 93–101. For example, in October 2013 and October 2016, when Epstein transferred thousands of dollars into Doe's Bank of America account, his prior sex crimes had been publicly known for about a decade. *Id*. ¶¶ 55, 61, 64. Further, Bank of America processed transfers to and from accounts created at Epstein's direction under the names of his affiliates and sham corporations. *Id*. ¶¶ 54, 56–62. The Bank also ignored transactions from Doe's Bank of America account to 301/66 Owners Corp., a company with a registered address known to be affiliated with Epstein. *Id*. ¶ 64.

At the time Bank of America facilitated transfers of millions of dollars between Epstein, Black, and Maxwell, Epstein had already been publicly exposed for sexually abusing dozens of young women and girls. Discovery will shed light on the exact dates of those transfers, but what is already clear is that Maxwell had been publicly identified as Epstein's co-conspirator long before her arrest on federal sex-trafficking charges in the Southern District of New York in July 2020. *Id.* ¶¶ 39–40; n.6 *supra*. Taken together, these allegations show that the Bank knew or recklessly disregarded that Epstein was operating a sex-trafficking venture and using Bank of America accounts to do so. *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 407 ("[P]laintiffs allege that JP Morgan was aware of Epstein's convictions for sex crimes and ignored numerous red flags . . . which all suggested that Jeffrey Epstein operated a sex-trafficking venture. Even these allegations alone are sufficient to support plaintiffs' allegations that JP Morgan knew or recklessly disregarded that Epstein operated such a venture."). Whether Doe herself understood the purpose of certain payments is irrelevant to whether Bank of America—a sophisticated financial institution—knew or should have known that it was connected to Epstein's sex-trafficking venture. And the Bank *should have known* because its regulatory obligations required it to investigate such

irregular transactions.

Bank of America's cases are inapposite. In *Mueller*, 777 F. Supp. 3d at 339, the plaintiff's TVPA claim was dismissed for failing to allege that the bank knew that its customer was an agent for al-Qaeda. There, the complaint merely alleged that the financial institution should have known of his client's criminal activities because he was a young Afghan national and "his activities exhibited several indicia of [the TVPA violation]." *Id.* at 333; *see also B.J. v. G6 Hosp., LLC*, 2023 WL 3569979, at \*6 (N.D. Cal. May 19, 2023) ("Where alleged conduct has 'two possible explanations, only one of which can be true and only one of which results in liability . . . [s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true.'"). Here, by contrast, Epstein's sex crimes, including sex trafficking, were publicly known for years, Compl. ¶¶ 93–101,[13] and Maxwell's association with Epstein was publicly documented, n.6 *supra*.

3.  <u>Bank of America Benefited from its Participation in Epstein's Sex-Trafficking Venture.</u>

Bank of America also wrongly asserts that the Complaint fails to allege that it knowingly benefitted from its participation in Epstein's sex-trafficking venture. Mot. at 10–11, 18. It contends that Doe does not plead that the bank "knew it received the alleged benefit *because* it was providing banking services that facilitated Epstein's sex-trafficking venture." Mot. at 11. This Court has

---

[13] Bank of America cannot seriously dispute its knowledge. As just one example, Bank of America ███████████████████ *See* Ex. A, Interrogatory Answer No. 3; Emily Flitter & Jessica Silver-Greenberg, *JPMorgan Kept Jeffrey Epstein as a Client Despite Internal Warnings*, N.Y. Times (Aug. 8, 2019), https://www.nytimes.com/2019/08/08/business/jeffrey-epstein-jpmorgan.html. Basic KYC and due-diligence requirements obligated Bank of America to assess the risks of ███████ Compl. ¶ 72, which is sufficient to impute knowledge of Epstein's suspicious banking behavior.

already rejected this exact causation argument. *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 408 (a causal relationship is not required to plead the benefit element of a TVPA participation liability claim). In any event, as in *Deutsche Bank/JP Morgan*, Doe alleges that Bank of America ignored glaring red flags about Epstein, Maxwell, and Black because it knew that retaining them as clients was more financially valuable than exposing them for their crimes. Compl. ¶¶ 108–114. *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 408 (allowing TVPA participation liability claims to proceed).

