UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JANE DOE, Individually and on Behalf of all Others Similarly Situated,

Plaintiffs,

v. 25 Civ. 8520 (JSR)

BANK OF AMERICA, N.A.,

Defendant.
------------------------------x
JANE DOE, Individually and on behalf of all others similarly situated,

Plaintiffs,

v. 25 Civ. 8525 (JSR)

THE BANK OF NEW YORK MELLON CORPORATION,

Defendant.
------------------------------x
New York, N.Y.
December 12, 2025
4:00 p.m.

Before:

HON. JED S. RAKOFF,

District Judge

APPEARANCES

BOISE, SCHILLER & FLEXNER LLP
Attorneys for Plaintiffs
BY: DAVID BOIES
ANDREW VILLACASTIN
-and-
EDWARDS HENDERSON LEHRMAN PLLC
Attorneys for Plaintiffs
BY: BRADLEY J. EDWARDS

APPEARANCES (Cont'd)

JONES DAY
Attorneys for Defendant Bank of America
BY: CHARLOTTE TAYLOR
BETHANY K. BIESENTHAL
PAULA QUIST

WILMER CUTLER PICKERING HALE & DORR LLP
Attorneys for Defendant Bank of New York Mellon
BY: FELICIA H. ELLSWORTH
CHRISTOPHER BOUCHOUX
ANDRES SALINAS

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Attorneys for the Epstein Victims Compensation Program
BY: SIMONE LELCHUK

ALSO PRESENT:

Elise Frejka and Doug Pepe

THE COURT: This is Judge Rakoff. Would counsel please identify themselves?

MR. BOIES: Good afternoon, your Honor. This is David Boies on behalf of plaintiffs. With me are my partners, Sigrid McCawley and Andrew Villacastin, and also on the phone representing plaintiffs is Brad Edwards.

THE COURT: Good afternoon.

MS. BIESENTHAL: Your Honor, good afternoon. This is Bethany Biesenthal for Bank of America, and I'm joined with my colleagues Charlotte Taylor and Paula Quist, also for Bank of America.

THE COURT: Good afternoon.

MS. ELLSWORTH: Good afternoon, your Honor, Felicia Ellsworth for Bank of New York, joined by my colleagues Christopher Bouchoux and Andres Salinas.

THE COURT: Good afternoon.

MS. LELCHUK: Good afternoon, Judge Rakoff. This is Simone Lelchuk, the court-appointed claims administrator. I've had two previous class actions before your Honor. And on with me are my counsel, Doug Pepe and Elise Frejka.

THE COURT: Good afternoon.

Thanks to everyone for calling in. I know you had nothing better to do on a Friday afternoon. So the reason for this call is the claims administrator, who ultimately reports to the Court, apprised me of the fact that some discovery

requests have been made by one or both parties, one or both defendants for information. And I wanted to get a better handle on that because, as undoubtedly you're aware, the vast majority of the information gathered by the claims administrator related to highly confidential information from and about victims. And so at a very minimum, there would have to be very substantial redaction of any materials produced, but I wasn't even clear what anyone thought the claims administrator would have that would bear on this case.

Let me hear from whoever it was who is seeking -- or is, who is seeking information from the claims administrator.

MS. ELLSWORTH: Your Honor, this is Felicia Ellsworth for BNY. I'm happy to begin. I believe Bank of America is also seeking similar information, but I'll let them speak for themselves. We have been in dialogue with counsel for the claims administrator. We have not yet served a subpoena, but have reached to have a dialogue about what information might exist and would be relevant to our opposition to the plaintiffs' motion for class certification in this case. What we have been discussing with counsel for the claims administrator is aggregated and anonymized data sets for each of the JPMorgan and the Deutsche Bank funds.

As your Honor might recall, in the prior litigation, there was information produced by the Epstein Victims Compensation Program. We would be seeking similarly

aggregated, anonymized information from the funds here, as the Court ordered and allowed produced from the EVCP in prior litigation. And we've been discussing what the categories of those data would be with counsel for the funds in order to determine whether that information was in the possession of the fund administrator and could be produced in an aggregated, anonymized manner.

I'm happy to run through some of the categories that we have been discussing with them.