### B. The Complaint States a Claim for Obstruction of TVPA Enforcement (Count IV).

The Bank's arguments for dismissal of Count IV, obstruction of TVPA enforcement, likewise fail. Bank of America asserts that the only "victim" of a TVPA obstruction claim is the government. Mot. at 21. But this Court recognized a civil claim for obstruction of TVPA enforcement in *Deutsche Bank/JP Morgan*, holding "the 'victims' of one who obstructs the enforcement of the TVPA include not just the government, but also . . . those who suffered harm because the government's enforcement efforts were hindered." 671 F. Supp. 3d at 409 (allowing TVPA obstruction claim to proceed). This includes sex-trafficking victims who were directly and proximately harmed, which is exactly what Doe alleges here. Compl. ¶ 191.

Recognizing this, Bank of America insists this case is different from *Deutsche Bank/JP Morgan* because Doe does not allege facts showing that Bank of America knew about a government investigation. That argument fails. Doe specifically alleges that Bank of America knew or should have known of several criminal investigations being pursued in both the Southern District of Florida and this District against Epstein and that it intentionally chose not to report suspicious activities or cooperate with such investigations because it knew it would be exposed as assisting Epstein's scheme. *Id.* ¶¶ 31–33, 81–85, 94–107, 180, 189. Bank of America also knew that this conduct was facilitated by Epstein's known co-conspirators, including Maxwell and

15

Black, both of whom the Bank knew had Bank of America accounts. *Id.* ¶¶ 41–42, 109, 189.

In addition, unlike cases not involving banks, Bank of America was required to file SARs with the federal government and follow AML and anti-structuring reporting requirements under the Bank Secrecy Act and other laws. *Id.* ¶¶ 81, 84, 183. These obligations required the Bank to review transactions in Epstein's (and his associates' accounts) for suspicious activities. *Id.* ¶¶ 69–74, 183. The Complaint explains how Bank of America's willful failure to follow those requirements and file SARs allowed Epstein and his-conspirators to continue their trafficking operations and frustrate ongoing investigations. *Id.* ¶¶ 81–85, 184–85. This Court has already found similar allegations sufficient to state a TVPA obstruction claim. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 409 (denying motion to dismiss TVPA obstruction claims where plaintiffs alleged banks "knew of investigations into Jeffrey Epstein's sex-trafficking operation and . . . intentionally failed to file [SARs] in order to frustrate such investigations").[14]

## II.    DOE HAS PROPERLY PLED HER NEGLIGENCE CLAIMS

### A.    Doe's Negligence Claims Are Not Time-Barred.

Bank of America's argument that Doe's negligence claims are untimely is premature. Assessing timeliness here would require resolving factual issues that are improper at the motion to dismiss stage. *See, e.g.*, *Local No. 4, Int'l. Ass'n. of Heat & Frost & Asbestos Workers v. Buffalo Wholesale Supply Co., Inc.,* 49 A.D.3d 1276, 1278 (4th Dep't 2008) ("[T]he question of whether a defendant should be equitably estopped is generally a question of fact."); *see also Bensky*, 743

---

[14] Doe is mindful that this Court previously dismissed TVPA perpetrator liability and aiding-and-abetting a violation of the TVPA claims with similar allegations to those alleged here. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 410–11. However, because the TVPA's remedial provision "doesn't distinguish between different violations," Doe respectfully submits that Counts II and III should survive because the Complaint plausibly alleges at least one form of liability under the TVPA. *See Bensky*, 743 F. Supp. 3d at 599 (declining to dismiss individual TVPA claims where plaintiff alleged at least one violation).