THE COURT: Well, give me your best shot, so to speak. What kind of information do you think would be most pertinent to a class certification debate?

MS. ELLSWORTH: So the first question would be the number of accepted, rejected, and total number of applicants. The categories of abuse, which is a category that the funds actually offered as the potential information they could provide, age --

THE COURT: Wait a minute. Wait a minute. Sorry. I'm not sure what I see is the relevance of the number. So there is, of course, a numerosity requirement for class certification. I can't imagine——but do tell me if you think I'm wrong——that you would be possibly contending that there wasn't numerosity in this case.

MS. ELLSWORTH: I don't think I can know the answer to that until I see the class certification motion and get

information about the number of members from the prior classes. But it is possible that we would not raise that argument, but we're seeking the discovery to make sure that we know what arguments we do and do not have at the class certification stage.

THE COURT: So the Second Circuit law is that normally if it's 20 or more, it satisfies——members of the class——it satisfies numerosity. And I think you can reasonably infer from anything you've read about this case, let alone your own involvement, that it's going to be a lot more than 20. So I don't understand why that would be even something you'd want to waste time on. But also what would be the relevance if someone was rejected. I'm not sure I understand what that bears on. Go ahead.

MS. ELLSWORTH: Your Honor, it goes to class treatment. If there were a number of individuals who applied and were rejected to one or more of the funds, that would be relevant to overall Rule 23 factors. I also would note there are other materials --

THE COURT: Only if they were being included in the class.

MS. ELLSWORTH: Only if they would be included in this class, your Honor?

THE COURT: Yes. In other words, let's assume hypothetically——this is purely hypothetical——that a very large

number of victims of Mr. Epstein applied, and one or two of them were rejected for whatever reason. Maybe they were untimely; maybe they were found not to have given sufficient evidence that justified their claim. So actually whether they are in or out of the class, what would it matter if there were one or two like that that the claims administrator had made a determination with respect to and determined they weren't eligible for funds? How would that affect class certification?

MS. ELLSWORTH: Again, your Honor, I think it goes to the appropriateness of the class action as a vehicle at all. I believe this information——this accepted and rejected and total number of applicants——has been produced in other litigations by the settlement funds. I believe the court has allowed it and ordered it to be produced, so we think it's relevant to be produced here.

THE COURT: Well, I don't know what may have been worked out in prior litigation. But I do know that this is the first time I'm getting personally involved in any meaningful respect, and that's because of two reasons. One is: It was written into the settlement agreements in the earlier cases and my express request that the Court have ultimate supervision over any issues that arise with respect to the claims administrator's functions; and second, that the claims administrator, in effect, is an officer of the Court. So I think it's a little bit different from whatever may have been

the situation involving the earlier litigation.

But anyway, for better or worse, I'm choosing to get involved right at this moment. I cut you off most impolitely, so please continue with the second of the things you were seeking.

MS. ELLSWORTH: Not a problem, your Honor. The other categories of information were age at the onset of abuse, and whether or not the individuals were minors or not, which again goes to whether common issue would predominate goes to the appropriateness of class treatment; whether or not any individual had a mental health diagnosis before the abuse or after the abuse. Again, these are yes or no questions, and again that goes to the appropriateness or applicability of class treatment, given common issues of facts; economic status and education level at the onset of abuse as well. That was the information we sought.

Your Honor, we had seen that in prior litigations where information had been sought from these funds, the parties had worked out with the funds a stipulation, something they could agree on, that was then presented to this court, and that has been the process that we were engaged in with the funds so far. So we had planned to come to you with something that was potentially agreed upon, but we welcome your guidance now and recommendations on what information would be appropriate to disclose here.

The last categories I wanted to point out are not the anonymized, aggregated data sets that would go to all of the fund applicants, but information specific to the plaintiff in this case, which is whether the plaintiff submitted a claim, was awarded anything from either of the settlement funds. We have asked the plaintiff to provide any claim forms that she may have submitted. We don't think we should have to get those from the funds, and also whether there were any other individuals who had identified the plaintiff in this case in their application to the fund in some manner, which would be relevant to the appropriateness of the plaintiff as a class representative.