F. Supp. 3d at 602. As courts in this Circuit have held, "when plaintiffs raise an equitable tolling argument, a court must deny a motion to dismiss based on the statute of limitations unless all assertions of the complaint, as read with required liberality, would not permit the plaintiffs to prove that this statute was tolled." *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d 228, 287 (S.D.N.Y. 2009) (internal quotations omitted); *Wang v. Enlander*, 2018 WL 1276854, at *4 (S.D.N.Y. Mar. 6, 2018) ("[A] claim may be dismissed based on the statute of limitations only if it is clear on the face of the complaint that the claim is untimely as a matter of law.") (citation omitted).

Because timeliness is an affirmative defense, Bank of America bears the burden of proving that Doe's claims are untimely, and Doe need not anticipate or plead around it. *See Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 301, 315 (S.D.N.Y. 2014). A motion to dismiss based on timeliness "should not be granted unless it appears *beyond doubt* that [Doe] can prove no set of facts" supporting tolling. *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) (internal quotation marks omitted).

Doe has adequately pleaded that Bank of America should be estopped from asserting any statute-of-limitations defense to her negligence claims. Equitable estoppel prevents a defendant from invoking a statute-of-limitations defense where the plaintiff was "induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli*, 377 N.E.2d 713, 716 (N.Y. 1978). Equitable estoppel applies where the defendant affirmatively conceals the cause of action, including the defendant's "involvement or identity in particular wrongdoing." *Wei Su v. Sotheby's, Inc.*, 490 F. Supp. 3d 725, 730 (S.D.N.Y. 2020); *Gen. Stencils, Inc. v. Chiappa*, 219 N.E.2d 169, 171 (N.Y. 1966) (equitable estoppel applies where the defendant's affirmative wrongdoing is "carefully concealed").

*City of Almaty v. Sater* is illustrative. In that case, the district court declined to dismiss

17

various state law claims as untimely. 503 F. Supp. 3d 51, 67–68 (S.D.N.Y. 2020). The plaintiffs there alleged that although the defendants received stolen funds in 2012 and 2013, the plaintiffs were unable to uncover the wrongdoing until 2017 because of the defendants' "overarching strategy to obscure the source of the funds," specific "misrepresentations designed to evade detection," and other efforts to hide defendants' "role in the transaction" and receipt of the funds "from public view." *Id.* at 63, 67. The court found that these allegations were "enough at the pleading stage to plausibly support the application of equitable estoppel." *Id.* at 67.

The same reasoning applies here. As the Complaint details, Bank of America affirmatively concealed its role in Epstein's sex-trafficking operation by failing to timely file required SARs, violating numerous banking laws and regulations, failing to implement enhanced monitoring of Epstein to conceal its involvement in Epstein's venture, providing services to avoid leaving a visible "paper trail," and failing to report or investigate the financial activity flowing through accounts related to Epstein, his entities, or his associates. Compl. ¶¶ 3, 81, 84, 91, 134–36. These affirmative acts of concealment, much like the conduct in *Almaty*, prevented the public, law enforcement, regulators, and victims (including Doe) from uncovering Bank of America's involvement until only recently.

Indeed, Doe was not privy to the facts that have only recently been revealed. *Id.* ¶ 7, *supra* n.5. That Bank of America failed to file timely SARs for hundreds of millions of dollars in Epstein-related transactions was first reported in December 2024, and raised by Congress to Bank of America CEO Brian Moynihan as late as October 8, 2025.[15] Those SARs were filed in February

---

[15] Matthew Goldstein, *Bank of America Flagged Suspicious Payments to Epstein Only After He Died*, N.Y. TIMES (Dec. 13, 2024), https://www.nytimes.com/2024/12/13/business/jeffrey-epstein-bank-of-america.html; U.S. House of Representatives Committee on the Judiciary, *Letter to Bank of America CEO Brian Moynihan from Representative Raskin* (Oct. 8, 2025), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-

and October 2020, many months after Epstein's death, seven years after the suspicious transactions, and six years after FinCEN's 2014 guidance to financial institutions about red flag indicators of human trafficking.[16] Likewise, that Maxwell's bank accounts were used by Epstein's accountants for purposes unknown to her was only revealed in August 2025. *See* n.8 *supra*.  These facts were unknown to anyone other than those at Bank of America who assisted in covering up the elaborate financial infrastructure that continuously fueled Epstein's sex-trafficking operation for decades.