THE COURT: So let me ask you this. Assuming for the sake of argument that there are some items of information to which you are entitled for class certification purposes, it seems to be crystal clear that, as you yourself recognize, there is going to have to be considerable care taken to prevent not only the identification of the victims directly. It's easy enough to redact their names. But if there's further information that you're seeking that the Court allows that gets into more detail, there may have to be further redactions; some of which might require someone with detailed knowledge to do the redactions such as the claims administrator or her counsel.

Assuming that was done, are you agreeable that the cost of doing that, which might require some hours by the

claims administrator or counsel, it should be borne by your client.

MS. ELLSWORTH: Yes. We've agreed in the conversations we've had with counsel for the administrator that our client would bear the cost of any legal fees incurred as a part of responding to the request.

THE COURT: By legal fees, what I'm talking about, depending upon how broad the requests are that are ultimately approved, it might be tens of hours of going through documents and deciding what needed to be redacted. So if that's included in what you're paying for, that's great. I just want to make sure that is what you are agreeing to.

MS. ELLSWORTH: It is, your Honor. It is. I'm sorry for not being clear.

THE COURT: All right. Let me hear from counsel for the other defendant.

MS. BIESENTHAL: Thank you, your Honor.

This is Bethany Biesenthal from Bank of America. We, Bank of America, are a few steps behind Bank of New York in their dialogue with the funds at this point, but we do anticipate seeking similar information that has just been described by Ms. Ellsworth and for the same reasons. But we still are in the exploratory phase with the funds in determining what documents and information is present and then what might be relevant to the claims at issue.

So at this point, while we do agree with everything that Ms. Ellsworth said as far as relevance for class certification issues, our primary goals are really ensuring that we receive information that relates to Jane Doe, and then also that we have a preservation of all of the information that the fund currently has. So it's our understanding that the claims forms and other information, that would have been submitted by the women seeking compensation, would include substantive information about say, for example, their trafficking experience.

We're sympathetic to the privacy issues that the funds have raised. And so that is why I think at this point our goal is to make sure that the information is preserved as we——outside of, of course, the Jane Doe information——identify potential putative class members for whom we would want additional information. So we have been working diligently with the plaintiffs in trying to identify who those individuals might be. We've requested a list from them of those putative class members a number of times, and they have declined to provide that information to us.

Were we to get that information, we would very much like to narrow any of our requests that we make to the funds, but we're just not at a point right now where we can do that. My understanding from some of the communications from the funds is that one of their goals will be to destroy the information

at a certain point, and that's why we want to make sure that the information is preserved so that we can come back to the Court as additional names are identified for us, sort of outside of this aggregate data that Bank of America is seeking, so that we can seek out additional information as we proceed through the case.

There is one --

THE COURT: With respect to the structure, just so that there's no misunderstanding, my determination is that nothing in the possession of the claims administrator, no information in the possession of claims administrator, whether it's by document or email or text message or whatever, can be destroyed without prior order of the Court. So you don't need to worry about that at this point. That might be an issue going forward, but it's not an issue right now. I want to reassure you of that.

MS. BIESENTHAL: OK. Well, thank you for that clarification.

Like I said, as we identify additional putative class members, we probably will go back to the fund, and we are going to continue to seek that information from plaintiffs which will probably be the subject of a forthcoming application to the Court that will be in a separate call. Because we do want to be able to identify that information so that we can keep these privacy issues front of mind as we move forward and try our

best to narrow the information that we're requesting, as it relates to any of the class members, including Jane Doe.

There was one additional issue --

THE COURT: Before you do that, just so that I understand. Assuming for the sake of argument though, my guess is that——this is not likely——assuming for the sake of argument, there was some defense special to Jane Doe but not to the, what I'm going to strongly suggest to you is the very numerous other victims of Jeffrey Epstein; what would stop plaintiffs' counsel from simply substituting or adding another individual representative?

I've had many, many class actions in which that has been done. It was discovered before the class certification hearing that there was the individual representative was in some way special, so all that plaintiffs' counsel did, with the full approval of the Court, was either add or substitute another of the prospective class action members who didn't have that particular situation. So I really wonder whether it's going to be a good use of your time to pursue that information if that's the reason you want special information about Jane Doe.