Bank of America's authorities do not move the needle. Those cases involved conclusory allegations of passive concealment. *See Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 444 (S.D.N.Y. 2014) (plaintiff alleged that defendants "failed to warn students and their families of the known risk of abuse"); *Sejin Precision Indus. Co., Ltd. v. Citibank, N.A.*, 235 F. Supp. 3d 542, 552 (S.D.N.Y. 2016) (plaintiffs' reliance on defendants' corporate structure and "reverse transactions" rather than affirmative steps to allege "self-concealing" fraud dismissed as conclusory). Here, by contrast, Doe has alleged particularized, affirmative acts by Bank of America to conceal its misconduct.[17]

---

judiciary.house.gov/files/evo-media-document/2025-10-08.raskin-to-moynihan-bofa-re-epstein.pdf, at 2.

[16] U.S. Senate Committee on Finance, *Letter to Attorney General Bondi, Secretary Bessent and Director Patel from Senator Wyden* (Mar. 11, 2025), https://www.finance.senate.gov/imo/media/doc/wyden_letter_to_doj-treasury-fbi_on_epsteinpdf.pdf, at 4; *see also* Wyden Letter, at 2; Financial Crimes Enforcement Network, *Guidance on Recognizing Activity that May be Associated with Human Smuggling and Human Trafficking – Financial Red Flags* (Sep. 11, 2024), https://www.fincen.gov/system/files/advisory/FIN-2014-A008.pdf.

[17] Contrary to Bank of America's argument, Mot. at 22–23, Federal Rule of Civil Procedure 9(b)'s particularity requirement does not apply here because equitable estoppel is asserted as a bar to a statute of limitations affirmative defense, not as an independent cause of action. *See, e.g.*, *Bild v. Konig*, 2011 WL 666259, at *6 (E.D.N.Y. Feb. 14, 2011) (declining to dismiss claim as barred by the statute of limitations and explaining that "equitable bar[s] to the assertion of the affirmative defense of statute of limitations" are not pleadings and therefore fall outside the scope of Rule

While Bank of America claims Doe "had all the facts she needed to allege a claim based on the use of her own account," Mot. at 23, that is false. The Complaint alleges that Doe's Bank of America accounts were frequently used without her knowledge or for purposes she did not understand, and that Epstein and his co-conspirators actively misled her when she questioned irregularities with her account. Compl. ¶¶ 54–66. That Doe may have known that her traffickers opened an account for her at Bank of America does not equate to her knowledge of the Bank's wrongdoing, which remained unknown even to government investigators until recently. *Id.* ¶ 7 n.5 *supra*. These circumstances, combined with Bank of America's own affirmative actions, concealed the true extent of the Bank's involvement in Epstein's sex-trafficking venture.[18]

---

9(b)). Even if Rule 9(b) applied, Bank of America's wrongdoing was inherently self-concealing such that Doe "need not plead any affirmative actions by" the Bank. *S.E.C. v. Jones*, 2006 WL 1084276, at *6 (S.D.N.Y. Apr. 25, 2006); *see also In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) (alleged price-fixing scheme was inherently self-concealing such that "plaintiff is not required to show defendants took independent affirmative steps to conceal their conduct"). Doe has nonetheless sufficiently pled Bank of America's affirmative actions, as described above.