MS. BIESENTHAL: Well, Judge, it is, and I think that there is a possibility that the plaintiffs will do exactly as you suggested. I do think there's the possibility, the very real possibility, that we, at least as Bank of America, will be

arguing to the Court that Jane Doe is not an adequate class rep. And so at that point, I would anticipate that the plaintiffs would do exactly as you're suggesting, which is why we are trying, as we are moving forward with the matter, to get an understanding of who those other putative class members might be, so that we can preserve the information, narrow our requests, and request information about those specific individuals only; in addition to, again, sort of the aggregate data that Ms. Ellsworth described to the Court for that exact reason, which is that we are going to want to explore any individual who is either seeking to represent the entire class or who is availing themselves of this litigation as a putative class member.

And so that's exactly where our thinking is as far as attempting to get those names and understand who those individuals might be, so that we can focus our attention there. As opposed to just attempting to have blanket assertions of needing all relevant information relating to all potential Epstein victims, which we agree implicates all sorts of privacy issues.

THE COURT: All right. I have some further thoughts, but first, anyone else want to be heard on anything we've discussed so far?

MR. BOIES: This is David Boies, your Honor.

If I could just be heard briefly? I think the Court's

instinct is right that with respect to people other than the class representative, there is no relevance shown and certainly no relevance that would overcome I think, A, the general principle that you don't have discovery of absent class members, but also the very specific issue here that you are dealing with highly confidential information. And you're dealing with a court-ordered and court-supervised procedure in which, pursuant to the Court's suggestion, the victims were expressly asked Question No. 12, whether they would consent to the release of this information. And they, in almost all cases, said no, and I think that they had the understanding that this would be preserved confidentially except in a case where the Court concluded that the interest of justice upheld production but that would not be done lively.

I think with respect to the named class members, they are going to take discovery. As we produce documents, depositions are going to be taken. If there are materials that she does not have in her possession and which the Court concludes are appropriate for production, then it seems to me that there may very well be an application to the claims administrator, but certainly none of that has been shown thus far. And since the information is going to be preserved, I don't see any justification for producing that at this time.

With respect to Bank of America counsel's last suggestion that they want this information to potentially

identify other class member representatives so that they can begin vetting them, that's exactly the kind of personally identifying personal information seeking that I think the Court has properly held is not permissible. If there are other class representatives put forward, the information will be preserved, and at that point, if there's information in the class administrator's possession that is relevant and the Court concludes it over to be produced, it will be preserved. It can be produced then, but, again, I don't think there's any basis for doing that now.

THE COURT: All right. Anyone else want to be heard?

OK. So here is what I think makes sense:

First, if I recall correctly, there's going to be argument in my court on Monday on the motions to dismiss. And my wife is very grateful that I scheduled this for Monday so that I won't sit at home watching the football games but will come to chambers on Sunday to prepare for that argument. And I will, as is always my practice, at the end of oral argument on Monday set a time for a decision on the motions to dismiss. Typically, I'll agree to give a bottom-line ruling in one or two weeks, depending on how many issues I think require further study, to be followed by a full opinion. But for your purposes and for the immediate purposes, let's assume that it will be a bottom-line ruling two weeks from Monday.

So I don't think we should pursue this further until

the Court has ruled on the motions to dismiss. Motion to dismiss may narrow the case. Motions to dismiss may not. Motions to dismiss may eliminate the case. Who knows. So it seems not to be a good use of anyone's time to pursue this until I give the bottom-line ruling on the motions to dismiss.

Assuming that the cases are in part or in whole still alive after that bottom-line ruling, then I think the parties should then make a final effort in light of the conversation that we've had here today and the conversations you've already had with the claims administrator and her counsel previously to see what resolutions you can arrive at, if any. But I would want then to have the matter presented to me in a joint telephone call no later than one week after I issue the bottom-line rulings unless, of course, I dismiss the case in which case it will be moot. So that will still be fairly expeditious, and then on that telephone call, three weeks from Monday, I'll give you right then and there a determination on whatever has or has not been agreed to. So I think that is all I needed to cover.

Anything else anyone wanted to raise?

MR. BOIES: Not from the plaintiffs, your Honor.

This is David Boies.