[18] Bank of America also relies on a handful of out-of-circuit cases to argue that Doe's TVPA claims arising before October 15, 2015 are untimely because the continuing tort doctrine does not apply to TVPA claims. Mot. at 22 n.6. That is incorrect. *See, e.g.*, *Schneider v. OSG, LLC*, 2024 WL 1308690, at *5 (E.D.N.Y. Mar. 27, 2024) ("Courts have held that the [TVPA] involves a continuing tort, and that a single act occurring within the limitations period will preserve a claim based on all acts that were part of a single pattern."); *Doe 3 v. Indyke*, 2025 WL 2674235, at *5 (S.D.N.Y. Sep. 18, 2025) (same). Here, the Complaint alleges both injury to Doe and a banking relationship with Epstein—including transactions in Doe's account that should have raised obvious red flags to Bank of America—within the limitations period. *See, e.g.*, Compl. ¶ 47 (alleging sexual abuse from 2011 through 2019); ¶ 59 (Epstein and Klein transferring seven months of rent to Doe's Bank of America account in December 2015); ¶ 62 (Epstein still making transfers from accounts in his name to Doe's Bank of America account by October 2016); ¶ 66 (Epstein and Kahn using Doe's Bank of America account through Epstein's death in 2019). Because the Complaint was filed on October 15, 2025 and alleges wrongdoing as part of a single, continuous trafficking venture through 2019, Doe's claims are timely under the TVPA's ten-year statute of limitations.

20

### B. The Complaint States Two Claims for Negligence (Counts V–VI).

Doe has properly stated claims for both her negligence counts. To state a claim for negligence under New York law, Doe must plead "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 414. Bank of America argues that it owed no duty to Doe and that the Complaint fails to allege proximate cause. The Court should reject both arguments.

### 1. Doe Adequately Alleges a Duty Sufficient to State a Negligence Claim.

Bank of America contends that it owed no duty to Doe to prevent harm from Epstein. But Bank of America, "like everyone else," owed a "duty of reasonable care" to avoid injury to others by "forces [it] set in motion," including actions undertaken by third parties. *Id.*; *see also* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 (2010) ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm."); *Ford v. Grand Union Co.*, 197 N.E. 266, 268–69 (N.Y. 1935) (explaining that defendant owes a duty to avoid injury to others "by forces set in motion" by the defendant).

That is precisely what Doe alleges here: Bank of America "set [the] forces in motion" that injured Doe, as its financial support and concealment efforts were critical to Epstein's sex-trafficking venture. Compl. ¶ 199. The Complaint makes clear that his venture "*was not possible*" without Bank of America, which provided special treatment to Epstein and his co-conspirators that ensured the venture's continued operation and sex-trafficking of young women and girls. *Id.* ¶ 19 (emphasis added). Bank of America knowingly provided financial services which enabled Epstein to make payments to victims, including Doe, *id.* ¶¶ 54–66, 89; failed to follow numerous banking requirements in connection with financial dealings with Epstein, including AML rules, KYC rules, and anti-structuring rules, *id.* ¶¶ 69–74, 213, 215–16; purposely and deliberately failed to timely file SARs for suspicious activities in Epstein-related accounts, including for Epstein's known

21

associates like Maxwell and Black, *id.* ¶¶ 81–84, 109; ignored repeated red flags and suspicious activity indicative of sex-trafficking, including in Doe's account, *id.* ¶¶ 54–66, 84; facilitated payments for sham companies owned by Epstein and his co-conspirators, *id.* ¶ 58; chose not to cooperate with law enforcement and other investigations into Epstein's scheme, *id.* ¶ 85; and opened accounts for Epstein despite knowing that Epstein was a sexual predator engaging in sex crimes, ¶¶ 93–101, 108, 129. Because Doe alleges Bank of America "helped 'set in motion' Jeffrey Epstein's sex-trafficking venture" that caused Doe's injury, she plausibly alleges that Bank of America owed her a duty. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 414 (allowing negligence claims to proceed).

As to foreseeability, Bank of America tries to argue that it was not reasonably foreseeable that providing banking services to others aside from Epstein would cause Doe harm. Mot. at 24. Notwithstanding that Epstein's relationship with these individuals is well-documented, *see supra* pp. 4–7, the Complaint alleges that Bank of America provided special and non-routine banking services to *both* Epstein *and* his known co-conspirators, including numerous transactions sent to or from bank accounts in known sexual predator Epstein's name. Compl. ¶¶ 61–62, 80–85, 108–09; *see also* Section II.B.2 *infra*. These non-routine services made it reasonably foreseeable that victims of Epstein's sex-trafficking venture, including Doe, would be harmed.