MR. EDWARDS: Your Honor, this is Brad Edwards, also for the plaintiffs. On this issue we don't, but with your indulgence, I'd like to raise an issue related to your Monday

ruling, as we have a disagreement, and it relates to BSA. Currently, we are in an unsealed posture, so if we could address it and you are willing, your Honor, then I think that it is proper for it to be sealed.

THE COURT: Sure. Go ahead.

MR. EDWARDS: OK. You entered an order on Monday requiring, as the plaintiffs believed, for all BSA materials, as well as documents supporting documents associated with each filing, to be produced the following day, meaning Tuesday at 5:00. We received only the information that was provided in the ultimate SARs. We did not receive all of the supporting documents, and I believe——and maybe I'm overstating this, but we had a meet-and-confer yesterday——that the defendants' position is that wasn't part of your order. And we believed the materials that were ordered to be produced were the materials that your Honor described to both FinCEN and OCT in your email, which is what we requested. So I think it's really a clarification that those documents, in addition to SARs, should also have been produced and should be produced.

THE COURT: Well, I need to go back and look -- go ahead.

MR. BOUCHOUX: I'm sorry, your Honor. This is Chris Bouchoux for BNY Mellon. Just to clarify one point for Mr. Edwards, it's not simply the SAR narrative that has been produced, but also the accompanying supporting transaction

material, the transaction records for the filing; the SAR filing, where there was a transaction record that was filed with FinCEN. That was also provided. So it's the SAR narrative itself, and the SAR supporting transaction data that is provided and filed to FinCEN. Both of those have been produced. And, your Honor, respectfully, just to add, I don't think there would be any feasible way, at least from BNY's perspective, that all the other pieces of paper, to the extent they exist, that Mr. Edwards is talking about, could have been produced in 24 hours or would have been contemplated.

Well, I must admit that, without going back and looking at my own notes, it seems to me that the two things that were just referenced as what I had in mind should be immediately produced, and part of that was because I thought that could easily be done. So I think the point you're making just now, about if it was broader that it would have required much more time and perhaps more argument, is a good one.

But rather than shooting from the hip, let me go back and look at my own notes, and I will send everyone an email no later than Monday clarifying whether anything else has to be produced and if so by when. Under the same terms, of course as the original production. But I'm glad, Mr. Edwards, you raised it today. But I'm going to have to go back and I will do that over the weekend, and get you an email by Monday.

Anything else?

MR. EDWARDS: Thank you, your Honor.

MR. BOIES: Your Honor, this is David Boies. When you're thinking about it, I would ask you to focus on two separate issues: One, what needs to be produced, and, two, the timing of the production. Because I think that if you go back and look at what was instructed to be produced, it is broader and I think he may well be right, that can't all be produced in the same time frame. But I think it's important in a reasonable time frame it all be produced.

MR. BOUCHOUX: Your Honor, this is Chris Bouchoux. Sorry, your Honor.

THE COURT: No, go ahead.

MR. BOUCHOUX: Of course, your Honor. And the Court should do as you said in terms of reviewing it. The issue was the documentation associated with each filing. Those files have been provided quickly, and happy to hear Mr. Boies's point that you should consider the rest. But we've done that on a very expedited basis.

Discovery is moving forward in this case. The order, as I recall it, was to take the materials out and get the discovery moving. We've done that, and we're continuing to move in due course with any additional materials to the extent responsive. We would submit, the parties have fully complied, and there's nothing else here, but we certainly look forward to the Court's direction.

THE COURT: Well, I agree with you all that all production should be made in reasonable time and in accordance with the dictates of due course. But as, of course, you all know by now, my preferred synonym is "as soon as possible." But I will think about all this and give you my ruling on Monday.

MR. BOIES: Thank you, your Honor.

THE COURT: Anything else.

MS. TAYLOR: Your Honor, Charlotte Taylor for Bank of America, if I may?

THE COURT: Yes.

MS. TAYLOR: Just two points. One just to clarify or state on the record that Bank of America is similarly situated. We produced SAR as well as SAR supporting documents, which are the folders maintained for the financial regulators of underlying documents, with the limited exception of some very voluminous Excel spreadsheets showing all transaction records of associated accounts, which need to be redacted in accordance with your Honor's order of Tuesday, which is an ongoing process. But the transactions relevant to the SARs are already disclosed to plaintiffs with the materials produced. So those Excel spreadsheets will follow, but I have no additional information. So we're not 100 percent clear on what additional materials plaintiffs are asking us to produce but, again, we would welcome your Honor's order.