Bank of America also contends that any duty it owed is limited by the scope of its purported contract with Doe as a customer. Mot. at 23–24. But New York law is clear "that banks owe a duty of care to their customers." *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 667 (S.D.N.Y. 2000) (collecting cases); *see also Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir. 1980) ("[I]t does not follow that because acts constitute a breach of contract they cannot also give rise to liability in tort."). In any event, Bank of America's argument rests on a

mischaracterization of Doe's claims. Doe does not allege negligence based on a breach of contractual duties owed to her as a Bank of America customer. Rather, she alleges that Bank of America affirmatively facilitated and enabled Epstein's sex-trafficking venture. Compl. ¶¶ 80–92, 129–132. That conduct caused injury to Doe and other class members, regardless of whether they were Bank customers. The cases cited by Bank of America—which merely state that a negligence claim must be based on a duty independent of the bank's contract with its customer—are therefore irrelevant.[19] To the extent there is any doubt, discovery may reveal evidence bearing on this issue. *See Dubai Islamic Bank*, 126 F. Supp. 2d at 667 (denying motion to dismiss negligence claim where "discovery may lead to evidence that bears upon . . . the question whether [defendant bank] had a 'duty' to Plaintiff independent of any alleged contractual obligations").

### 2. Doe Adequately Alleges Causation Sufficient to State a Negligence Claim.

Doe has adequately alleged that Bank of America was the direct and proximate cause of her injuries. Epstein's venture was not possible without the participation of Bank of America to provide special and non-routine treatment to Epstein and his co-conspirators and to ensure the sex-trafficking scheme's continued operation. Compl. ¶ 19. It provided the necessary financial resources, structuring, and operational support that enabled Epstein to recruit, transport, and pay victims, to conceal his activities from law enforcement, and to continue abusing young women and girls for decades. *See, e.g.*, *id.* ¶¶ 78–86. Not only are these but-for causes of Doe's injuries, but also it was highly foreseeable that Bank of America's participation in a sex-trafficking venture

---

[19] *Abhyankar by Behrstock v. JPMorgan Chase, N.A.*, for example, involved allegations that JP Morgan failed to implement "commercially reasonable security measures" to prevent fraudulent transfers. 2020 WL 4001661, at *5 (S.D.N.Y. July 15, 2020). The court granted summary judgment for JP Morgan after plaintiffs identified no evidence demonstrating JP Morgan owed an independent duty to provide additional scrutiny to those transactions. *Id.* *6. Here, by contrast, Doe alleges affirmative conduct by Bank of America that injured Doe (and others), wholly separate from any obligations the Bank owed to her as a customer.

would result in injuries to victims.

Nevertheless, Bank of America points the finger at Epstein as the true proximate cause of Doe's injuries. But as this Court previously held, proximate cause is adequately alleged where the defendant bank "*should have known*,"—and in fact actually knew or recklessly disregarded—that its banking services sustained a sex-trafficking venture. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 415 (emphasis added) (allowing negligence claims to proceed). That is precisely what Doe alleges here. *See, e.g.*, Compl. ¶¶ 81, 93–107, 109–10, 112, 133, 202, 220.