The other issue that we wanted to raise is two-fold, I guess, both going to confidentiality. One is a potential amendment to the protective order, and another is just some parameters on the hearing on Monday to preserve the confidentiality of confidential materials. So I think there's two buckets of confidential material. There's the SARs in the associated BSA-protected matter, and then there's sealed materials from Bank of America responses and objections that plaintiffs of America attached to their opposition to the motion to dismiss. And we have slightly different requests with respect to those if now is a good time to raise them.

THE COURT: Well, yes. Go ahead. I haven't gotten as deep into the attachments and things like that as I will obviously need to over the weekend. But I mean, normally when there's a question that comes up in an argument of any kind of something having to be sealed, my typical practice is just to have the parties come to the sidebar and explain to me on a sealed record why any reference to X or Y or Z needs to be sealed, and then I'll decide it right then rather than make a global ruling in advance. Is that not going to be satisfactory in this situation?

MS. TAYLOR: Yes. I think that as long as everybody is aware that before they begin discussing sealed material on the record that they request a sidebar, and then we can raise it at the hearing, then I would be fine with Bank of America.

We did also ask -- the protective order that the Court entered previously in the JPMorgan Deutsche Bank case did have a provision directing the parties to use extreme diligence and caution to avoid disclosing AML/BSA-protected information, SAR-related information in public court proceedings, and we asked plaintiffs agree to amend the protective order to conform to the order in the prior case. And we're now requesting -- they've not consented to that, so we are raising it with the Court.

THE COURT: OK. Well, let me ask plaintiff counsel. What is the objection?

MR. BOIES: I don't have a strong objection, your Honor. I think the protective order is adequate. I think we --

THE COURT: Let's do this. Forgive me for interrupting, Ms. Taylor. Why don't you just send my law clerk, some time before the end of today, the language you propose, and I'll take a look at it since it sounds like plaintiffs are leaving it to the discretion of the Court.

MR. BOIES: The only thing I would ask, your Honor, is that if we do put in some language like that, the language apply not only to the SAR but apply to any identifying information relating to the victims.

THE COURT: Well, that makes sense.

Does defense counsel agree to that?

MS. TAYLOR: We have no objection to that. We would have to confer. So the language from the prior protective order doesn't encompass that, so I think we would just need to come to ground on wording with plaintiffs' counsel.

THE COURT: I'll tell you what, instead of sending it to me today, send me, sometime Monday, your proposed language. I think it can certainly wait until close of business on Monday. If you are agreed, let me know. If you are still disagreed, I'll undertake to make a ruling. I don't think we need further argument on that. I'll just either accept it as is, modify it, or not accept it at all, but we'll get it done by Monday, end of business.

MS. TAYLOR: Thank you, your Honor.

MR. BOIES: Thank you, your Honor.

MR. EDWARDS: Your Honor, Brad Edwards. Sorry to make this hearing unnecessarily long, but the SARs material was turned over currently for attorneys eyes only. Is that extended --

THE COURT: That was a temporary thing to just get it done, and that was my thinking.

MR. EDWARDS: Yes.

THE COURT: And it was subject to being revised later. So you want to show it to your expert?

MR. EDWARDS: Yes.

THE COURT: Any objection?

MR. BOUCHOUX: Your Honor, this is Chris Bouchoux again, Bank of New York. No objection to that pursuant to that the expert -- and I'm sure Mr. Edwards would agree to this -- is that the expert would follow the protective order, sign the appropriate disclosures, all of that. Subject to that, of course, that's fine.

MR. EDWARDS: Absolutely.

THE COURT: OK. Terrific. So ordered.

Anything else?

MR. BOIES: Again, your Honor, this is David Boies. Nothing from plaintiffs.

MS. ELLSWORTH: Nothing for the BNY defendants, your Honor. Thank you.

MS. TAYLOR: Nothing more for Bank of America. Thank you.

THE COURT: And the claims administrator and her counsel have been incredibly quiet. Of course, I very much appreciate that. Anyway, I hope everyone has a good weekend, and I'll see you on Monday.

(Adjourned)