Bank of America also incorrectly asserts that it cannot be liable because the transactions specific to Doe—rent, immigration assistance, and tax payments—were supposedly "routine." Mot. at 3, 25. The Complaint repeatedly states, however, that Bank of America's services were far from routine. Compl. ¶¶ 80–85, 211–214, 219. For example, Bank of America processed a $170 million payment from Black to Epstein for purported "tax and estate planning advice," without any satisfactory explanation for such an astonishingly large payment for such services. *Id.* ¶ 82. Doe's account reflected "incredibly alarming and erratic banking behavior" in amounts "impossible based on [her] income or typical pattern of deposit." *Id.* ¶ 65. Transfers to Doe's Bank of America account were often made from accounts held in Epstein's name. *Id.* ¶¶ 61–62. Rent payments were made to 301/66 Owners Corp., associated with 301 East 66th Street, an address known to be affiliated with sexual predator Epstein. *Id.* ¶ 64. These allegations, taken together, are readily distinguishable from the cases Bank of America cites where the allegations were merely conclusory or involved ordinary banking services. *In re Terrorist Attacks on Sep. 11, 2001*, 740 F. Supp. 2d 494, 518 (S.D.N.Y. 2010) (defendant bank merely provided services "offered to all bank customers"); *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 831–33 (S.D.N.Y. 2005) (plaintiff did not allege defendant bank's knowledge of terrorist activities); *Rothstein v. UBS*

*AG*, 647 F. Supp. 2d 292, 294 (S.D.N.Y. 2009) (no direct involvement alleged); *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 56 Cal. Rptr. 2d 756, 760 (Ct. App. 1996) (no allegations of out-of-the-ordinary banking activity).

*Linde v. Arab Bank PLC*, cited by Bank of America, supports Doe's allegations. There, the plaintiffs alleged that the defendant bank *knew* its services were sustaining a "well-publicized" operation. 384 F. Supp. 2d 571, 588 (E.D.N.Y. 2005). Given those allegations of knowing participation, the court found that "there is nothing 'routine' about the services the Bank is alleged to provide." *Id.* So too here: Doe alleges that Bank of America knew or at least recklessly disregarded that its services were sustaining Epstein's sex-trafficking venture, so its services cannot be deemed "routine." In any event, "[i]t is sufficient, for pleading purposes, for plaintiffs to allege the knowledge and intent of [defendant bank] and not spell out their proof." *Id.* This is particularly true where, as here, Bank of America is hiding behind banking laws to avoid providing discovery into its suspicious handling of accounts that lie exclusively within its control.

## CONCLUSION

The Court should deny Bank of America's Motion to Dismiss Doe's Complaint in its entirety.[20]

---

[20] Alternatively, if the Court grants any portion of Bank of America's motion to dismiss, such dismissal should be without prejudice and with leave to amend. *See Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*, 2025 WL 2825402, at *12 (S.D.N.Y. Oct. 6, 2025) (Rakoff, J.) ("Where claims are dismissed under Rule 12(b)(6), 'leave to amend the complaint should be refused only if there is no basis for concluding that plaintiff can state a claim.'"). Any deficiencies in Plaintiff's Doe's allegations could be cured in an amended complaint, in particular given the Bank's admissions in discovery ██████████████████████████ *See E.E.O.C. v. Michael Cetta, Inc.*, 2011 WL 5117020, at *1 (S.D.N.Y. Oct. 27, 2011) (granting motion for leave to amend in light of information learned during discovery).

Dated: December 1, 2025

Respectfully submitted,

*/s/ Sigrid McCawley*
Sigrid McCawley
Daniel Crispino
Megan Nyman
Boies Schiller Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022
Email: smccawley@bsfllp.com
Email: dcrispino@bsfllp.com
Email: mnyman@bsfllp.com

David Boies
Andrew Villacastin
Rachael Schafer
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: dboies@bsfllp.com
Email: avillacastin@bsfllp.com

Bradley J. Edwards
Brittany N. Henderson
Dean Kaire
Edwards Henderson
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Telephone: (954) 524-2820
Fax: (954) 524-2822
 Email: brad@cvlf.com
Email: brittany@cvlf.com
Email: dean@cvlf.com

*Counsel for Plaintiff Jane Doe*

## **CERTIFICATE OF COMPLIANCE**

I, Sigrid McCawley, hereby certify pursuant to Local Civil Rule 7.1(c) that the foregoing

Memorandum of Law was prepared using Microsoft Word and complies with Rule 2(e) of this

Court's Individual Rules and Local Rule 7.1(c).

_/s/ Sigrid McCawley_