## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>        v.<br><br>BANK OF AMERICA, N.A.<br><br>    Defendant. | **AMENDED INDIVIDUAL AND CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>Case No. 1:25-cv-08520-JSR |

## <u>AMENDED INDIVIDUAL AND CLASS ACTION COMPLAINT</u>

Plaintiff Jane Doe files this individual and civil class action complaint for damages and other relief under (among other provisions of law) the United States federal anti-sex trafficking statute, 18 U.S.C. § 1591, *et seq.*—the Trafficking Victim Protection Act ("TVPA")—and for common-law tort claims under New York law. The suit arises from Defendant Bank of America, N.A.'s ("BANA" or the "Bank") participating in and financially benefitting from Jeffrey Epstein's widespread and well-publicized sex-trafficking operation, as well as the direct financial benefits it received therefrom. Doe makes the following allegations based on personal knowledge as to her own acts and status and upon information and belief as to all other matters. As detailed below, BANA has actively concealed details and evidence concerning its assisting and facilitating Epstein's sex trafficking. Doe believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

1.      Jeffrey Epstein, the world's most infamous sexual predator, ran an international sex-trafficking operation and abused thousands of women and girls for decades. Epstein's sex

trafficking could not have happened at the scope, scale, and duration it did without the assistance and facilitation of powerful individuals and institutions, including BANA and its major client Leon Black.

2.       As a recent Congressional investigation reported, "more than $1 billion worth of transactions . . . flowed in and out of Epstein's accounts"[1] at large financial institutions. As a document in the Treasury Department's Epstein file reveals, between 2003-2019 there were more than 4,725 wire transfers exceeding $1 billion involving Jeffrey Epstein, his entities, and his agents, including Darren Indyke, Harry Beller, Richard Kahn and Erika Kellerhals. Epstein's sex trafficking depended on these transactions. More than $170 million of these transactions were transfers made by BANA by, to, or on behalf of Epstein, his entities, agents, and co-conspirators.

3.       Until recently, BANA's role in assisting and facilitating Epstein's sex trafficking was not known. One of the ways BANA concealed Epstein's sex trafficking and its assistance and facilitation of it, was by failing to file Suspicious Activity Reports ("SARs") concerning large cash transfers to, by, and on behalf of Epstein—reports that BANA was legally obligated to file, and reports which, if filed, would have alerted authorities to the sex trafficking and brought it to an end.

4.       Despite widespread public knowledge of and attention to Epstein's sex trafficking, BANA continued to provide financial support, assistance, and facilitation to Epstein's sex trafficking until after Epstein's second arrest. For example, BANA ███████████████████

---

[1] *See, e.g.*, U.S. Senate Committee on Finance, *Letter to Attorney General Bondi from Senator Wyden* (July 21, 2025), https://www.finance.senate.gov/imo/media/doc/wyden_letter_to_doj_-_follow_the_money_on_jeffrey_epstein_7-21-25pdf.pdf/ ("July 2025 Wyden Letter"), at 1; *see also* Alex Woodward, *Top Democrat demands Trump's IRS investigate Epstein bank records in sprawling probe: 'Follow the money'*, THE INDEPENDENT (July 31, 2025), https://www.the-independent.com/news/world/americas/us-politics/epstein-bank-records-ron-wyden-leon-black-b2799888.html.

████████████████████████████████████████████████████████████

████████████ BANA also opened and maintained an account for one of Epstein's victims, into which Epstein's funds were deposited to pay for the victim's living and other expenses related to the sex trafficking. Despite the fact that the victim spoke little English and had no apparent means of earning money, the Bank continued to make tens of thousands of dollars in transfers into and out of this account without any known or apparent lawful or business reason or justification. BANA also made $170 million in cash transfers from Black to Epstein—transfers that for several years were the primary means by which the sex-trafficking venture was funded and for which there was no apparent business or lawful purpose. Throughout all this, BANA knowingly and intentionally failed to timely file the SARs it was legally required to file until it was far too late to do any good.

5.      BANA knowingly and intentionally benefited from the assistance and support it provided to Epstein, including from fees, referrals, and the development and preservation of relationships with Black and others.

6.      Many details of BANA's knowing assistance and facilitation of Epstein's sex trafficking remain unknown as a result of BANA's refusal to voluntarily produce data or documents without court orders, or to cooperate with Congressional investigations. For example, an October 8, 2025 letter from the U.S. House of Representatives to BANA's CEO Brian Moynihan requested information and documents concerning Epstein-related accounts, including accounts for Black and Ghislaine Maxwell.[2] BANA has not produced the requested information

---

[2] U.S. House of Representatives Committee on the Judiciary, *Letter to Bank of America CEO Brian Moynihan from Representative Raskin* (Oct. 8, 2025), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2025-10-08.raskin-to-moynihan-bofa-re-epstein.pdf, at 1–2. Letters were also sent to the CEOs of other financial institutions tied to Epstein's sex-trafficking venture, including

to Congress. What is known from the limited data and documents that have come to light is:

(a) BANA knew that Epstein was a convicted and registered sex offender; BANA knew that Epstein was widely and publicly accused of continuing an international sex-trafficking venture;

(b) BANA knew that Epstein's sex trafficking required access to banking services and to large amounts of cash;

████████████████████████████████████

████████████████████████████████████

████████████████████

(d)  BANA had both actual and constructive knowledge that each of these accounts were used to make transfers by and on behalf of Epstein. These suspicious transactions were made for no legitimate business purpose, including by Black, who financed Epstein's international sex-trafficking operation from 2013 to 2019;

(e) BANA opened accounts and made transfers for Epstein, his known entities, and agents despite BANA's actual and constructive knowledge of highly publicized information that Epstein was a registered sex trafficker known for running a sex-

---

JPMorgan Chase & Co, Deutsche Bank, and Bank of New York Mellon. *See* U.S. House of Representatives Committee on the Judiciary, *Letter to JPMorgan CEO Jamie Dimon from Representative Raskin* (Oct. 8, 2025), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2025-10-08.raskin-to-dimon-jpmorgan-re-epstein.pdf; U.S. House of Representatives Committee on the Judiciary, *Letter to Deutsche Bank CEO Christian Sewing from Representative Raskin* (Oct. 8, 2025), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2025-10-08.raskin-to-sewing-deutsche-bank-re-epstein.pdf; U.S. House of Representatives Committee on the Judiciary, *Letter to Deutsche Bank CEO Robin Vince from Representative Raskin* (Oct. 8, 2025), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2025-10-08.raskin-to-vince-bny-mellon-re-epstein.pdf.

trafficking operation. BANA also knew Epstein was a college dropout, maintained no professional licenses, and had no professional training in tax, estate planning, or other expertise;

(f) BANA opened an account in the name of an Epstein victim without any due diligence and with actual and constructive knowledge that the account was being used to assist and facilitate Epstein's sex trafficking. Tens of thousands of dollars of Epstein's money was transferred in and out of that account despite the lack of explanation for why a victim who spoke little English and had no prospect of legitimate employment or personal wealth would be receiving such funds from a sex trafficker; and continued to process payments for living expenses without any inquiry as to why a known sex trafficker would be housing and paying the living expenses of a young woman in her 20s who had recently arrived in the country;

(g) BANA transferred $170 million in cash from Black's accounts at the Bank to Epstein and his entities without any known or apparent lawful or business reason or justification;

(h) BANA provided a business operating account to MC2, which was owned by Jean-Luc Brunel and financed by Epstein, which was publicly known to have been used to lure, manipulate, groom, and exploit young women, including many from Eastern Europe. Epstein and Brunel used MC2's BANA operating account to fund and conceal Epstein's sex-trafficking enterprise;

(i) BANA failed to timely file the SARs it was legally required to file to alert the authorities to these large and numerous suspicious transfers; and

(j) BANA continued to assist Epstein, and even increased BANA's business with

Epstein and his entities, after other banks terminated Epstein and his entities as clients.

## JURISDICTION, VENUE, AND TIMELINESS

7.      This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Jane Doe—individually and on behalf of the other Class members—proceeds under the federal TVPA statute, 18 U.S.C. § 1589 through § 1595. The Court also has supplemental jurisdiction over the state law claims recounted below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

8.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the acts, events, and omissions giving rise to this cause of action occurred in this District. Epstein, his co-conspirators, and BANA all conducted substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through actions that originated in this District. In addition, Epstein sexually abused and trafficked Jane Doe and members of the Class in this District.

9.      This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1) because it is filed within ten years after the cause of action arose.

10.     In addition, any statute of limitations applicable to Jane Doe's and the putative Class's claims, if any, is tolled due to the Bank's affirmative concealment of the facts that make up Doe's and the Class's claims, including affirmative misrepresentations that created the false impression that the Bank had no meaningful role in, or knowledge of, Epstein's sex-trafficking enterprise, as well as the continuous and active deception, duress, threats of retaliation, and other forms of misconduct that Epstein and his co-conspirators used to silence his many victims,

including Doe. These acts induced Doe, despite reasonable diligence, to refrain from bringing suit earlier.

11.    BANA strategically and fraudulently covered up its conduct, and it was not until recently when Congress began to release information concerning Epstein's financial institutions that the Bank's conduct was partially revealed. These acts went well beyond the underlying wrongdoing and were specifically designed to and did obscure the Bank's role in facilitating Epstein's sex-trafficking enterprise.

12.    BANA knowingly and fraudulently concealed its involvement by, among other things, failing to make filings and disclosures that it was legally obligated to make; failing to provide responsive documents requested by Congressional investigations; making misleading assertions that it only provided routing banking services to Epstein, his entities, and agents, and that it was unaware that BANA accounts were used to assist and facilitate Epstein's sex trafficking; delaying or withholding the production of responsive documents; and resisting cooperation with law enforcement and Congressional investigations.

13.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

14.    This concealment occurred against the backdrop of a broader scheme of coercion and silence orchestrated by Epstein and his co-conspirators, including threats of retaliation, threats to Doe's immigration status, economic pressure, confidentiality demands, and other forms of intimidation that deterred victims from coming forward. BANA knowingly benefited from and

capitalized on this environment of enforced silence, which further impeded Doe's ability to discover the Bank's involvement through reasonable diligence.

15.     These actions were separate from and subsequent to the conduct giving rise to their liability and were intended to prevent Epstein's victims, including Doe, from learning of the Bank's role and from timely commencing suit.

16.     Including for these reasons, BANA is equitably estopped from asserting a statute-of-limitations defense.[3]

## PARTIES

17.     Plaintiff Jane Doe is a citizen of Florida and was at all relevant times a resident of and domiciled in the State of New York.

18.     Jane Doe is using a pseudonym to protect her identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

19.     Jane Doe is also at serious risk of retaliatory harm because the co-conspirators who participated in the Epstein sex-trafficking venture had—and continue to possess—tremendous wealth and power and have demonstrated a clear ability to cause her serious harm, including threats to her immigration status.

20.     Jane Doe's safety, right to privacy, and security outweigh the public interest in her identification and any prejudice to Defendant by allowing her to proceed anonymously.

21.     As discussed below, many other women are similarly situated to Jane Doe and also need to proceed anonymously for the same reasons. The identities of most of these other women are known to Defendant.

---

[3] Alternatively, BANA's wrongdoing is inherently self-concealing such that Doe need not plead any affirmative actions by the Bank.

22.    Defendant Bank of America, N.A., or BANA, is a global financial institution headquartered in Charlotte, North Carolina, and operating in this District.

23.    BANA is responsible, under United States law and otherwise, for the acts of its officers, directors, employees, and agents, including the acts and knowledge described in this complaint. The acts and knowledge alleged were committed by BANA's officers, directors, agents, and employees, including the acts and knowledge of its employee Paul Morris, who was intimately familiar with Epstein's sex trafficking and Epstein's sex-trafficking venture, and BANA's reliance on banking services from Morris's prior work with JP Morgan and Deutsche Bank prior to the time that first JP Morgan and then Deutsche Bank terminated Epstein, acting within the scope of their employment and with the intention to benefit BANA.

## THE TRAFFICKING VICTIMS' PROTECTION ACT

24.    The Trafficking Victims Protection Act ("TVPA") outlaws sex-trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States. It is to be construed broadly because it serves a remedial purpose and uses intentionally broad language. The TVPA forbids the following sex-trafficking conduct:

(a)  Whoever knowingly—

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in

a commercial sex act, shall be punished as provided in subsection (b). 18 U.S.C. § 1591(a).

25.    The TVPA also contains an explicit "civil remedy" provision which allows an individual who is a victim of a violation of Chapter 77 of Title 18 (*e.g.*, violation of 18 U.S.C. §§ 1591–94) to bring a civil action against the perpetrator and any person or entity who knowingly benefits, financially or by receiving anything of value from participation in an illegal sex-trafficking venture. 18 U.S.C. § 1595(a).

1.Unlike the criminal penalties provisions in the TVPA, the civil remedies provision contains a "constructive knowledge" provision. This provision allows a civil action to be brought not only against a person or entity who participated in a venture known to have engaged in illegal sex trafficking but also against a person or entity who participated in a venture that the person or entity should have known had engaged in illegal sex trafficking. 18 U.S.C. § 1595(a). This provision provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

## FACTUAL ALLEGATIONS

### A.    The Epstein Sex-Trafficking Venture.

26.    Beginning in the early 1990s and continuing through the summer of 2019, Epstein knowingly established and ran a sex-trafficking venture in violation of 18 U.S.C. §§ 1591–95. As part of the venture, Epstein used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young women and girls from all over the world to engage in commercial sex acts and to sexually abuse them. For example:

(a)  Epstein and his co-conspirators threatened that physical and reputational harm would come to victims if they did not comply with his demands that they perform commercial sex acts;

(b)  Epstein and his co-conspirators falsely and fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands, promises that Epstein did not, and never intended to, fulfill; and

(c)  Epstein and his co-conspirators threatened to deprive victims of their living accommodations, clothing, education, food, or other necessities, exploiting the vulnerabilities of his often poor and underprivileged victims.

27.    In creating and maintaining this network of victims in multiple states and in other countries to sexually abuse and exploit, Epstein worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, recruiting victims, coercing victims, and scheduling their sexual abuse by Epstein at his New York mansion, his Palm Beach mansion, and his island in the U.S. Virgin Islands.

28.    Among other things, Epstein sexually abused his many victims and caused his victims to engage in commercial sex acts, specifically sex acts for which his victims received things of value, including money, promises of educational and career advancement, a place to live, and promises that Epstein would provide various forms of assistance.

29.    As one means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators threatened that harm would come to victims if they did not comply with his demands that they perform commercial sex acts.

30.    As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators falsely and fraudulently promised to further victims' educational or career

aspirations if they would comply with his sexual demands. These promises, most of which were never, and were never intended to be, fulfilled, were a quid pro quo for the sex acts that occurred.

31.     As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators would threaten to deprive his victims of their living accommodations and other necessities, further exploiting the vulnerabilities of his often poor and underprivileged victims. Epstein used this material support to maintain victims' dependence, including by threatening to withhold basic necessities like food for non-compliance with his demands.

32.     In 2006, Epstein was arrested in Florida after state and federal law enforcement discovered that he had sexually abused more than 30 children in his Palm Beach, Florida mansion. During that investigation, the government concluded that Epstein and his co-conspirators had committed federal criminal acts constituting violations of the TVPA and other federal laws, including 18 U.S.C §§ 2422(b), 2423(f), 2423(b), 2424 (e); 18 U.S.C § 371; 18 U.S.C §§ 1591(c)(1), 1591(a)(1), 1591(a)(2); as well as state crimes in violation of Florida Statute §§796.07 and 796.03, against dozens of young women.

33.     As a consequence of the Florida investigation, Epstein pled guilty to two felonies, was permanently labeled a "Registered Sex Offender," and was jailed in 2008. Epstein also entered into a non-prosecution agreement with the U.S. Attorney's Office for the Southern District of Florida barring his prosecution (and prosecution of his co-conspirators) for violations of the TVPA and other sex offenses by that office. When the U.S. Attorney's Office entered into that non-prosecution agreement with Epstein, it had not received reports from BANA about Epstein, nor did BANA provide any other assistance in the investigation.

34.     Epstein's criminal case in Florida and the many related news reports left no doubt about Epstein and his extraordinary penchant for sex abuse and trafficking of young females.  For

instance, it was reported that up until the time of his Florida arrest, Epstein had been sexually abusing *three to four young females per day*.

35.    The Epstein sex-trafficking venture transported victims across state boundaries between New York, Florida, New Mexico, New Jersey, Massachusetts, the U.S. Virgin Islands, and elsewhere, and in foreign commerce between the United States and Europe, especially Eastern Europe.

36.    At all times relevant to this complaint, the Epstein sex-trafficking venture was a group of two or more individuals associated in fact, even if they were not a formal legal entity. Indeed, members of the Epstein sex-trafficking venture referred to it as an "organization." Epstein was continuously at the hub of this sex-trafficking organization, which operated throughout the times indicated in this complaint.

37.    The Epstein organization used its in-house attorney, Darren Indyke, for services related to Epstein's trafficking operation and other illegal activities, which sought to protect inter-organization communications by the claim of attorney-client privilege, and which was used to withhold relevant documents from discovery.  Any time Epstein needed legitimate legal work performed, including defending his criminal investigations and defending all civil lawsuits, he hired high-end legal teams and firms.

38.    Likewise, while Epstein hired outside accounting firms to service his corporate taxes, he utilized a company providing exclusive accounting and in-house financial services for Epstein—HBRK—to keep the books on his sex-trafficking venture, pay victims, withdraw and hold large amounts of cash for hush money payments and illegal payments to sex-trafficking victims, create false companies and maintain accounts for the purpose of causing sex-trafficking victims to remain entrapped by the organization and to otherwise develop false schemes to protect

the operation and control the victims.  "HBRK" stands for "Harry Beller Richard Kahn," referring to its founding members and longtime Epstein associates and accountants, Harry Beller and Richard Kahn.  Kahn serviced the taxes of numerous Epstein victims and devised schemes to entrap them, and often had to communicate with financial institutions on behalf of victims (including Jane Doe and other trafficking victims which should have raised other red flags).

39.    On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a sealed, two-count Indictment against Epstein, including one count of Sex Trafficking Conspiracy and one count of Sex Trafficking for violations of 18 U.S.C. §1591, in part due to Epstein's criminal activities in his New York Mansion located at 9 East 71st Street.  *See United States v. Jeffrey Epstein*, Case No. 1:19-cr-490 (S.D.N.Y.).

40.    On July 8, 2019, Epstein was arrested pursuant to the New York Indictment.

41.    On August 10, 2019, prison guards found Epstein unresponsive in his Metropolitan Correctional Center jail cell, where he was awaiting trial on the federal sex-trafficking charges. He was later pronounced dead from apparent suicide.

42.    In July 2020, Epstein's co-conspirator in the sex-trafficking venture, Maxwell, was arrested on federal sex-trafficking charges filed in the Southern District of New York. The charges alleged that she had assisted, facilitated, and contributed to Epstein's abuse of sex-trafficking victims, helping Epstein to recruit, groom, and ultimately abuse his victims. *See United States v. Maxwell*, Case No. 1:20-cr-00330 (S.D.N.Y.).

43.    On December 29, 2021, after a weeks-long jury trial during which witnesses testified about Epstein's sex-trafficking operation in painstaking detail, Maxwell was found guilty on five federal sex-trafficking counts and is now serving nearly 20 years in federal prison for these crimes.

44.     Relatedly, on July 6, 2020, a Consent Order penalizing Deutsche Bank $150 million was entered in favor of the NY Department of Financial Services finding violations against Deutsche Bank for violations of AML laws. The Order detailed criminal activity committed by Epstein's top loyalists, Indyke and Kahn, identified respectively in the consent order as "ATTORNEY-1" and "ACCOUNTANT-1," who were carrying out suspicious financial actions in furtherance of Epstein's sex-trafficking operation.

45.     As noted by the Senate Committee on Finance, Indyke and Kahn were employed by Jeffrey Epstein for decades.[4] "In their capacities as Epstein's in-house attorney and accountant, Indyke and Kahn controlled the movement of funds through Epstein's bank accounts and oversaw virtually every aspect of the financial infrastructure that paid for Epstein's sex trafficking activities." December 2025 Wyden Letter, at 1. Moreover, Kahn has lied to U.S. immigration officials by supporting a sham marriage designed to help Epstein's victims remain in the United States. *Id.*

46.     The Senate Committee on Finance explained that "at Epstein's direction, Indyke and Kahn structured hundreds of Epstein's bank accounts, created and administered dozens of corporate entities, regularly made large cash withdrawals on Epstein's behalf and authorized thousands of suspicious wire transfers." *Id.* "According to bank records recently unsealed in federal court, Indyke and Kahn had signatory authority or power of attorney over Epstein's bank accounts and were the subject of numerous suspicious activity reports ("SARs") filed with the U.S.

---

[4] U.S. Senate Committee on Finance, *December 17, 2025 Letter to Attorney General Bondi and FBI Director Patel from Senator Wyden* (Dec. 17, 2025) https://www.finance.senate.gov/imo/media/doc/letter_to_doj-fbi_from_us_senators_on_darren_indyke_and_richard_kahn_12-17-25pdf.pdf ("December 2025 Wyden Letter"), at 1.

Treasury Department." *Id.*

47.    The Senate Committee on Finance also noted that SARs filed by JP Morgan Chase, flagging more than $1 billion worth of suspicious wire transfers through Epstein's accounts, noted that Indyke "controlled the movement of Epstein's funds as signer of several Epstein accounts." *Id.* at 2.

48.    As Congressional investigations found, and the Wall Street Journal reported, Kahn and Indyke participated in Epstein's sex-trafficking venture by, among other things, perpetuating sham marriages between Epstein's victims.[5] Kahn lied to U.S. Immigration officials by providing "glowing" endorsements of the forced marriages.[6] "Another part of the job was dealing directly with women later revealed to have been caught in Epstein's web. They facilitated marriages that turned out to be shams, sent payments to women who have since said they were abused, and monitored the personal expenses Epstein was paying for."[7]

49.    In one documented instance, Kahn prepared a letter describing a "healthy marriage" between two women, and "their bond so deep they 'often complete each other's sentences.'"[8] "Kahn prepared the letter on behalf of his longtime boss and patron, Jeffrey Epstein" who "was

---

[5] Khadeeja Safdar & Joe Palazzolo, *The CPA and the Lawyer Who Served Jeffrey Epstein—and Control His Fortune and Secrets*, THE WALL STREET JOURNAL (Nov. 22, 2025), https://www.wsj.com/us-news/epstein-accountant-lawyer-control-estate-0d31070b?gaa_at=eafs&gaa_n=AWEtsqcukK5gB2i3PhfPz9TdTmdeljSyeQNHQDBeKrUuOPA0CPoaKj-3Ql99MiBHBTY%3D&gaa_ts=6948a670&gaa_sig=jKOB_1Txjj849sg56QIqZ6dhxTEtoVm8RgMDCOKn3ladmEgUAfmZuv96TXCs09-z15wQuf-xStGXAITuD_qRnQ%3D%3D.

[6] *Id.*

[7] *Id.*

[8] *Id.*

trying to secure U.S. papers for an Eastern European woman he wanted to keep in the country. The plan required a spouse. Epstein had pressured an American woman he had abused into marrying the woman—and Kahn's letter gave it legitimacy."[9] Kahn's assertions were knowingly false.

50.     As the Wall Street Journal reported, "the American woman told attorney Darren Indyke that she wanted a divorce. Indyke, who had previously advised her on how to communicate with U.S. immigration officials, warned against it. He, too, worked for Epstein."[10]

51.     "[I]t was Kahn, the trusted accountant, and Indyke, the loyal lawyer, who kept the engine running for years with their financial and legal maneuvers."[11] Kahn managed the expenses, and Indyke structured withdrawals of cash in amounts that didn't trigger federal reporting.

52.     As the Wall Street Journal further reported, Kahn and Beller established HBRK to serve a single client: Jeffrey Epstein. HBRK listed its business address as "301 E. 66th Street, [a] building used by Epstein. It was a one-bedroom apartment converted into an office. Indyke had a similar one, and their doors were across the hall from each other."[12] As detailed below, BANA intentionally ignored and failed to flag as suspicious the fact that Jane Doe's account made payments to a company that, like HBRK, also listed 301 E. 66th Street as its business address.

**B.     BANA Knew, Should Have Known, and Recklessly Disregarded Epstein's Sex Crimes and Sex-Trafficking.**

53.     Epstein's sex-trafficking venture was publicly and widely known. For decades, several high-profile investigations, lawsuits, and articles covered up Epstein's crimes. Despite

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

having access to and knowledge of these public sources, BANA knowingly and intentionally disregarded this damning information in the name of financial gain.

54.     On October 28, 2002, Landon Thomas published, "Jeffrey Epstein: International Moneyman of Mystery" in New York Magazine.[13] This article publicly linked Epstein to Black. This article was available to any financial institution conducting diligence checks on Epstein when deciding whether to open or maintain accounts for him, and emphasized the need to scrutinize the source of Epstein's funds and whether his incoming and outgoing payments could reasonably have any valid business purpose.

55.     On March 1, 2003, Vicky Ward published, "The Talented Mr. Epstein" in Vanity Fair, revealing Epstein's deep rooted ties to Maxwell, the fact that he dropped out of college and acted as a school teacher before being hired at Baer Sterns, and the fact that his deposition was taken by the SEC in 1981 for committing a Regulation D violation.[14] The article also documented Epstein's ties to convicted criminal Steven Hoffenberg and his unusual relationship with Leslie Wexner, the founder of Victoria's Secret. The article raised serious questions about Epstein's credibility, sources of wealth, business practices, and associations, and publicly exposed numerous red flags that were readily available to financial institutions conducting due diligence on Epstein.

56.     In 2005, the Palm Beach Police Department began investigating Epstein.

57.     On July 23, 2006, Epstein was arrested.[15]

---

[13] Landon Thomas, Jr., *Jeffrey Epstein: International Moneyman of Mystery*, NEW YORK MAGAZINE (Oct. 28, 2002), https://nymag.com/nymetro/news/people/n_7912/.

[14] Vicky Ward, *The Talented Mr. Epstein*, VANITY FAIR (Mar. 1, 2003), https://www.vanityfair.com/news/2003/03/jeffrey-epstein-200303?srsltid=AfmBOoqec1Twtdt-Bq8Oo14_-nlf02nRGON9rgbBU2YMrGtzZiivv1m.

[15] *Probable Cause Affidavit,* Palm Beach Police Dep't (July 25, 2006), available at https://abcnews.go.com/images/WNT/Palm_Beach_Records_Epstein.pdf

58.     In 2006, Epstein was publicly exposed for sexually abusing dozens of young women and girls, several as young as 14 years old. There were hundreds of pages of police reports revealing that Epstein was a serial sexual abuser and trafficker, including detailed reports making it clear that his operation depended on his accessing nearly large amounts of cash to use as payments to his victims who were then paid more cash to bring him more victims. The money trail into the Epstein-related accounts made plain that Epstein was engaging in crimes and the recipients of his money exposed the type of crimes. The police reports generated in that investigation were made public and spread rampantly across the internet, beginning with TheSmokingGun.com.[16]

59.     In 2006, local Palm Beach press began covering the Epstein investigation which resulted in dozens of early articles about Epstein's arrest and the allegations of sexual abuse being published and circulated online.[17]

60.     By August 14, 2006, the Epstein saga had become more wide-spread and nationally known culminating in an article by the New York Post titled, "Mystery Moguel's Teen Sex Secret Bared in Probe."[18]

61.     On September 24, 2007, Epstein entered into a Non-Prosecution Agreement ("NPA") with the Southern District of Florida.

62.     On October 6, 2007, Page Six of the New York Post published an article linking

---

[15] Staff Writer, *Billionaire in Palm Beach Sex Scandal*, The Smoking Gun (July 26, 2006), https://thesmokinggun.com/documents/sex/billionaire-palm-beach-sex-scandal
[16] Staff Writer, *Billionaire in Palm Beach Sex Scandal*, The Smoking Gun (July 26, 2006), https://thesmokinggun.com/documents/sex/billionaire-palm-beach-sex-scandal.

[17] *See e.g.*, Staff Writer, *After long probe, billionaire faces solicitation charge*, THE PALM BEACH POST (July 27. 2006), https://www.palmbeachpost.com/story/news/2006/07/27/after-long-probe-billionaire-faces-solicitation-charge/2623078007/.

[18] Dan Mangan, *Mystery Mogul's Teen-Sex Secret Bared in Probe*, NEW YORK POST (Aug. 14, 2006), https://nypost.com/2006/08/14/mystery-moguls-teen-sex-secret-bared-in-probe/.

Jean-Luc Brunel and MC2 Models to Epstein.[19] Additionally, as the 2020 Consent Order states, "press reports during this time noted allegations that Mr. Epstein was involved with Eastern European women in particular and that a modeling agency he helped fund brought 'young girls . . . often from Eastern Europe' to the U.S. on Epstein's private jets."[20] The modeling agency was MC2.

63.     The October 15, 2007 Page Six article also reported that "lawyers for Manhattan billionaire investor Jeffrey Epstein . . . are bracing for a slew of lawsuits from as many as 40 young women."[21]

64.     By 2007, because Epstein was so publicly exposed as a sex trafficker and abuser, Epstein's primary financial supporter, Les Wexner, abandoned him and terminated his support.

65.     On June 30, 2008, Epstein pled guilty to solicitation of prostitution and procuring a minor for prostitution in state court in Florida.  As a result of his guilty plea, Epstein was required to publicly register as a sex offender which became publicly available to anyone anywhere.[22]

66.     On July 3, 2008, a victim sued the US Attorney's Office in Southern District of Florida Case 08-80736 for violations of the Crime Victims' Rights Act under 18 U.S.C § 3771.

---

[19]  PageSix.com Staff, *Model Shop Denies Epstein Tie*, Page Six (Oct. 6, 2007), https://pagesix.com/2007/10/06/model-shop-denies-epstein-tie/; PageSix.com Staff, *Sex Case 'Victims' Lining Up*, Page Six (Oct. 15, 2007), https://pagesix.com/2007/10/15/sex-case-victims-lining-up/.

[20] New York State Department of Financial Services, Consent Order Under New York Banking Law §§ 39 and 44 (July 6, 2020), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf.

[21]  PageSix.com Staff, *Sex Case 'Victims' Lining Up*, Page Six (Oct. 15, 2007), https://pagesix.com/2007/10/15/sex-case-victims-lining-up/.

[22] Landon Thomas Jr., *Financier Starts Sentence in Prostitution Case*, NY Times (July 1, 2008), https://www.nytimes.com/2008/07/01/business/01epstein.html

67.     Shortly thereafter, Epstein's NPA with the U.S. Department of Justice was made public when it was unsealed in connection with the litigation. Among other things, the agreement outlined the possible federal sex offense charges that could have resulted from the investigation, including TVPA charges.[23]

68.     Epstein's legal team also garnered significant publicity between 2006 and 2008, not only because of their well-known names, but also the unusual number of them. Epstein hired Alan Dershowitz, Roy Black, Ken Starr, Jay Lefkowitz, Guy Lewis, Michael Tien, Lily Ann Sanchez, Gerald Lefcourt, Guy Fronstein, and Jack Goldberger. All of these lawyers were now on Epstein's payroll and millions of dollars were being paid to these attorneys to pay for his legal defense. From public reports, BANA was also aware that members of this defense team were engaged in a public media campaign aimed at discrediting Epstein's minor victims and minimizing his alleged crimes.[24]

69.     As this point in time in 2008, Epstein was a registered sex offender accused of maintaining inordinate amounts of cash to pay underage victims and hush money for witnesses. With indisputable publicly available knowledge that Epstein was a sexual offender who was using his wealth to run a sexual abuse and trafficking operation, any responsible bank providing only routine banking services would have cut ties with Epstein.

---

[23] Staff Writer, *Epstein secret pact with Feds reveals "highly unusual" terms*, Palm Beach Post (June 10, 2009) https://www.palmbeachpost.com/story/news/2009/06/10/epstein-secret-pact-with-feds-reveals-ldquohighly-unusualrdquo-terms/2616074007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z113728d00----v113728d--42--b--42--&gca-ft=245&gca-ds=sophi.

[24] Jane Musgrave, *Victims Seeking Sex Offender's Millions See Painful Pasts Used Against Them*, The Palm Beach Post (Jan. 24, 2010); Michele Dargan, *Claim: Epstein filed lawsuit to 'intimidate' victims' attorney*, Palm Beach Daily News (Oct. 16, 2010).

70.     Court proceedings against the government involving the challenge to Epstein's NPA also continued beyond 2008 and attracted significant media attention. Indeed, for years between 2008 and 2015, hundreds of press reports outlined the allegations underlying the NPA and to varying degrees detailed the involvement of Epstein's alleged co-conspirators, including Lesley Groff, Indyke, Kahn, and Maxwell.

71.     In addition to public reporting surrounding the Crime Victims' Rights Act Case, dozens of public civil lawsuits were filed against Epstein, revealing greater details of Epstein's sexual abuse and trafficking of young women and girls.  These public lawsuits all received significant media attention.

72.     These lawsuits detailed millions in payments that Epstein was making to recruiters, co-conspirators, cover-guys (such as his longtime fixer/lawyer and fixer/accountant), and his victims.

73.     Through the civil lawsuits, evidence such as message pads taken from Epstein's trash by police or through prior search warrants, flight logs, and black books began to publicly surface, shedding further public light on the expansiveness of Epstein's sex-trafficking operation.

74.     One such case was *Jane Doe 102 v. Jeffrey Epstein*, Case No. 09-cv-80656 (S.D. Fla. May 1, 2009). In her Complaint, Virginia Roberts Giuffre detailed that Epstein had trafficked her nationally and internationally, including by trafficking her to other men. Because the allegations extended beyond Epstein himself and involved broader sex-trafficking conduct, the lawsuit garnered significant media attention.[25]

---

[25] Michele Dargan, *Jeffrey Epstein address book 'Holy Grail' of famous names*, Palm Beach Daily News (Mar. 11, 2011) https://www.palmbeachdailynews.com/story/news/2011/03/12/jeffrey-epstein-address-book-holy/6643962007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z114401d00----v114401d--44--b--44--&gca-ft=142&gca-ds=sophi; Paul Lewis and Jon Swaine, *Jeffrey Epstein: Inside the decade of scandal entangling Prince Andrew*, The Guardian

75.    Epstein was deposed in a number of those civil lawsuits, which again were covered widely by the press because of Epstein's invocation of his Fifth Amendment rights.[26]

76.    In 2009, Epstein's sexually abusive behaviors again made headlines when during a deposition he was asked a question about the shape of his genitalia. Epstein abruptly ended the deposition and left the room, but the clip has been re-circulated all over the internet ever since.[27]

77.    In July 2010, Conchita Sarnoff from the Daily Beast wrote in an article titled "Jeffrey Epstein, Pedophile Billionaire, and his Sex Den," "[p]erhaps most disturbing, in terms of possible sex trafficking, was Epstein's relationship with Jean Luc Brunel, owner of the MC2 modeling agency."[28]

78.    A second article by Sarnoff covered the Department of Justice's investigation into Epstein for child trafficking. The article stated, "federal investigators continue to investigate

---

(Jan. 10, 2015) https://www.theguardian.com/world/2015/jan/10/jeffrey-epstein-decade-scandal-prince-andrew.

[26] Susan Spencer-Wendel, *Suit Accuses Jailed Tycoon of Sex Crime*, The Palm Beach Post (April 21, 2009); Michele Dargan, *Victim: Unseal Epstein Document*, Palm Beach Daily News (July 16, 2009); Michele Dargan, *No Monitoring Device for Epstein*, Palm Beach Daily News (July 23, 2009); Jane Musgrave, *Victims Seeking Sex Offender's Millions See Painful Pasts Used Against Them*, The Palm Beach Post (Jan. 24, 2010); Michele Dargan, *Lawyer: Epstein Made Admissions on Tape*, Palm Beach Daily News (April 29, 2010); Michele Dargan, *Judge Receives Epstein Tape*, Palm Beach Daily News (May 5, 2010); Jane Musgrave, *Sex Offender Agrees to Disclose Net Worth, but Wants it a Secret*, The Palm Beach Post (May 7, 2010); Jane Musgrave, *Epstein's Attorneys Affirm He's Billionaire*, The Palm Beach Post (May 14, 2010); Michele Dargan, *Judge Orders N.Y. Paper To Give Up Epstein Tape*, Palm Beach Daily News (May 27, 2010); Michele Dargan, *Judge: Ex-Epstein worker has 10 Days to Produce Journal*, Palm Beach Daily News (June 3, 2010); Michele Dargan, *Claim: Epstein filed lawsuit to 'intimidate' victims' attorney*, Palm Beach Daily News (Oct. 16, 2010).
[27] *Jeffrey Epstein Egg Shaped Penis Deposition*, The Daily Beast (May 4, 2010) https://www.thedailybeast.com/jeffrey-epstein-egg-shaped-penis-deposition/.

[28] Conchita Sarnoff, Jeffrey Epstein, *Pedophile Billionaire, and his Sex Den*, THE DAILY BEAST (July 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/.

Epstein's activities, to see whether there is evidence of child trafficking—a far more serious charge than the two in his non-prosecution agreement, the arrangement between Epstein and the Department of Justice allowing him to plead guilty to lower-level state crimes."[29] Further, "an alleged victim said that Epstein, Maxwell, Brunel, Rodriguez, and [one of Epstein's victims] 'deliberately engaged in a pattern of racketeering that involved luring minor children through MC2, mostly girls under the age of 17, to engage in sexual play for money.' (Which would amount to trafficking.)"[30]

79.    In a third article, Sarnoff summarized the claims against Epstein and a history of sex crimes.[31] Sarnoff reported: "In March 2005, [the West Palm Beach Police Department], acting on a complaint from the Florida parents of a 14-year-old girl, launched an investigation that would eventually uncover a pattern of predatory behavior stretching back years and spanning several continents, knowingly enabled by Epstein's associates and employees."[32]

80.    Sarnoff further reported, "the Palm Beach Police Department identified 17 local girls who had contact with Epstein before the age of consent; the youngest was 14, and many were younger than 16. And that was just at one of Epstein's many homes around the world—he also owns property in New York, Santa Fe, Paris, London, and the Caribbean. Subsequent investigation by the FBI, reaching as far back as 2001, identified roughly 40 victims, not counting an Epstein

---

[29] Conchita Sarnoff, *Jeffrey Epstein Investigated for Child Trafficking*, THE DAILY BEAST (July 29, 2010), https://www.thedailybeast.com/jeffrey-epstein-investigated-for-child-trafficking/.

[30] Conchita Sarnoff, Jeffrey Epstein, *Pedophile Billionaire, and his Sex Den*, The Daily Beast (July 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/.

[31] Conchita Sarnoff, *Jeffrey Epstein, Billionaire Pedophile, Goes Free*, THE DAILY BEAST (July 17, 2010), https://www.thedailybeast.com/jeffrey-epstein-billionaire-pedophile-goes-free/.

[32] *Id*.

victim, whom Epstein referred to as his 'Yugoslavian sex slave' because he had imported her from the Balkans at age 14."[33]

81.    In October 2010, Michele Dargan from the Palm Beach Daily News wrote in article titled "Suit links Epstein to modeling agency," that publicly linked Epstein and Brunel's use of MC2 to bring in underage girls from all over the world and promise them modeling contracts.[34]

82.    In January 2011, Epstein's attorneys attempted to get his sex offender registry status changed and requested that he be afforded Level 1 sex-offender status in New York. The Court rejected his request, labeling him a Level 3 sex offender, the highest possible risk level. This public fact was widely publicized, and culminated in Epstein's public registration as a high-risk sex offender in the state of New York in November 2011. As the New York Post reported in February 2011, this meant "according to the state, Epstein is at 'high risk' to repeat his offense and poses 'a threat to public safety.'"[35]

83.    In March 2011, Sharon Churcher published a series of articles in the Daily Mail that brought international attention to Epstein's sex-trafficking of Virginia Giuffre, including that she had been trafficked by Epstein and Maxwell to Prince Andrew. These stories sparked international media attention on Epstein and his sexual crimes.[36]

---

[33] *Id.*

[34] Michele Dargan, *Suit links Epstein to modeling agency*, PALM BEACH DAILY NEWS, Oct. 16, 2010.

[35] *See* Amber Sutherland, *Billionaire Jeffrey Epstein: I'm a sex offender, not a predator*, NEW YORK POST (Feb. 25, 2011), https://nypost.com/2011/02/25/billionaire-jeffrey-epstein-im-a-sex-offender-not-a-predator/ (reporting that "a New York judge ruled at a hearing last month that the moneyman is the most dangerous kind of sex offender: a Level 3").

[36] Sharon Churcher, *Prince Andrew and the 17-year-old girl his sex offender friend flew to Britan to meet him*, THE DAILY MAIL (Mar. 2, 2011), https://www.dailymail.co.uk/news/article-1361039/Prince-Andrew-girl-17-sex-offender-friend-flew-Britain-meet-him.html;    Sharon Churcher, *Epstein's Girl Friday 'fixer': Dead tycoon's daughter Ghislaine Maxwell and the girls*

84.     In May 2011, Baltic News Services brought even further international attention to Epstein and Brunel's relationship, including that Brunel "known for his pedophile tendencies" judged a modeling contest in Latvia. The article further went on to detail Brunel's connections to Epstein who had already served a jail term in the United States for child sex offenses, and indicated that "the FBI is currently probing Brunel for supplying Epstein with underage girls."[37]

85.     In August 2013, after having banked with JP Morgan for more than a decade, Epstein was kicked out of the bank because of his suspicious banking activities, and his accounts were terminated. Section 314(b) of the USA Patriot Act provides financial institutions with the ability to share information with one another, under a safe harbor that offers protections from liability in order to better identify and report activities that may involve money laundering or terrorist activities. As of the date of Epstein's offboarding from JP Morgan, any bank with subsequent banking affiliation with Epstein had the ability to obtain information regarding his suspicious activity directly from JP Morgan. ███████████████████████

██████████████████████████████

86.     Immediately thereafter, Epstein's accounts were onboarded at Deutsche Bank through his former JP Morgan banker, Paul Morris, who had full knowledge that Epstein was a sexual abuser, sex trafficker, and money launderer who utilized banking services for illegal purposes in furtherance of his trafficking operation. Morris left Deutsche Bank in 2016, joining

---

*she hired for paedophile's stable*, THE DAILY MAIL (Mar. 7, 2011), https://www.dailymail.co.uk/news/article-1363444/Jeffrey-Epstein-Robert-Maxwells-daughter-Ghislaine-hired-girls-paedophile.html; *see also* Sharon Churcher & Chelsea White, *The Prince, a paedophile and the sex slave teen*, THE DAILY TELEGRAPH, https://www.dailytelegraph.com.au/the-prince-a-paedophile-and-the-sex-slave-teen/news-story/8cdeee961a486febf459eafe00a7f710.

[37] *Alleged Pedophile from US judges modeling contest in Latvia*, BALTIC NEWS SERVICE (May 2, 2011).

BANA and Merrill Lynch as a private banker, bringing to BANA the full knowledge that Epstein was a sex –trafficker and of JP Morgan's and Deutsche Bank's roles of facilitating Epstein's sex-trafficking venture and conspiracy. Paul Morris continued to communicate with Epstein and Epstein associates while employed by BANA using BANA email systems.

87.    On September 21, 2015, Virginia Giuffre sued Maxwell for defamation in the Southern District of New York, again publicly laying out the mechanics of Epstein's sex-trafficking operation. There was extensive media coverage of this lawsuit.[38]

88.    On April 18, 2016, author Conchita Sarnoff published the book, *TrafficKing*, who "despite bribes to stay silent, risked her life to expose the brutal reality of human trafficking and the Jeffrey E. Epstein case." ███████████████████████████████

████████████████████████████████████████████████

██████████████████████

89.    On October 10, 2016, bestselling author James Patterson released *Filthy Rich: The Jeffrey Epstein Story*, a New York Times bestseller self-described as, "A Powerful Billionaire, the Sex Scandal that Undid Him, and all the Justice that Money can Buy: The Shocking True Story of Jeffrey Epstein." Among other things, the book detailed Epstein's relationship with Brunel, including that Epstein provided financial support to MC2; that Epstein and Brunel "used the agency to bring underage girls from foreign countries into the United States by promising them

---

[38] Caroline Davies, *Court papers put daughter of Robert Maxwell at centre of 'sex slave' claims*, The Guardian (Jan. 4, 2015) https://www.theguardian.com/us-news/2015/jan/04/court-papers-robert-maxwell-daughter-sex-slave-claims-prince-andrew; Lia Eusachewich, *Alleged Epstein madam forced to hand over 17 years of documents*, Page Six (Mar. 17, 2016) https://pagesix.com/2016/03/17/alleged-epstein-madam-forced-to-hand-over-17-years-of-documents/; Josh Gerstein, *Suit over billionaire's underage sex abuse settles*, Politico (May 24, 2017) https://www.politico.com/blogs/under-the-radar/2017/05/24/jeffrey-epstein-sex-abuse-lawsuit-238793

modeling contracts"; and that "[t]hese girls were then housed in condominiums belonging to Epstein" and then charged rent, "presumably to live as underage prostitutes in the condos." ███

███████████████████████████████████████████████

90.     On January 26, 2017, Jane Doe 43 sued Epstein for sex-trafficking in the Southern District of New York, publicly detailing the inner workings of Epstein's sex-trafficking operation. *See Jane Doe 43 v. Epstein et al.*, Case No. 17-cv-00616-JGK (S.D.N.Y.).  The suit was also brought against SK, who was then alleged to have "recruited young females and maintained Epstein's sex schedule," including "handl[ing] travel arrangements for the various females being exploited for sexual purposes." There was again extensive media coverage of this lawsuit.[39] Despite the material negative media about their customer, ████████████████████████ █████████████████████

91.     On November 28, 2018, the Miami Herald published a series titled, "Perversion of Justice," which revisited the heinous details of the sexual abuses that Epstein serially committed against high school children in Palm Beach in the early 2000s and prompting international outrage.[40] Yet, throughout this, BANA and Merrill Lynch employees, including Paul Morris, continued to email with Epstein and his associates, including Kahn.

92.     Throughout all of this, BANA continued to provide banking services, including large cash transfers to Epstein and his entities and agents without seeking explanations, without any known or apparent lawful or business purpose, and without filing the required SARs.

---

[39] Martin Gould, *Pedophile Jeffrey Epstein is accused of luring an underage girl into his elaborate sex trafficking enterprise under the guide of using his wealth and connections to get her into a prestige NYC college*, Daily Mail (Jan. 27, 2017) https://www.dailymail.co.uk/news/article-4164082/Pedophile-Jeffrey-Epstein-accused-new-sex-traffick-case.html
[40] Julie K. Brown, *How a future Trump Cabinet member gave a serial abuser the deal of a lifetime*, MIAMI HERALD (Nov. 28, 2018), https://www.miamiherald.com/news/local/article220097825.html/

93.    On July 6, 2019, Epstein was again arrested in New York on federal sex-trafficking charges. On July 25, 2019, Epstein committed suicide in his Manhattan jail cell.

94.    In December 2021, Maxwell, who also maintained accounts at BANA, was convicted of federal sex-trafficking charges.

**C.    BANA Knew, Should Have Known, and Recklessly Disregarded Epstein's Connections to Indyke, Kahn, Black, Maxwell, Brunel, and MC2, Which Were Well Known.**

95.    BANA knew, should have known, and recklessly disregarded Epstein's connection to Indyke and Kahn.

96.    BANA had actual knowledge that Indyke and Kahn served as Epstein's representatives. ████████████████████████████████████████████████
██████████████████████████████████████████

97.    BANA had actual knowledge that Kahn was one of Epstein's representatives because of Kahn's conduct and association with other Epstein accounts, including ████████████
████████████████████████████████████████

98.    Indyke was a signatory for several of Epstein's accounts, including his accounts at BANA.

99.    BANA also had constructive knowledge that Indyke and Kahn were Epstein's representatives.

100.    In 2008, Indyke publicly appeared as one of Epstein's attorneys in the criminal case against Epstein.

101.    During that time, press reports, including the Miami Herald, identified Epstein's legal team as including Indyke.

102.    Additional public press reports and corporate filings identified Indyke and Kahn as

officers of several of Epstein's entities. Corporate filings indicate that one of, and frequently both, Indyke and Kahn were involved in the creation and/or management of several of Epstein's sham entities, including: C.O.U.Q. Foundation (the Florida Science Foundation); Gratitude America Ltd.; the J. Epstein Virgin Islands Foundation; FT Real Estate Inc.; Hyperion Air, Inc.; Jeepers, Inc.; Mort, Inc.; and Zorro Development Corporation. None of these sham entities had any real business purpose other than facilitating sex trafficking.

103.    Indyke and Kahn were also officers of the corporate entities that held the real estate on which Epstein abused countless victims, including:

(a) Nautilus, Inc., is the corporate entity that owned Epstein's private island "Little St. James" in the U.S. Virgin Islands, where countless of Epstein's victims were transported, harbored, and abused. Indyke and Kahn were the secretary and treasurer of Nautilus, Inc., respectively.

(b) Poplar, Inc., a corporate entity that had signatory authority over Great St. Jim, LLC, which held title to another set of properties that Epstein owned in the U.S. Virgin Islands, which were the islands closest to Little St. James. Indyke and Kahn were the secretary and treasurer of Poplar, Inc., respectively.

(c) Cypress Inc., is a corporate entity that owned the property 49 Zorro Ranch Road in Stanley, New Mexico, which is the Epstein New Mexico property at which he transported, harbored, and abused countless victims. Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Cypress, Inc.

(d) Maple, Inc., a corporate entity that owned the property at 9 East 71st Street in New York—Epstein's New York townhome at which he transported, harbored, and abused

countless victims. Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Maple, Inc.

(e) Laurel, Inc., is a corporate entity that owned the property at 358 Brillo Way in Palm Beach, Florida—Epstein's Palm Beach mansion at which he transported, harbored, and abused countless victims. Thus, Laurel, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Laurel, Inc.

104.  ███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████.

105.  BANA had actual and constructive notice that the Financial Trust Company, later known as the Southern Financial Trust Company,[41] was linked to Epstein.

106.  Indeed, the Financial Trust Company had been publicly linked to Epstein since at least 2002, when the company and Epstein brought a suit against Citibank in the Virgin Islands. *See Financial Trust Co., Inc. v. CITIBANK NA*, 268 F. Supp. 2d 561 (D.V.I. 2003).

107.  In July 2007, Bloomberg reported on Epstein, as a "money man of mystery," indicating that Epstein owned a "Virgin Islands-based money-management firm, Financial Trust Company."[42]

---

[41] Matthew Goldstein, *Jeffrey Epstein Raked In $200 Million After Legal and Financial Crises*, The New York Times (Oct. 3, 2019), https://www.nytimes.com/2019/10/03/business/jeffrey-epstein-southern-trust.html (explaining that the Southern Financial Trust is a wholly owned subsidiary of the Financial Trust Company that Epstein established in 2011, and in 2013, it replaced the latter as Epstein's money managing arm).

[42] Matthew Goldstein, *Bear Stearns' Collateral Damage*, Bloomberg (Jul. 11, 2007), https://www.bloomberg.com/news/articles/2007-07-11/bear-stearns-collateral-damagebusinessweek-business-news-stock-market-and-financial-advice

108.    Also, in July 2007, the New York Times reported that the Epstein's "Virgin Islands-based money-management firm, Financial Trust Company, is listed in a filing with the Securities and Exchange Commission as a stakeholder in Bear Stearns's High-Grade Structured Credit Strategies Enhanced Leverage Fund, which became much easier to refer to in recent weeks as 'Bear Stearns' collapsing hedge fund."[43]

109.    Indyke and Kahn were also the Vice President and Treasurer, respectively, of Financial Infomatics, Inc., and Financial Strategy Group Ltd, two other Epstein-related entities.

110.    Additionally, a shell entity that Jane Doe "owned," was incorporated by Indyke and financially run by Kahn. Indyke and Kahn were later involved in transferring ownership of that shell entity to Kahn.

111.    Given Indyke and Kahn's extensive involvement across Epstein's various entities, even minimal due diligence would have revealed that Indyke and Kahn were acting on behalf of Epstein.

112.    In fact, BANA's own records would have independently confirmed the relationship. BANA opened and maintained accounts for multiple Epstein-related entities for which Indyke and Kahn served as officers or signatories, ███████████████████████████ ██████████████████████, placing and Indyke and Kahn's roles as Epstein's agents squarely within BANA's own customer due diligence files.

113.    BANA knew that every time it communicated or provide financial services to Kahn or Indyke the Bank was serving their principal, Epstein.

114.    BANA had actual knowledge of Epstein's ties to Black.

---

[43] Dealbook, *More Bad News for Jeff Epstein*, The New York Times (Jul. 11, 2007), https://archive.is/kTd1n#selection-1019.41-1027.161

115.    ███████████████████████████████████████████

████████████████████████████████████████████████

BANA knew that the transfers from Black's BANA account were going to, and for the benefit of,

Epstein.

116.    Further, recently released documents related to the Congressional investigation of

Epstein's crimes reveal that BANA had actual knowledge that Spinella was a signatory for Black's

BANA account:



117.    BANA also had constructive knowledge of Epstein's ties with Black.

118.    Epstein and Black have been publicly linked to one another since Epstein became

a Trustee of the Leon D. Black Foundation in 1997. In the March 2003 Vanity Fair expose on Epstein titled, "The Talented Mr. Epstein," Black was identified as a real estate tycoon businessman who would dine with Epstein at his home.[44] That connection became the subject of public attention and heightened scrutiny just before Epstein began his Palm Beach jail sentence in 2008.[45]

119.    These reports were public and were or should have been detected through the Bank's required customer due diligence.

120.    BANA also had actual and constructive knowledge of Epstein's connection to Maxwell, who was a BANA customer.

121.    Maxwell's connections to Epstein were well documented since the early 2000s.

122.    In March 2003, Vanity Fair reported that Maxwell "summon[ed]" young women to Epstein's town house, and threw parties filled "with young Russian models."[46] Epstein was quoted as describing Maxwell as his "best friend," and explained that while Maxwell was not on his payroll, she seemed to "organize much of his life." In another Vanity Fair article published in March 2011, Maxwell was described as a "'procurer' of young women" for Epstein who

---

[44] Vicky Ward, *The Talented Mr. Epstein*, VANITY FAIR (Mar. 1, 2003), https://www.vanityfair.com/news/2003/03/jeffrey-epstein-200303?srsltid=AfmBOoqnnrU1uBXxU99OWzhZNbZBcb1STXwnAnTsESpEKC8JsAh2iMee.

[45] *Exposed: The Leon Black-Jeffrey Epstein Connection!*, GAWKER (Aug. 20, 2008), https://www.gawkerarchives.com/501354/exposed-the-leon-black-jeffrey-epstein-connection; *see also* Jessica Pressler, *Jeffrey Epstein was Buddies with Leon Black*, NEW YORK MAGAZINE (Aug. 21, 2008), https://nymag.com/intelligencer/2008/08/jeffrey_epsteins_connections_t.html.

[46] Vicky Ward, *The Talented Mr. Epstein*, Vanity Fair (Mar. 1, 2003), https://www.vanityfair.com/news/2003/03/jeffrey-epstein-200303?srsltid=AfmBOoqnnrU1uBXxU99OWzhZNbZB….

introduced him to young women he later had sexual relationships with.[47]

123.    In July 2010, Conchita Sarnoff of the Daily Beast wrote an article titled "Jeffrey Epstein, Pedophile Billionaire, and his Sex Den," reporting on Epstein's sex-trafficking ring.[48] Sarnoff detailed Maxwell's recruitment of young women and minors to engage in sexual activities with Epstein. "According to police reports and sworn statements in the civil suits, all four women, among their other duties, worked to ensure that an appointment book for twice- or thrice-daily 'massages' was stocked with fresh recruits. Ghislaine Maxwell, daughter of the late Czechoslovakian-born press baron Robert Maxwell, who was for many years Epstein's live-in partner, also recruited young girls."[49]

124.    In August 2010[50] and 2015,[51] the Daily Beast again connected Maxwell to Epstein, describing Epstein's crimes and Maxwell's continued allegiance.

125.    In March 2011, the Guardian described Maxwell and Epstein's romantic relationship despite Epstein's sex crimes.[52]

---

[47] Vicky Ward, *Jeffrey and Ghislaine: Notes on New York's Oddest Alliance*, Vanity Fair (Mar. 8, 2011), https://www.vanityfair.com/news/2011/03/notes-on-new-yorks-oddest-couple-jeffrey-epstein-and-ghislaine-maxwell?srsltid=AfmBOoqzvh7sO7NiaU0Sd0GCKiqz38N9bzaKn-p37Dzuf-tGRfldKQMC.

[48] Conchita Ward, Jeffrey Epstein, *Pedophile Billionaire, and Hi Sex Den*, THE DAILY BEAST (July 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/.

[49] *Id.*

[50] Conchita Sarnoff, *Jeffrey Epstein and the New Pedophile Defense*, THE DAILY BEAST (Aug. 18, 2010), https://www.thedailybeast.com/epstein-and-saintil-the-new-pedophile-defense/.

[51] Vicky Ward, *I Tried to Warn You About Sleazy Billionaire Jeffrey Epstein in 2003*, THE DAILY BEAST (Jan. 6, 2015), https://www.thedailybeast.com/i-tried-to-warn-you-about-sleazy-billionaire-jeffrey-epstein-in-2003/.

[52] Owen Bowcott, *Ghislaine Maxwell: Press baron's daughter and Epstein's former lover*, THE GUARDIAN (Mar. 6, 2011), https://www.theguardian.com/uk/2011/mar/06/ghislaine-maxwell-sandringham-epstein.

126.    In early January 2015, Maxwell was described as a "'madame' for Epstein, supplying a string of underage girls for the American billionaire and his friends"[53] and as "one of the main women whom Epstein used to procure under-aged girls for sexual activities."[54]

127.    On January 10, 2015, the Guardian reported that Maxwell was Epstein's girlfriend and recruiter of young women for Epstein to abuse.[55] In furtherance of Epstein's crimes, Maxwell allowed Epstein to abuse young women at her various properties.

128.    On September 21, 2015, Virginia Giuffre sued Maxwell for defamation in the Southern District of New York, which extensively detailed Maxwell's central role as one of the main women who Epstein used to procure under-aged girls for sexual activities and a primary co-conspirator and participant in his sexual abuse and sex-trafficking scheme. *See Giuffre v. Maxwell*, Case No. 15-cv-7433 (S.D.N.Y.). The case was intensely litigated and received widespread national and international media coverage.

129.    The information and materials, which made clear Maxwell's role in Epstein's sex-trafficking venture were, and certainly should have been, known by BANA, including and as a result of the Bank's required customer due diligence.

130.    Further, BANA should have known, and recklessly disregarded Epstein's

---

[53] Caroline Davies, *Court papers put daughter of Robert Maxwell at centre of 'sex slave' claims*, THE GUARDIAN (Jan. 4, 2015) https://www.theguardian.com/us-news/2015/jan/04/court-papers-robert-maxwell-daughter-sex-slave-claims-prince-andrew.

[54] Paul Lewis & James Ball, *Prince Andrew named in US lawsuit over underage sex claims*, THE GUARDIAN  (Jan. 3, 2015),  https://www.theguardian.com/uk-news/2015/jan/02/prince-andrew-named-us-lawsuit-underage-sex-allegations.

[55] Paul Lewis & Jon Swaine, *Jeffrey Epstein: inside the decade of scandal entangling Prince Andrew*, THE GUARDIAN (Jan. 10, 2015), https://www.theguardian.com/world/2015/jan/10/jeffrey-epstein-decade-scandal-prince-andrew.

connection to MC2 and Brunel.

131.    Epstein cultivated a relationship with another known sexual abuser, Brunel, a French model scout who had suffered public disgrace for serial sexual abuse of young females. Epstein enlisted Brunel to recruit new victims from all over the world, enticing them with promises of modeling careers before sexually abusing and trafficking them through a modeling agency Epstein and Brunel established called MC2. The name referred to the math equation "E=MC2," where "E" stood for Epstein. MC2 was financed entirely by Epstein.

132.    BANA had actual and constructive knowledge of Epstein's connections to Brunel and MC2, and of the sex crimes and sex-trafficking activities carried out through their venture.

133.    In 1988, *60 Minutes* exposed Brunel's sex crimes, reporting that Brunel used his position in the fashion industry, including his fashion agency Karin Models, to drug and sexually assault young women with modeling aspirations.[56] Notably, according to public corporate filings, in 2005, Karin Models changed its corporate name to MC2 in 2005.[57]

134.    In 1995, author Michael Gross published a book titled *Model: The Ugly Business of Beautiful Women*, which detailed the *60 Minutes* allegations against Brunel and quoted prominent industry players who described Brunel as someone who used drugs and committed "silent rape," spiking women's drinks to exploit them sexually. By that time, Brunel's criminal conduct was well known both in the industry and throughout the world as a result of the consistent major reporting on him.

135.    In 2003, author Ian Halperin published a book titled *Bad and Beautiful: Inside the*

---

[56] 60 MINUTES: *American Girls in Paris* (aired Dec. 23, 1988).

[57] Division of Corporations of the State of Florida, https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2005%5C0913%5CH0210889.Tif&documentNumber=L03000036942

*Dazzling and Deadly World of Supermodels*, describing Brunel as the dark side of the modeling world where glamorous facades hide serious abuses. The book details allegations from former models who directly accused Brunel and his associates of rape including on one occasion when he invited more than a dozen models to a private party and forced a number of them to have sex.

136.    During the 2005 Palm Beach Police Department investigation into Epstein, investigators recovered message pads in Epstein's garbage that included messages from Brunel about MC2. These messages were also made public, highlighting the connection between Epstein and Brunel. Among them was a message that Brunel left for Epstein that said: "He has a teacher for you to teach you how to speak Russian. She is 2x8 years old not blonde. Lessons are free and you can have 1st today if you call."

137.    Press reports during this time noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped develop with his friend and sexual abuser, Brunel, brought young girls from Eastern Europe to the United States on Epstein's private jets.

138.    On October 6, 2007, *Page Six* published an article titled, "Model Shop denies Epstein Tie," described Epstein's sexual exploitation of young women, stating "[t]he owners of MC2 Models are denying industry speculation that massage maven Jeffrey Epstein is a secret financial backer of the agency being run-by-scandal-scarred Jean-Luc Brunel, who was once accused of taking advantage of underage models."[58] The article further reported that "Epstein, who this week agreed to plead guilty to soliciting underage prostitutes at his Florida mansion in a deal that will send him to prison for about 18 months, reportedly gave 'millions' to start MC2, which

---

[58]    PageSix.com Staff, *Model Shop Denies Epstein Tie*, Page Six (Oct. 6, 2007), https://pagesix.com/2007/10/06/model-shop-denies-epstein-tie/

opened in October 2005 with offices in New York, Miami and Tel Aviv. One of the girls Epstein, 54, was accused of soliciting massages from was described in court documents as being just 14."

139.    In July 2010, an article detailing Epstein's sex crimes and sex-trafficking venture, *Jeffrey Epstein, Pedophile Billionaire, and His Sex Den*, reported that Epstein gave $1 million to "his friend Jean Luc Brunel when he was starting the modeling agency MC2" and that many of the young women recruited by MC2 flew on Epstein's private jets.[59] "Perhaps most disturbing, in terms of possible sex trafficking, was Epstein's relationship with Jean Luc Brunel, owner of the MC2 modeling agency and their deliberate pattern of racketeering that involved luring minor children through MC2, mostly girls under the age of 17, to engage in sexual play for money."[60]

140.    In August 2010, an article covered Epstein's sex crimes, including having a 14-year-old sex slave, and his connection to Brunel and MC2, reporting that "Brunel, along with numerous young models, was a frequent passenger on Epstein's private jet, according to flight manifests. The agency owner also allegedly received $1 million from Epstein in 2005, when he founded MC2[…]."[61] The article further reported that whether "the money was a secret investment in MC2, or a payment for Brunel's services as a procurer, is unknown. Brunel also visited Epstein in jail."[62]

141.    In 2012, local news outlets reported that Epstein provided MC2 with financial

---

[59] Conchita Sarnoff, *Jeffrey Epstein, Pedophile Billionaire, and His Sex Den*, The Daily Mail (Jul. 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/

[60] *Id.*; *see also* Conchita Sarnoff, *Jeffrey Epstein, Billionaire Pedophile, Goes Free*, The Daily Beast (Jul. 20, 2010), https://www.thedailybeast.com/jeffrey-epstein-billionaire-pedophile-goes-free/.

[61] Jenna Sauers, The Sex Trafficking Model Scout, Jezebel with Splinter (Aug. 4, 2010), https://www.jezebel.com/the-sex-trafficking-model-scout-5603638.

[62] *Id.*

support and that Epstein and Brunel used MC2 to bring underage girls from all over the world and would house the girls in Epstein's New York condos.[63]

142.    In February 2015, another article reported on allegations that "Brunel procured young models by offering them visas. Once in the country, some of the models were allegedly funneled into Epstein's various mansions and then victimized."[64] Further, "[t]wo sources familiar with Epstein's finances [told] The Daily Beast they believe Epstein dropped as much as $2 million into MC2 to get it started."[65]

143.    In 2019, Brunel was arrested in France for sex trafficking related to his relationship with Epstein and, like Epstein, was found hanging in his cell from an apparent suicide.

144.    As Virginia Giuffre recounted in her posthumous memoir, Epstein boasted that Brunel had sent him "more than a thousand girls," including "three French twelve-year-olds," and that Brunel dispatched "'talent' scouts to Brazil to recruit young girls from soccer fields for Epstein.'"[66]

145.    In June 2021, Giuffre bravely provided testimony in Paris, France during Brunel's

---

[63] Michele Dargan, Lawsuit documents link Jeffrey Epstein to modeling agency owner Jean Luc Brunel, Palm Beach Daily News (April 1, 2012), https://www.palmbeachdailynews.com/story/news/2012/04/01/lawsuit-documents-link-jeffrey-epstein/9662207007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z115001d00----v115001d--50--b--50--&gca-ft=199&gca-ds=sophi

[64] M.L. Nestel, *The Dead Model and the Dirty Billionaire*, The Daily Beast (Feb. 13, 2015), https://www.thedailybeast.com/the-dead-model-and-the-dirty-billionaire/.

[65] *Id*.

[66] U.S. House Committee on Oversight and Government Reform, *Letter from Rep. Robert Garcia to the U.S. Department of Justice Regarding Giuffre Information* (Oct. 22, 2025), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/2025-10-22.garcia-to-doj-re-giuffre-info.pdf (citing VIRGINIA ROBERTS GIUFFRE, NOBODY'S GIRL: A MEMOIR OF SURVIVING ABUSE AND FIGHTING FOR JUSTICE (2025)).

criminal trial about his participation in Epstein's sex-trafficking operation in June 2021.[67]

146.    BANA has not denied, and could not plausibly deny, its knowledge of Epstein's

sex trafficking or his connection to Brunel and MC2.

147.    ████████████████████████████████████████████████████

████████████████████████████████████████████████.

### D.    BANA Knew, Should Have Known, and Recklessly Disregarded Epstein's Sex-Trafficking Venture, including MC2's Role in the Venture, After it Hired Epstein's Long-Time Banker Paul Morris.

148.    BANA wealth management executive Paul Morris was an integral part of Epstein's

sex-trafficking venture.

149.    Before joining BANA, Morris worked as a banker at JP Morgan and served as a

member of the team servicing Epstein's accounts.

150.    During this time, Morris had actual knowledge of Epstein's sex crimes and use of

various financial institutions to fuel and legitimize his sex-trafficking operation.

151.    While at JP Morgan, Morris had actual knowledge that in or around 2006 Epstein

financed MC2, a modeling agency front, owned by Brunel, and used in furtherance of Epstein's

sex-trafficking venture.

152.    Morris was copied on a January 3, 2011 memo by JP Morgan's Rapid Response

Team, a due diligence team, identifying several risks related to Epstein's accounts including news

articles and reports from as early as 2010 describing Epstein as a sex offender and summarizing

the civil and criminal allegations against him, including the trafficking of children. The Rapid

---

[67] Jessica Murray, *Jeffrey Epstein Accuser Virginia Roberts Giuffre Testifies Against Modeling Agent*, NBC NEWS (June 16, 2021), https://www.nbcnews.com/news/world/jeffrey-epstein-accuser-virginia-roberts-giuffre-testifies-against-modeling-agent-n1270959.

Response Team memo further notes that in 2006, JP Morgan, and Morris, knew of Epstein's crimes and the risks of banking with him and during a follow up discussion, JP Morgan addressed the charges of human trafficking with Epstein.

**Rapid Response Team**
**January 3, 2011**
**Existing Client – Jeffrey Epstein (Follow-up Rapid Response Mtg.)**

Private Banker – Paul Morris – 212 464-0701
Senior Manager – Mary Casey – 212 464-0374

**Nature of Existing Relationship**
The Epstein relationship, which includes accounts for his personal investment company –
Financial Trust Company, mainly consists of banking and asset accounts with balances totaling
approximately $112.4 million.

**[ EMBED AcroExch.Document.7 ]**
**Relationship list excludes Credit Products**

During the period of March 2010 to December 2010, there were eight large cash withdrawals
totaling $240,000 where Currency Transaction Reports were filed.

**Source of Wealth**
Jeffrey Epstein is a money manager for wealthy individuals.  Press articles indicate that he owns
what is said to be the Manhattan's largest private house and runs his business from a 100 acre
private island in St. Thomas.

**Recent Excerpts from press**
- **The Palm Beach Post 8/1/10    Epstein may be under new sex crime scrutiny from feds**

Authorities may not be done with billionaire sexual deviant **Jeffrey Epstein** after all.

Epstein, 57, who recently fulfilled all the requirements of his slap-on-the-wrist sentence may be under
investigation for other sex crimes, including child trafficking.  And this time, Epstein would be facing the
federales -- and 20 years in prison!

According to the news website The Daily Beast, the feds are also checking whether a modeling agency
run by a friend of the Wall Street investor Epstein fed his appetite for underage foreign girls. Epstein was
known to fly young women from Eastern Europe to Palm Beach, where they'd massage him, among other
services.

Because of double jeopardy rules, Epstein -- now a registered Florida sex offender -- can never be
prosecuted again for crimes covered by the state charges. He pleaded guilty to felony solicitation of
prostitution and procuring a person under 18 for prostitution, also a felony.  Child trafficking, however,
would offer two advantages to federal prosecutors: The charge would not be covered by double jeopardy;
and there's no statute of limitations

Palm Beach Daily News    9/19/10    Woman sues Epstein for $50 M, alleging abuse as teen

A new federal lawsuit filed Friday against billionaire sex offender Jeffrey Epstein asks for more than $50
million in damages for a woman who alleges repeated sexual abuse by Epstein at his El Brillo Way
mansion when she was 16.  The victim,███████ alleges she was coerced into prostitution as a minor by
Epstein, assisted by his employee ███████

███████alleges Epstein has transferred and is transferring his assets overseas and elsewhere to conceal them
from her and to prevent ███████ from obtaining those assets in any judgment she may receive against him.

She is asking Epstein to post a $15 million bond to satisfy a potential judgment in the case. In addition,
she wants an accounting of his "significant financial assets," an injunction against him transferring his
assets elsewhere and the appointment of a receiver to take charge of his assets.

**Conclusion from 1st Rapid Response Meeting of 10/17/06**
After internal discussions with Jes Staley, Mary Erdoes, Catherine Keating, John Duffy and
Mary Casey, it was decided that we will keep Mr. Epstein solely as a banking client and on a
'reactive', client service basis. We will not proactively solicit new investment business from him.

**Conclusion from follow-up Rapid Response of 7/15/08:**
No change to relationship approach.

**2011 Update:**
PB discussed the Epstein relationship with Jes Staley, who called Mr. Epstein to discuss the
human trafficking allegations in press, which he claimed were without merit.

Additional PB meetings held regarding clients request to renew an SBLC for another year,
reducing from $1 million to $800k. The SBLC backs a loan from Mellon to MC2 Models
Management. Decision made in March 2011 not to renew the SBLC.

153.    Further, in a January 2011 internal JP Morgan email, Morris, sought approval from

JP Morgan's due diligence team to extend the expiration date of a letter of credit in support of

Epstein's "back stop[ping]" a loan from BNY Mellon to MC2:

```
-----Original Message-----
From: James, Shari R
Sent: Thursday, January 13, 2011 12:47 PM
To: Morris, Paul V
Cc: Lay, James
Subject: RE: Jeff Epstein

Hi Paul,

The Stand by Letter of Credit is in the name of Jeffrey Epstein for $1mm ($1mm o/s) to backstop a loan
from Mellon to MC2 Models Management, LLC. The beneficiary is Mellon United National Bank. The Letter of
Credit is set to expire 4/14/2011. Do you know if they would like to extend the expiry date of the LC?

I have attached the most recent Credit Approval Memo for your reference. Is there anything that you would
like me to look into on my end?

Thanks,
Shari

Shari James| Associate | The Private Bank at J.P. Morgan | 270 Park Avenue, Floor 17,  New York, NY 10017
|T: 212-464-2680 | F: 212-464-2531| shari.r.james@jpmorgan.com
```

154.    Morris left JP Morgan in 2012 and joined Deutsche Bank in November 2012,

bringing with him the knowledge he had acquired at JP Morgan about Epstein's sex-trafficking

venture and conspiracy.

155.    Soon after joining Deutsche Bank, Morris suggested to senior management that

Epstein was a potential client who could generate millions of dollars of revenue as well as leads

for other lucrative clients to Deutsche Bank. Morris and Epstein began discussions in the spring

of 2013 about a potential relationship between Deutsche Bank and Epstein.

156.    Around this time, Epstein was kicked out of JP Morgan because of his suspicious banking activities, and his accounts were terminated.[68]

157.    Epstein found a new banking home at Deutsche Bank with his trusted banker, Paul Morris.

158.    In April 2013, as part of Deutsche Bank's customer due diligence, a junior relationship coordinator at Deutsche Bank allegedly prepared a memo for Morris to send to senior management at Deutsche Bank about taking Epstein on as a client that noted his 2007 non-prosecution agreement on federal charges, and his arrest on state charges for soliciting a minor for prostitution.

159.    In particular, the memorandum stated that "Epstein was charged with soliciting an underage prostitution [sic] in 2007," that "[h]e served 13 months out of his 18-month sentence," and that "[h]e was accused of paying young woman [sic] for massages in his Florida home." It also highlighted that Epstein was involved in 17 out-of-court civil sex abuse settlements related to his 2007 conviction.

160.    Morris and Deutsche Bank ignored these obvious red flags and continued onboarding Epstein as a customer.

161.    Over the course of the relationship, Epstein, his related entities, including the Southern Trust Company Inc., and associates would eventually open and fund more than 40 accounts at Deutsche Bank, with Morris's help, holding more than $110 million in just one of the accounts.

162.    In or about 2016, Morris joined BANA, bringing with him the knowledge he had

---

[68] Emily Flitter & Jessica Silver-Greenberg, *JPMorgan Kept Jeffrey Epstein as a Client Despite Internal Warnings*, N.Y. TIMES (Aug. 8, 2019), https://www.nytimes.com/2019/08/08/business/jeffrey-epstein-jpmorgan.html.

acquired at JP Morgan and Deutsche Bank about Epstein's sex-trafficking venture and conspiracy.

163.    Morris also brought with him to BANA Epstein's business.





165. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████.

166. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████.

167.    Epstein's relationship with Morris went beyond a typical client-banker relationship. During the time Morris worked for Merrill Lynch, Epstein frequently had appointments with him, including appointments in September 2016, December 2016, March 2017, and October 2017.

168.    Epstein's close relationship with Morris is further illustrated by the business he brought to the Bank. For example, in or about February 2018, Epstein contacted Kahn and Morris

to move an account belonging to his friend, an influential philosopher, from another financial institution to Merrill Lynch. Through agents like Morris, BANA knew that Epstein's network of wealthy and influential acquaintances brought profitable opportunities to the Bank and provided a financial incentive for maintaining a banking relationship with Epstein.

169.    BANA is responsible, under United States law and otherwise, for the acts and knowledge of its officers, directors, employees, and agents, including for the acts described in this complaint. The acts alleged were committed, and the knowledge alleged was acquired, by BANA's officers, directors, employees, and agents within the scope of their employment and with the intention, at least in part, to benefit BANA.

170.    Section 314(b) of the USA Patriot Act provides financial institutions with the ability to share information with one another, under a safe harbor that offers protections from liability in order to better identify and report activities that may involve money laundering or terrorist activities. As of the date of Epstein's termination by JP Morgan, and subsequently Deutsche Bank, any bank with a subsequent, actual, or proposed banking relationship with Epstein, including BANA, had the ability to obtain all information regarding his suspicious activity directly from JP Morgan and Deutsche Bank.

**E.    BANA's Required Compliance With Banking Laws and Regulations Provided BANA With Actual, And Certainly Constructive Knowledge, Of Epstein's Sex Trafficking Venture and the Bank's Assistance And Facilitation of That Venture.**

171.    The Federal Bank Secrecy Act ("BSA") requires financial institutions to have adequate anti-money laundering ("AML") policies and systems in place. New York state law also requires financial institutions to devise and implement systems reasonably designed to identify and report suspicious activity and block transactions prohibited by law.

172.    Indeed, Section 326.8 of the Bank Secrecy Act establishes requirements for all

covered institutions, like BANA, to implement an effective and reasonably designed AML program as a system of internal control to assure ongoing compliance. These safeguards include policies, procedures, and processes aimed at mitigating the risks associated with offering financial services to customers.

173.    All regulated institutions are expected to configure systems based on their unique risk factors, incorporating parameters such as institution size, presence in high-risk jurisdictions, and the specific lines of business involved, and the institutions have an affirmative duty to ensure that their systems run effectively. In addition, to having effective AML controls in place, the BSA requires banks to have "appropriate risk-based procedures for conducting ongoing customer due diligence."[69]

174.    According to the Financial Crimes Enforcement Network ("FinCEN"), the customer due diligence rules requires that financial institutions, like BANA, establish and maintain written policies and procedures that are reasonably designed to: (1) identify and verify the identity of customers; (2) understand the nature and purpose of customer relationships to develop customer risk profiles; and (3) conduct ongoing monitoring, which frequently involves retrospective reviews into various accounts at the financial institution, to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information.[70] This due diligence is necessary for financial institutions to monitor their customers for the purpose of preventing their customers from facilitating criminal activity using the institutions' facilities. Authorities expect correspondent banks to conduct sufficient due diligence to understand and mitigate risk which entails understanding of whom its customer does business with.

---

[69] 31 C.F.R. § 1020.210

[70] *Id.*

175.    As part of preventing criminal activity through customer due diligence, Know Your Customer ("KYC") procedures are critically important, and financial institutions must collect customer information at the time of establishing new relationships with clients, to assess the risks associated with the client. KYC obligations require banks to obtain customer information including name, address, date of birth and identification number, and to verify the identity of the customer.

176.    In addition, banks must adopt and implement Customer Due Diligence ("CDD") for all customers, particularly those that present a higher risk of money laundering. The objective of CDD is to enable the bank to understand the nature and purpose of a customer relationship, which may include understanding the types of transactions in which a customer is likely to engage. CDD information typically collected by financial institutions includes the intended use of the account, expected transaction types/volumes/amounts/geography, business or entity type details including ownership structure, source of wealth, information about a business customer's customers, and other information.

177.    To uncover potential risks, financial institutions, like BANA, must assess information about the customers, sanctions lists published by governments, public data sources, and private data sources on an ongoing basis.

178.    Financial institutions must also conduct KYC reviews for each client relationship at intervals commensurate to the AML risks posed by the client, including reviewing account activity to determine whether such activity fits with what would have been expected given the nature of the account. Each client's AML risk should also be re-assessed if material new information or unexpected account activity is identified.

179.    Financial institutions must also establish criteria for determining when a client relationship poses too high of a risk and therefore must be terminated. A financial institution may

be liable under applicable laws if it maintains such a relationship despite repeated indications of facilitation of improper transactions.

180.    Another critical aspect of the AML regime are suspicious activity reports ("SARs"). Financial institutions are required to report known or suspected criminal offenses or transactions that they suspect involve money laundering or other crimes, like sex trafficking.

181.    Typical suspicious activity monitoring systems are comprised of several components, including: (1) the identification or alert of unusual activity (such as employee identification, law enforcement inquiries, other referrals, and transaction surveillance monitoring system output); (2) managing alerts; (3) suspicious activity report decision making; (4) suspicious activity report completion and filing; and (5) monitoring and suspicious activity reporting on continuing activity.

182.    Generally, a transaction is suspicious and merits the filing of a SARs if a bank "knows, suspects, or has reason to suspect" the transaction: (1) involves funds derived from illegal activities, or is conducted to conceal monies derived from illegal activities; (2) is designed to evade the reporting requirements of the BSA or related regulations; or (3) has no business or apparent lawful purpose or is not the sort in which the customer normally would be expected to engage, and the bank knows of no reasonable explanation for the transaction after examining the available facts, including background and possible purpose of the transaction.

183.    Suspicious activities include but are not limited to: (1) wire transfers that are unexplained, repetitive, unusually large, shows unusual patterns or have no apparent business purpose; (2) wire transfers made in small amounts in an apparent effort to avoid triggering identification or reporting requirements; and (3) payments made by third party check or money

transfer from a source that has no apparent connection to the customer.[71]

184.    Suspicious activity monitoring and reporting does not exist in a vacuum. Financial institutions incorporate KYC and CDD information when monitoring a customer's activity. For example, if a customer was identified as a Politically Exposed Person ("PEP") then the institution would tailor the monitoring to the unique risks posed by PEPs, for instance corruption.[72] Similarly, if a bank customer was previously convicted of soliciting a minor for prostitution[73], the bank would tailor their monitoring to the risks posed by that specific customer for human trafficking. Finally, financial institutions incorporate customer risk ratings into the frequency and level of scrutiny of customer transactions. For example, private banking[74] is typically considered a high-risk[75] customer relationship by banks.

---

[71] *FINRA Provides Guidance to Firms Regarding Suspicious Activity Monitoring and Reporting Obligations, Regulatory Notice 19-18,* FINRA (May 6, 2019), https://www.finra.org/rules-guidance/notices/19-18.

[72] Federal Financial Institutions Examiners Council (FFIEC), *BSA/AML Manual: Risks Associated With Money Laundering and Terrorist Financing – Politically Exposed Persons Examination and Testing Procedures* (last visited Dec. 28, 2025), https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/20_ep; *see also* FFIEC, *BSA/AML Manual: Risks Associated With Money Laundering and Terrorist Financing – Politically Exposed Persons* (last visited Dec. 28, 2025), https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/20/.

[73] U.S. Department of State, *Tracking Suspicious Financial Activity to Address Human Trafficking* (June 2018), https://www.state.gov/wp-content/uploads/2019/02/283793.pdf.

[74] FATF, *International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation*, Interpretive Note to Recommendation 10 (Customer Due Diligence) (updated October 2025), at 71, available at https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%202012.pdf.coredownload.inline.pdf.

[75] FFIEC, *BSA/AML Manual: Assessing Compliance with BSA Regulatory Requirements – Customer Due Diligence – Overview* (last visited Dec. 28, 2025), https://bsaaml.ffiec.gov/manual/AssessingComplianceWithBSARegulatoryRequirements/02.

185.    Regulators, non-governmental organizations, government agencies, international bodies, and private sector groups published notices and advisories to help financial institutions recognize transactional and behavioral red flags of money laundering, and for specific crimes including human trafficking, to incorporate into their monitoring programs.

186.    Human trafficking red flags have been extensively documented. Examples include: Financial Action Task Force (FATF)'s 2011 report "Money Laundering Risks Arising from Trafficking in Human Beings and Smuggling of Migrants," 2014 FinCEN's Advisory "Guidance on Recognizing Activity that May be Associated with Human Smuggling," and 2018 FATF's Report "The Financial Flows of Human Trafficking," and FinCEN's 2020 "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity."[76] In addition, private sector initiatives such as the United States Banks Alliance developed a 'Toolkit' on human trafficking including red flag indicators for financial institutions. BANA was a participant in the human trafficking Toolkit development.

187.    Red flag indicators of human trafficking from both the victim and perpetrator perspective visible to financial institutions include: (1) a common mobile number, address and employment references are used to open multiple accounts in different names; (2) frequent money transfers to 'risk' countries; (3) concentration of 'risk' nationalities among the opening of accounts; (4) money rapidly withdrawn from accounts, from one ATM, or several ATMs in close

---

[76] FATF, *Money Laundering Risks Arising from Trafficking in Human Beings and Smuggling of Migrants* (July 2011), available at https://www.fatf-gafi.org/content/dam/fatf-gafi/reports/Trafficking%20in%20Human%20Beings%20and%20Smuggling%20of%20Migrants.pdf; Financial Crimes Enforcement Network, *Guidance on Recognizing Activity that May be Associated with Human Smuggling and Human Trafficking – Financial Red Flags* (Sep. 11, 2024), available at https://www.fincen.gov/system/files/advisory/FIN-2014-A008.pdf; FATF, *Financial Flows from Human Trafficking* (July 2018), available at https://www.fatf-gafi.org/content/dam/fatf-gafi/reports/Human-Trafficking-2018.pdf.

proximity; (5) frequent deposits or withdrawals with no apparent business source; (6) transactions undertaken that appear inconsistent with customer profile; (7) unusual withdrawals, deposits or wire activity inconsistent with normal business practices, or dramatic and unexplained changes in the account activity; (8) transactional activity inconsistent with a customer's alleged employment, business, or expected activity, or where transactions lack a business or apparent lawful purpose; and (9) frequent outbound wire transfers, with no business or apparent lawful purpose, directed to countries at a higher risk for human trafficking or to countries that are inconsistent with the customer's expected activity. All of these red flags were present with respect to BANA's banking services to, for, or on behalf of, Epstein, his entities, agents, and co-conspirators.

188.    The United Nations, the U.S. State Department, and the FATF have all identified Russia and former Soviet republics as "High Risk" origin countries for human trafficking victims. For example, in 2017, the U.S. State Department stated: "[a]s reported over the past five years, Russia is a source, transit, and destination country for men, women, and children subjected to forced labor and sex trafficking."[77] The Department of State kept the Russian Federation as a Tier 2 Watch List for trafficking for almost a decade and, in most recent years, downgraded it to a Tier 3 because the country has and continues to be a destination and source country for traffickers and trafficking victims.

189.    Financial institutions consider the human trafficking indicators alongside the customer's profile (e.g., a registered sex offender or a young woman recently arriving from Russia) when evaluating whether observed behaviors or transactions are potentially suspicious.

190.    BSA laws require financial institutions to monitor for and report potentially

---

[77] U.S. Department of State, *2017 Trafficking in Persons Report: Russia*, available at: https://www.state.gov/reports/2017-trafficking-in-persons-report/russia.

suspicious activity related to human trafficking. In 2014, FinCEN added the keyword "Advisory Human Trafficking" in applicable SARs. In 2018, FinCEN updated the SAR form to include a standard checkbox indicating suspected human trafficking. Since the addition of the human trafficking SAR checkbox in 2018 through November 2025, banks and credit unions filed 18,491 human trafficking SARs. All financial institution types (including broker-dealers, money services businesses, etc.) filed more than 39,000 human trafficking SARs during that same period. Financial institutions can recognize human trafficking and do report it via SARs.

191.    BSA laws require Bank of America to conduct Customer Due Diligence on customers. As part of the CDD process, banks typically employ Negative News (alternatively called "Adverse Media") screenings against customer names and beneficial owners of accounts, especially those customers deemed a higher risk.[78]

192.    A financial institution reviews media reports, news articles and/or other references to assist in its performance of customer due diligence, as well as its evaluation of any transactions or activity it considers unusual or potentially suspicious. For example, negative news may cause a financial institution to review customer activity as well as other related information, such as that of third parties with transactions involving the customer's account. Following an evaluation and investigation of the negative news in conjunction with its review of transactions, the financial institution will determine if a SAR filing is required. When multiple negative news alerts arise based on the same underlying event, financial institutions process alerts to determine whether the alert contains new or different information that warrants investigation or assists or informs its evaluation of activity. The financial institution assesses whether to update the customer risk

---

[78] *Publication of the Negative News Screening FAQs*, The Wolfsberg Group (May 11, 2022), https://wolfsberg-group.org/news/3.

profile, investigate transactions that may result in the filing of a SAR, or escalate or terminate a customer relationship. As demonstrated by the multi-year lag between the Epstein-related suspicious transactions, negative news about Epstein, and BANA's SAR filings, BANA provided non-routine services to Epstein by allowing his transactions to continue unreported.

193.    BANA, including Merrill Lynch and BANA's other affiliates, were sophisticated financial institutions, which understood KYC laws and other banking obligations, and BANA's strict obligation to comply with those laws and obligations. Through its KYC, CDD, and other required processes, BANA learned, and certainly should have known, of Epstein's sex-trafficking venture; the important roles played by Maxwell, Black, Indyke, and Kahn in that venture; and the assistance and facilitation of that venture by BANA itself.

194.    Further, accepted industry practice as well as banking rules and regulations required BANA and banks performing BANA's functions to know the parties to, from, and on whose behalf they were transferring and processing the transfers of cash, to monitor such transfers for suspicious transactions, and to report suspicious transactions.

195.    It is indisputable that BANA learned and disregarded or should have learned of Epstein's sex-trafficking venture, including Maxwell and Black's roles, through the KYC and CDD process.

196.    The Bank's obligation to monitor did not end at the opening of Epstein, Maxwell, Black, and Doe's accounts, but continued throughout the banking relationship, particularly, in light of the highly publicized reports of Epstein and his co-conspirators' wrongdoing.

**F.    BANA Knowingly and Intentionally Participated in Epstein's Sex-Trafficking Venture by Providing Non-Routine and Tailored Services to Epstein and His Associates.**

**1.  BANA participated in Epstein's trafficking of Jane Doe.**

197.    Jane Doe was living in Russia when she met Epstein in 2011.

198.    Epstein and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Jane Doe. Epstein and his co-conspirators constantly reminded Jane Doe how powerful and important Epstein was, and that: (1) Epstein possessed extraordinary wealth, power and influence; (2) Epstein's business and political friends, including world leaders, also included some of the most powerful people in the world; (3) Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise; (4) medical and other life necessities would be denied victims if they failed to perform commercial sex acts for Epstein; and (5) Epstein could take away Jane Doe's and other victims' life necessities such as shelter or housing if she or they failed to perform those acts.

199.    Jane Doe was exceptionally vulnerable to being victimized by Epstein. His sex-trafficking venture targeted vulnerable young women and Jane Doe was soon indoctrinated and unable to extricate herself. Jane Doe was sexually abused and trafficked by Epstein for several years. Having been conditioned that the sexual abuse was "normal" and knowing that everyone surrounding Epstein, including accountants, lawyers, and other important people, were aware of the sex abuse, Jane Doe was coerced into a cult-like life controlled and manipulated by Epstein and others doing Epstein's bidding.

200.    Over the ensuing years, from 2011 through 2019, Epstein sexually abused Jane Doe on at least 100 occasions, including but not limited to, forcibly touching her, forcibly raping her, and forcing her to engage in sexual acts with other women for his own depraved sexual gratification.

201.    Epstein used means of force, threats of force, fraud, coercion, abuse of process, and

a combination of such means to cause Jane Doe to engage in commercial sex acts.

202.    Epstein recruited Jane Doe to cause her to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including use of cellular telephones and means of interstate transportation (such as aircraft that he owned or controlled).

203.    Epstein transported Jane Doe from New York to other states to cause her to engage in commercial sex acts.

204.    Jane Doe wanted to escape from the Epstein sex-trafficking venture, yet Epstein and his supporting team of co-conspirators increased the tactics of fraud, force, or coercion to cause her to remain compliant in fulfilling Epstein's sexual demands.

205.    Epstein controlled Jane Doe financially, emotionally, and psychologically. He used his knowledge of Jane Doe's aspirations, fears and problems to manipulate her until she was completely controlled by and dependent upon him.

206.    In 2019, Indyke and Kahn instilled even more fear in Jane Doe when they attempted to contact her through other associates of Epstein, including Lesley Groff and Bella Klein, as a consequence of Doe's attempt to sever ties with the Epstein organization.

207.    From 2011 through 2019, Jane Doe was paid repeatedly by Epstein in furtherance of his sex trafficking operation.

208.    On May 15, 2013, Jane Doe opened a bank account at BANA at the direction of Kahn, Kahn and Epstein's associate, Bella Klein, and immigration attorney, Arda Beskardes, as part of an Epstein/Kahn/Indyke plan to defraud immigration officials.

209.    BANA knew and certainly should have known based on the Bank's obligations, including to Know Your Customer, that (1) Jane Doe was only twenty-two years old; (2) Jane Doe was not a United States citizen as evidenced by the fact that she used her Russian passport to open

the account and that Russia was a "High Risk" country of origin for sex trafficking; (3) Jane Doe barely spoke English as evidenced by her conversation with the Bank employee who opened the account; (4) Jane Doe had no employment history or experience; (5) Jane Doe had no prior income or wealth; and (6) Jane Doe had no ability to legitimately earn any substantial income.

210.    Notwithstanding these factors, from the inception of the account, Jane Doe was designated by the Bank as a "Preferred Customer," and was provided with "Advantage Tiered Checking" beginning in October 2014 despite the fact that accounts with such designation are typically reserved for accounts with higher monthly balances than Jane Doe's account maintained. Based on these designations, Jane Doe's account was either referred to a banker within the Bank, or it was bundled with other higher value accounts, such as those related to Epstein, to avail her of the preferential treatment. In either case, the services that the Bank provided to Jane Doe were not routine or ordinary and were tailored to her account based on Jane Doe's connection to Epstein, who had accounts with BANA since as early 2001.

211.    As soon as Doe's account was opened, Kahn wired $14,073.00 into the account from a personal account in the name of Jeffrey E. Epstein at JP Morgan.

212.    To be clear, a young woman from a country with a high risk of sex trafficking with limited English and no employment history, had her newly opened Bank of America bank account initially funded by a $14,073 wire from a man widely known to engage in sex trafficking.

213.    Thereafter, thousands of dollars were wired into Jane Doe's BANA account by Epstein. For example, in July 2013, $12,000 was wired to Jane Doe's BANA account from a personal account in Epstein's own name. There was no apparent or legitimate reason for this transfer.

214.    When wires and other communications relating to Jane Doe's accounts were made

by BANA, they were made to Epstein and his agents, including Bella Klein, further evidencing the Bank's knowledge of the suspicious nature of her account. For example, in September 2013, when BANA was concerned that there was a potential fraudulent charge from Jane Doe's account, the Bank informed not Jane Doe, but Klein. The Bank also had actual and constructive knowledge that Jane Doe did not pay her BANA credit cards from bank accounts under her name.

215.    Kahn and Klein also utilized the account to provide Jane Doe with money from Epstein for monthly rent and other living expenses. Kahn was a signatory for Epstein's bank accounts and was able to transfer funds directly from Epstein's bank accounts to Doe's BANA account. Sex-trafficking victims are generally exploited over an extended period. Therefore, traffickers are required to meet the essential needs of the victim throughout the duration of their exploitation. This includes housing, personal products, nourishment, and expenses. [79]

216.    Another account at BANA was created in the name of Jane Doe and the woman that Epstein forced her to marry.

217.    In January 2014, after Epstein had been terminated from JP Morgan as a result of very public negative news related to his branding as a sex-trafficker, Epstein transferred $14,000 into Jane Doe's BANA account from a personal account in his name at Deutsche Bank. This information was known to the Bank as it appears in Jane Doe's BANA transaction history.

218.    On June 23, 2014, Epstein transferred $25,000 into Jane Doe's BANA account from a personal account in his name at Deutsche Bank.

219.    On November 4, 2014, Epstein transferred another $25,000 into Jane Doe's BANA account from a personal account in his name at Deutsche Bank.

---

[79] FATF Report, *Financial Flows from Human Trafficking* at 53 (Jul. 2018), https://www.fatf-gafi.org/content/dam/fatf-gafi/reports/Human-Trafficking-2018.pdf

220.    As BANA knew, and as evidenced in Jane Doe's BANA account statements, all money that was deposited into her account from its inception through the closing of her account in 2019 was either deposited into her account from Epstein's JP Morgan Chase and Deutsche Bank accounts, or as a direct deposit from an Epstein-Related Entity that was incorporated by Indyke, who the Bank knew was Epstein's agent and representative.

221.    In December 2015, Klein and Epstein transferred seven months of rent in the amount of $8,424.92 into BANA accounts in Jane Doe's name.

222.    In April 2016, additional funds were deposited in Jane Doe's name by Kahn.

223.    In addition to depositing money into one of Jane Doe's BANA accounts for rent and living expenses, Kahn and Klein also used the account to make transfers unrelated to Jane Doe without any apparent legitimate purpose and contrary to what the Bank knew would be typical transfers from Kahn and Klein.

224.    In October 2016 into 2017, additional funds were transferred from Epstein's accounts to Jane Doe's BANA accounts.

225.    In addition to the other obvious red flags that arose from banking transactions related to Jane Doe's BANA accounts, BANA knew, or should have known, that she was making monthly payments from a BANA account to 301/66 Owners Corp with an address of 301 East 66th Street, an address known to be affiliated with Epstein. ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ In addition to the Bank's own knowledge from its internal records, a link between Epstein and the building used to house his dozens and dozens of sex-trafficking victims has been public since at least 2010, including from Epstein's public Black Book. As previously noted, financial red flag indicators of sex trafficking has long included a

common address used to open multiple accounts.[80]

226.    A review of Jane Doe's account history also shows erratic and suspicious banking behavior, as Epstein utilized Jane Doe's account to conduct business in amounts and for purposes that were not typical for Jane Doe, and that would have in fact been impossible based on Jane Doe's income or typical pattern of deposit. Financial indicators of sex trafficking have long included transactions that appear inconsistent with the customer profile and victims routinely report that their traffickers used or controlled accounts opened in their name.[81]



---

[80] FATF Report, *Money Laundering Risks Arising from Trafficking in Human Beings and Smuggling of Migrants* (July 2011), https://www.fatf-gafi.org/content/dam/fatf-gafi/reports/Trafficking%20in%20Human%20Beings%20and%20Smuggling%20of%20Migrants.pdf

[81] *Id., see also New Legislation Provides Survivors with a Path to Financial Freedom* (Jan. 4, 2022), https://polarisproject.org/blog/2022/01/new-legislation-provides-survivors-with-a-path-to-financial-freedom/

230.    BANA should have filed a SAR at the time the suspicious transfers were made, not a decade later. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

231.    From the time that Jane Doe's account was opened to the time that it was closed, Jane Doe never received income from any source other than Epstein or his affiliated entities.

232.    At least one of Jane Doe's bank accounts at BANA continued to be utilized by Epstein and Kahn through Epstein's death in 2019 for activities unknown and unexplained to Jane Doe.

233.    Sex traffickers routinely open and/or control financial accounts in the names of their victims.[82] For example, the Debt Bondage Repair Act which allows human trafficking victims to remove adverse credit report information was passed in response to this common method of control by traffickers.

234.    Epstein and his co-conspirators continued to coerce Jane Doe to engage in commercial sex with Epstein, through the use of Epstein's force, fraud, and coercion, through 2019. Epstein and his co-conspirators continued to coerce Jane Doe in various ways, including by

---

[82] Financial Services Industry, *On-Ramps, Intersect ions, and Exit Routes*, Polaris (July 2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Financial-Industry.pdf

holding his control over her immigration status over her head, until her ultimate escape when Epstein died.

235.    BANA knew and should have known of Epstein's continued control and coercion over Jane Doe as evidenced by the transactions in her BANA account.

236.    Given BANA's regulatory obligations, it knew or should have known of the suspicious activity in Doe's account related to human trafficking because (1) her account did not exhibit normal payroll expenditures, like taxes, wages, and social security contributions; (2) Doe's transactional activity was inconsistent with her employment (or lack thereof) or expected business activity for someone her age, employment history, and business; (3) Doe's account activity did not appear to serve any lawful purpose; (4) Jane Doe did not pay her BANA credit card cards from her bank account; and (5) third parties maintained possession and control over her account, money, and documents.

237.    BANA knew or recklessly disregarded Epstein's continued control and coercion over Jane Doe as evidenced by the transactions in her BANA account.

## 2. BANA participated in Epstein's sex-trafficking venture through its non-routine relationship with Leon Black.

238.    BANA also knowingly and intentionally participated in and assisted Epstein sex-trafficking venture by enabling billionaire financier Leon Black to provide the financial underpinnings for Epstein to have ready and reliable access to financial resources to recruit, lure, coerce, and entice young women and girls to cause them to engage in commercial sex acts and other degradations.

239.    The Bank financially benefitted from that participation and assistance, including because it was financially incentivized to retain Black as a client due to his connections and referrals of other high-net-worth clients to the Bank

240.    Black is an American private equity investor and co-founder of Apollo Global Management, a private equity firm that has grown to manage over $785 billion in assets. Black's estimated net worth is over $14 billion. His vast wealth has allowed him access to the world's most elite individuals; facts all well-known to BANA as the financial institution that he was conferring vast financial benefits on because of such connections.

241.    As a billionaire and one BANA's wealthiest clients, BANA was required to apply scrutiny to Black's relationship with the Bank.

242.    In furtherance of his sex-trafficking operation, Epstein sought out reliable funding, which in this case, came from  Black through his accounts at BANA. BANA ignored red flags and relevant state and federal banking laws relating to Black's accounts, permitted him to transfer money without question, and allowed Black to otherwise knowingly facilitate the transfer of finances for the commercial aspect of Epstein's commercial sex-trafficking venture.

243.    Epstein and Black have been publicly linked to one another since Epstein became a Trustee of the Leon D. Black Foundation in 1997. In the March 2003 Vanity Fair expose on Jeffrey Epstein titled, "The Talented Mr. Epstein," Leon Black was identified as a real estate tycoon businessman who would dine with Epstein at his home.[83] That connection became the subject of public attention and heightened scrutiny just before Jeffrey Epstein began his Palm Beach jail sentence in 2008.[84]  Given his vast wealth, Black was already a high-risk client for the

---

[83]    Vicky Ward, The Talented Mr. Epstein, Vanity Fair (Mar. 1, 2023) https://www.vanityfair.com/news/2003/03/jeffrey-epstein-200303?srsltid=AfmBOopQ8ZalYKUSXHI1BKkps6dSA-6VGLgQ7oqnly3kWOvFNKTS2gmz

[84]    *Exposed: The Leon Black-Jeffrey Epstein Connection!*. Gawker August 2008, https://www.gawkerarchives.com/501354/exposed-the-leon-black-jeffrey-epstein-connection; *see also Jeffrey Epstein was Buddies with Leon Black*, New York Magazine, August 2008 https://nymag.com/intelligencer/2008/08/jeffrey_epsteins_connections_t.html

Bank. Had BANA engaged in proper negative news screenings, these articles would have appeared highlighting the relationship between their customer, Black, and known sex offender, Epstein.

244.    BANA had actual knowledge of the relationship between Epstein and Black as Black, his Family Office, and other agents of Black communicated with BANA about Epstein on many occasions between 2009 and 2019.

245.    The knowledge that BANA had, and certainly should have had, from the publicly available information linking Black and Epstein, required still further scrutiny of Black's transfers.

246.    In addition, Epstein and Black or an individual associated directly with Black were joined together on communications with BANA.

247.    BANA went far beyond what a non-complicit bank would have done and instead allowed Black to provide Epstein with the necessary financial structure to operate his sex-trafficking venture by ignoring the obvious red flags outlined both by the recent United States Senate investigation into payments made to Epstein by Black through his BANA accounts, and in SARs that were untimely filed by the Bank.

248.    BANA and Leon Black are presently under investigation by the Senate Committee on Finance resulting from $170 million in payments made by Black to Epstein between 2013 and 2017 for purported tax and estate planning advice.[85] The Committee "further discovered that a

---

[85] U.S. Senate Committee on Finance, *Letter to Attorney General Bondi, Secretary Bessent and Director Patel from Senator Wyden* (Mar. 11, 2025), https://www.finance.senate.gov/imo/media/doc/wyden_letter_to_doj-treasuryfbi_on_epsteinpdf.pdf ("March 2025 Wyden Letter"), at 3; *see also* U.S. Senate Committee on Finance, *Letter to Attorney General Bondi, Secretary Bessent and Director Patel from Senator Wyden* (June 16, 2025), https://www.finance.senate.gov/imo/media/doc/wyden_doj_treasury_epstein_letter.pdf ("June 2025 Wyden Letter"), at 1 ("$170 million in payments from Black and his associates to Epstein were used to finance Epstein's trafficking activities.").

major U.S. financial institution failed to do legally required due diligence on the payments from Black to Epstein and waited nearly seven years to report the transactions to the Treasury Department." March 2025 Wyden Letter, at 2.

249.    As noted by the Senate Committee on Finance, Black entered into a Settlement Agreement with the United States Virgin Islands in January 2023 wherein he acknowledged that, "Jeffrey Epstein used the money Black paid him to partially fund his operations in the Virgin Islands." March 2025 Wyden Letter, at 3. The $62 million settlement between Black and the U.S. Virgin Islands that gave Black immunity from sex trafficking charges in the USVI includes an admission that "Epstein used the money Black paid him to partially fund his operations in the Virgin Islands." July 2025 Wyden Letter, at 2.[86] This means that one of the most powerful billionaires on Wall Street financed Epstein's trafficking operations in the USVI with impunity.

250.    The Senate Committee on Finance further found that, "[r]ecords reviewed by staff revealed that the Bank failed to conduct meaningful due diligence on the payments to Epstein and cleared them without asking for information as to the nature of the transactions. Records filed by the Bank do not reflect the nominal 'professional services' purpose for the payments, suggesting that the Bank did not inquire about the payments to Black or his associates. In a February of 2020 filing, the Bank flagged $156 million paid by the Black accounts to Epstein and stated that 'the wire transfer activity does not appear to have a verifiable business purpose.' The filing also stated that the transactions had 'no apparent economic, business or lawful purpose' and involved 'suspicious use of multiple accounts.'" March 2025 Wyden Letter, at 4.

---

[86] *See also* U.S. Senate Committee on Finance, *Letter to Secretary Bessent from Senator Wyden* (Sept. 2, 2025), https://www.finance.senate.gov/imo/media/doc/letter_from_senator_wyden_to_secretary_bessent_on_epstein_documentspdf.pdf ("September 2025 Wyden Letter"), at 1

251.    The Senate Committee on Finance now recommends that BANA face investigation for violations of Federal anti-money laundering laws for its handling of transactions involving Epstein because: (1) "the Bank did not make filings related to the Black and Epstein transactions until seven years after the transactions began in 2013;" (2) "the Bank appears to have failed to conduct required due diligence on transactions between the Black accounts and Epstein," which "did not appear to have a verifiable business purpose;" (3) by failing to learn Black's stated purpose of professional services for his payments to Epstein, the Bank failed to engage in the due diligence that would have identified a number of suspicious indicators including that the payments were made without any written services agreement or contractual agreement and were simply made on an ad hoc basis, which "is incongruent with a legitimate professional services contract;" and (4) "for his services Epstein was paid amounts that far exceeded what Black paid other professional advisors involved in his tax and estate planning, which includes some of the most high-priced legal counsel in the nation."[87]



253.    BANA also failed to follow routine banking practices and allowed Black to transfer

---

[87] *Id.* at 5–6.

$170 million to him without question against the backdrop of the public information outing him as a serial sex abuser and reporting Epstein for what was obviously a sex-trafficking operation he was running.

254.    BANA, purposely and deliberately failed to timely file required SARs for Black's suspicious activities with Epstein. In short, instead of behaving as an ordinary provider of routine banking services, BANA instead assisted Black in his facilitation of Epstein's sex-trafficking operation.

255.    BANA intentionally ignored red flags in the form of $170 million in payments from Black to Epstein or Epstein-related entities, allowing Black to financially enable and facilitate Epstein's sex-trafficking operation. These suspicious transactions should have been reported contemporaneous with each transfer from Black to Epstein; however, internal discussion prevented the Bank from filing such reports. Instead, the Bank allowed for Black's suspicious activity to continue because Black was conferring such an extraordinary benefit on the Bank and the Bank did not want to lose the monetary benefit conferred by Black's business or by his connections.

256.    ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ BANA knew that the transaction served no business purpose and could not constitute legitimate payments for Epstein's professional services. Indeed, Black is purportedly one of the brightest financial minds in the world. Epstein held himself out to be a financial advisor on a subject which Black had far greater knowledge than Epstein. Black's explanation that he provided Epstein with $170 million for financial advice is preposterous on its face.

257.    Highlighting BANA's failures to report suspicious transactions and obstruction. █

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

258.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

259.    Had BANA timely and contemporaneously flagged those suspicious transactions, their customer Black would not have been able to send numerous large, round dollar-value wires to Epstein, Epstein-related shell companies, and young women with Eastern European surnames without any alerts or inquiries. BANA could have shut the financing for Epstein's trafficking operation off at the source, Black, but instead chose to provide non-routine banking services to

Black.

260. ████████████████████████████████████████████

████████████████████████

261. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

262. ████████████████████████████████████████████

██████████████████████████

263. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████

264. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████

265. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

266. ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ ██

267. ██████████████████████████████

████████████████████████████████████████

████████████████████



268. 

269.

270.

271.

272.    Black's payments to the women referenced above exhibited several human trafficking and money laundering red flags obvious to BANA in light of known regulatory and legal obligations, including: (1) funds transfer activity that is unexplained, repetitive, or shows unusual patterns; (2) payments with no apparent links to legitimate contracts, goods, or services

are received; (3) young women with the profiles of victims or potential victims; (4) large, round number transactions; (5) unusual use of trust funds in business transactions and other financial activity; and (6) transfer of funds to young women with known ties to Epstein, a known sex trafficker and abuser.

273.    As noted above Banks are required to monitor, detect and report suspicious activity. A variety of regulators have produced numerous advisories of red flag indicators of money laundering and financial crimes. BANA knew that it had these obligations and was aware of the red flag indicators.

274.



275.

276.



███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

277.     ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

278.     ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

279.     ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████

280.     ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████

281.    

282.    Epstein only offered his business to BANA because it was knowingly aiding Epstein's sex-trafficking operation and the concealment thereof. BANA knew that if it stopped allowing Black to aid the operation, it would lose the Epstein and Black-related accounts and the financial benefits attached to handling those accounts.

283.    BANA assisted and participated in Epstein's sex-trafficking venture by knowingly providing financial services to Black, which enabled him to make payments to victims, including directly or indirectly Jane Doe, and others similarly situated.

284.    Ultimately, BANA financially benefitted in the form of profits, high-net worth clients, and other financial incentives for its participation in the Epstein sex-trafficking venture.

285.    Throughout its relationship with Epstein and Black, BANA violated numerous banking laws and regulations in order to conceal and continue its lucrative venture facilitating the Epstein sexual abuse and sex-trafficking scheme.

286.    As discussed above, BANA knew that Black had a relationship with Epstein and was funneling tens of millions of dollars to a known sex abuser and trafficker. However, even if BANA had not had this knowledge the transfer of $170 million without any known or apparent lawful or business reason or justification was enough for BANA to have known or should have

known of its assistance and facilitation of the sex-trafficking venture.

### 3. BANA provided non-routine services to Epstein in furtherance of Epstein's sex-trafficking venture.

287. Over the course of the banking relationship, Epstein and his entities and agents directly used BANA accounts, investment accounts, and the bank's financial services in furtherance of the sex-trafficking scheme.

288. ███████████████████████████████████████████

███████████████████████████████

289. ███████████████████████████████████████████

███████████████████████████████████████████

290. Both accounts were open during the period Epstein was in jail for felony solicitation of a minor.

291. ██████████████████████████████████████████[90]

292. ████████████████████████████████████████████

████████████████████████████████████████

██ ████ ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████

294. ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

---

[90] ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

295.  

296.

297.    BANA had a legal and regulatory obligation to complete CDD and KYC due

diligence on ███████████████████████████████████████████, she

had been named in dozens of public articles as well as in public court cases[92] years prior to this

transaction alongside Jeffrey Epstein related to sexual exploitation of young girls and women.

298.

---

[91] The Butterfly Trust has no valid business purpose, was used to pay Epstein's co-conspirators and victims, and has been reported to be a mechanism for Epstein and his co-conspirators to hide funds. *See* Matthew Goldstein, *Executors of Jeffrey Epstein's estate are accused of moving $13 million*, N.Y. Times (July 22, 2022) https://www.nytimes.com/2022/07/22/business/jeffrey-epstein-estate-assets.html; New York State Department of Financial Services, Consent Order Under New York Banking Law §§ 39 and 44 (July 6, 2020), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf.

[92] *See Jane Doe II v. Epstein et al*, Case No. 09-cv-80469 (S.D. Fla.); ; *Jane Doe 43 v. Epstein et al.*, Case No. 17-cv-00616-JGK (S.D.N.Y.); *see also* Jon Swaine, *Jeffrey Epstein scandal: women with new identities run firms from Epstein-linked property*, THE GUARDIAN (Jan. 7, 2015), https://www.theguardian.com/us-news/2015/jan/07/jeffrey-epstein-former-accomplices-property-prince-andrew.



299. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████. Had BANA conducted the necessary due diligence and

filed the necessary SARs, Epstein's trafficking of Doe would have come to light.

300. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████.

301. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

302. ███████████████████████████████████████████████

███████████████████████████████████████████████

[93] Larry Keller, *Jeffrey Epstein: Scientist, stuntman, 'sex slave' visit jailed tycoon*, THE PALM BEACH POST (Aug. 13, 2008), https://www.palmbeachpost.com/story/news/2008/08/13/jeffrey-epstein-scientist-stuntman-sex-slave-visit-jailed-tycoon/4679547007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z113823d00----v113823d--43--b--43--&gca-ft=214&gca-ds=sophi.



303.

304.

305.

306.

The NYDFS settlement with Deutsche Bank notes, "The existence of coconspirators as beneficiaries of the [Butterfly] trust created the very real risk that payments through the Trust could

---

94 Khadeeja Safdar, JPMorgan's Ties to Jeffrey Epstein Were Deeper Than the Bank Has Acknowledged, The Wall Street Journal (Apr. 21, 2023), https://www.wsj.com/finance/jpmorgan-jeffrey-epstein-525febe3?gaa_at=eafs&gaa_n=AWEtsqfmMD3_2-Qp8mK3asMyXjlld9WJ0Gf0svCqDlVgj-7czjWRxxzheHHQ&gaa_ts=69502534&gaa_sig=UlHTNaFuxosGmae0H6gxF8q7brBIcZtBqnep3F3gGoGxyYzA5sRYmJAsSRKb9N1KHuvnCzmxsb8Kgs1xRfmW5A%3D%3D; see also David Benoit, Former JPMorgan Banker With Ties to Jeffrey Epstein Leaves Citigroup, The Wall Street Journal (Apr. 25, 2023), https://www.wsj.com/finance/former-jpmorgan-banker-with-ties-to-jeffrey-epstein-leaves-citigroup-fe79aa3f?gaa_at=eafs&gaa_n=AWEtsqdGl3bqYyr485Z14NLMpSJkUZBt-8c582LhCey6hfTGg6xQ-kiZltg_4YIroMc%3D&gaa_ts=6952bb97&gaa_sig=NrkULKQC67NqLGt_dM-PuhRrbH9H1xXWLDQ9_nGYAExXdI-Co-ta9hBrZyVl2RiHzca5GKAnG0pK84kDHQnWLQ%3D%3D.

be used to further or coverup criminal activity and perhaps even to endanger more young women."



307.

308.

309.

310.    Epstein's suspicious connections to Black were well known and should have been known by BANA as early as 1997, when Epstein became Trustee of the Leon D. Black Foundation, and certainly by 2008, following the publication of several articles describing their relationship and Epstein's sex crimes. BANA had access to these articles,

311. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████

312. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████

313. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████ These red flags should have been

detected at the time the transfers were made.

314. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████. All of

this information was available to BANA since as early as 2006.

315.    BANA had scores of opportunities to detect and report the human trafficking victim

payments flowing through multiple bank accounts over the course of eight years but chose instead

to protect the Bank's lucrative relationship with Epstein and those that funded his sex-trafficking

empire.

316.    Furthermore, even though Epstein had committed suicide in jail while charged with

human trafficking offenses, ████████████████████████████████████████

███████████████████████████████████████████████████████

████    Finally, given that the suspicious transactions were ongoing, BANA should have evaluated

whether the customer relationships posed too high of a risk and therefore terminated the

relationship instead of enabling human trafficking payments continue to flow into their institution.

317.    ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

### 4. BANA provided non-routine services to Ghislaine Maxwell in furtherance of Epstein's sex-trafficking venture.

318.    BANA also serviced accounts for Epstein's known associates, including convicted

sex-trafficker Ghislaine Maxwell

82

319.    Maxwell was Epstein's close associate, co-conspirator, and paramour.

320.    Maxwell, who was arrested in July 2020 on federal sex-trafficking charges in the Southern District of New York, was later found guilty on five federal sex-trafficking charges and is now serving 20 years in prison for her crimes.

321.    Maxwell was found guilty of enticing and grooming multiple minor girls to engage in sex acts with Epstein and of conspiring to further and conceal Epstein's sex-trafficking operation.

322.    Maxwell had been linked to Epstein for decades prior to her conviction.

323.    As early as 2003, Vanity Fair reported in an article titled "the Talented Mr. Epstein," that Epstein referred to Maxwell as his "best friend," and explained that Maxwell organized much of his life.[95] In 2011, Maxwell was described as a "procurer of young women" for Epstein who introduced him to young women he later had sexual relationships with.[96]

324.    BANA maintained and serviced accounts for Maxwell since as early as 2009.

325.    A recent memorandum issued by the Senate Committee on Finance reveals that Epstein paid Maxwell, who had a BANA account at the time, at least $25 million, including a one-time payment of $19 million from his accounts at JP Morgan.[97]

    **5.  BANA Participated in Epstein's Sex-Trafficking Venture Through its**

---

[95]    Vicky    Ward,    *The    Talented    Mr.    Epstein*,    Vanity    Fair    (Mar.    1, 2003), https://www.vanityfair.com/news/2003/03/jeffrey-epstein-200303?srsltid=AfmBOoqec1Twtdt-Bq8Oo14_-nlf02nRGON9rgbBU2YMrGtzZiivv1m

[96] Vicky Ward, *Jeffrey and Ghislaine: Notes on New York's Oddest Alliance*, Vanity Fair (Mar. 8, 2011), https://www.vanityfair.com/news/2011/03/notes-on-new-yorks-oddest-couple-jeffrey-epstein-and-ghislaine-maxwell?srsltid=AfmBOoqzvh7sO7NiaU0Sd0GCKiqz38N9bzaKn-p37Dzuf-tGRfldKQMC (alluding to Epstein's relationship with Maxwell and "how she introduced him to young women with whom he had sexual relationships").

[97] U.S. Senate Committee on Finance, *Memorandum to Senator Wyden* (Nov. 19, 2025), https://www.finance.senate.gov/imo/media/doc/memorandum_to_senator_wyden_on_jpmc-epstein_redactedpdf.pdf ("November 2025 Wyden Memo"), at 2, 17–18.

**Relationship with MC2 and Jean Luc Brunel.**

326.    As early as 2009 (if not earlier), BANA, without required risk-based due diligence, maintained an operating account for MC2. The funds from that banking relationship were used to fund Epstein's sex-trafficking operation along with Brunel under the veneer of legitimacy with an institution like BANA. Epstein used MC2 to make payments to victims and Epstein related entities, agents, and co-conspirators in furtherance of Epstein's sex-trafficking venture.

327.    Epstein and Brunel used MC2 to lure young girls—often from Eastern Europe—to the United States on Epstein's private jets for the sole purpose of sexually abusing them.

328.    From its inception in 2005 and continuing until Epstein's death, countless women were filtered through the pipeline from MC2 to Epstein to be abused.

329.    BANA facilitated hundreds of transfers of monies that were used to entice and silence young victims by keeping the pretense of a modeling agency alive. Young women would be promised modeling careers and connections in the fashion industry only to be abused by Epstein and Brunel. Many of the transfers out of the account were in whole round numbers, has been identified by regulators as red flags of criminal activity, including trafficking.

330.    Without BANA's active participation, MC2 would not have been able to pay Epstein's victims, through the ruse of a payroll system, nor would it have been able to appear like a legitimate modeling agency. The appearance of legitimacy was critical for Epstein and MC2 to trick young women into believing false promises of a future in the modeling industry.

331.    As mentioned above, BANA had actual and constructive knowledge of Epstein's use of MC2 as one vehicle of his sex-trafficking venture through public reports, articles, and filings linking MC2 to Epstein in furtherance of his sex trafficking venture. BANA also had actual and constructive knowledge through the knowledge Paul Morris brought to BANA, including his direct

involvement in Epstein's funding of MC2.

332.    Additionally, by at least 2009, BANA had actual and constructive knowledge that Kahn, Epstein's accountant, was managing the operating account. As mentioned above, BANA knew that Kahn was one of Epstein's agents.

333.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

334.    BANA also failed to satisfy its due diligence obligations by: (1) opening an operating account for MC2 without due diligence; (2) failing to periodically monitor the account as is required by law; and (3) failing to file the required SARs in light of suspicious activity in and out of MC2's operating account.

335.    For MC2 to have opened an operating account, BANA was required to conduct necessary customer due diligence. MC2 submitted (or should have submitted) an application to BANA, and underwent due diligence, including but not limited to beneficial ownership, source of funds, purpose of the business, and signatories.

336.    This initial due diligence would have required negative media screening for MC2, which would have undoubtedly revealed troubling reports of Brunel and Epstein's use of MC2 to abuse young women.[98]

_____

[98] *See e.g.* 60 MINUTES: *American Girls in Paris* (aired Dec. 23, 1988); PageSix.com Staff, *Model*

337.    By 2009 and certainly 2012, when MC2 issued a payment to HBRK Associates, BANA would have known about Brunel and MC2's role in Epstein's sex-trafficking venture.

338.    Further, while the operating account was open, BANA had a legal obligation to periodically monitor the account, particularly, where there were red flags of criminality.

339.    BANA should have monitored and flagged transfers in MC2's operating account because: (1) it had actual and constructive knowledge of Epstein's use of MC2 in his sex-trafficking venture; (2) payments were made to various "models," a designation used for Epstein's victims[99]; (3) payments were often made in large round numbers; and (4) MC2 made payments to entities associated with Epstein, like HBRK Associates, without any legitimate or business purpose.

340.    While providing MC2 with the business account and during the relevant period, BANA benefited from the same in the form of bank fees, all the while overlooking the public news reports related to MC2 and Brunel's involvement in the sexual abuse of young women from Eastern Europe as part of Epstein's sex trafficking enterprise.

## G.    BANA Knowingly Benefited from Epstein's Sex-Trafficking Venture.

341.    BANA knowingly benefitted from its participation in Epstein's sex-trafficking venture, including its provision of non-routine financial services and failure to monitor or report

---

*Shop Denies Epstein Tie*, Page Six (Oct. 6, 2007), https://pagesix.com/2007/10/06/model-shop-denies-epstein-tie/; Conchita Sarnoff, *Jeffrey Epstein, Pedophile Billionaire, and His Sex Den*, The Daily Mail (Jul. 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den; Conchita Sarnoff, *Jeffrey Epstein, Billionaire Pedophile, Goes Free*, The Daily Beast (Jul. 20, 2010), https://www.thedailybeast.com/jeffrey-epstein-billionaire-pedophile-goes-free/; Jenna Sauers, The Sex Trafficking Model Scout, Jezebel with Splinter (Aug. 4, 2010), https://www.jezebel.com/the-sex-trafficking-model-scout-5603638.

[99]    PageSix.com Staff, *Model Shop Denies Epstein Tie*, Page Six (Oct. 6, 2007), https://pagesix.com/2007/10/06/model-shop-denies-epstein-tie/

suspicious activities in furtherance of Epstein's sex-trafficking venture.

342.    Epstein and his associates, including Black and Maxwell, would not have conducted business with BANA but for the Bank's participation in Epstein's sex-trafficking venture.

343.    As noted above, BANA recognized but intentionally failed to flag a number of suspicious payments made by Epstein or an Epstein-related entity to at least six Epstein victims, including the Jane Doe in this litigation.

344.    For example,



The Butterfly Trust is known to be a Trust created by Epstein.

345.

346.

347.

348.

349.    As explained above, BANA knew and certainly should have known that these suspicious transfers and banking activities had all the markers of criminal activity, and that Epstein was using BANA accounts to fuel his sex trafficking venture.

350.    BANA financially benefitted in the form of profits, high-net-worth clients, and other financial incentives, for allowing Black's participation in the Epstein sex-trafficking venture.

351.    BANA recognized but failed to flag a highly suspicious transfer from Black to Epstein in the amount of $170 million for purported tax and estate services. BANA knew these services were not typically valued at such astronomical amounts.

352.    In total, BANA ████████████████████████████████████ ██████████████████████████████ and $170 million in suspicious transactions related to Black's funding of Epstein's trafficking operation, totaling nearly ██████████ in suspicious transactions that ultimately enabled Epstein to abuse hundreds of young women.

353.    BANA knew that if it flagged any of these transactions, it would have lost Epstein's business and connections to wealthy individuals.

354.    BANA gave more weight to the benefits it received from its participation in Epstein's sex-trafficking venture than to its regulatory and legal obligations.

355.    Similarly, BANA knew that if it stopped enabling Black to aid Epstein's sex-trafficking venture, it would lose the Black-related accounts and the financial benefits attached to handling those accounts.

356.    To the extent Epstein transferred any monies to Maxwell's BANA account, those transfers should have raised red flags and triggered review and monitoring of Maxwell's accounts.

357.    Rather than losing Black's or Maxwell's business, BANA deliberately failed to monitor their account activity or file SARs.

358.    Given BANA's knowledge about Epstein's past sex trafficking, its continuation of its financial relationship with Epstein, Maxwell, and Black was, at a minimum, in reckless disregard of the fact that Epstein was using means of force, threats of force, fraud, coercion (and a combination of such means) to cause Epstein's victims to engage in commercial sex acts.

359.    Similarly, in light of BANA's knowledge of the irregular circumstances activity of Doe's account, its continuation of a banking relationship with Epstein and continued failures to monitor and report the irregular activity amount to, at a minimum, reckless disregard that Epstein was using means of force, threats of force, fraud, coercion (and a combination of such means) to cause Epstein's victims, including Doe, to engage in commercial sex acts.

360.    If a financial institution decides to do business with a high-risk client, that institution is required to conduct due diligence commensurate with that risk and to tailor its transaction monitoring to detect suspicious or unlawful activity based on what the risk is. Additionally, each client's AML risk should be reassessed if material new information or unexpected activity is identified. BANA knowingly, intentionally, deliberately, and maliciously failed to do so with regard to its relationship with Epstein.

361.    BANA knowingly and intentionally benefitted financially and in other ways from its participation in Epstein's sex-trafficking venture with knowledge, or with reckless disregard to the fact, that Epstein used means of force, threats of force, fraud, and coercion (and combinations thereof) to force young women and girls into engaging in commercial sex acts.

362.    By facilitating and financing Epstein's commercial sex acts in interstate and foreign commerce, BANA earned interest, commissions, service fees, and other financial benefits directly from its connection with Epstein, Epstein-related entities, and others acting in concert with Epstein. Epstein provided those financial benefits to BANA precisely because it was facilitating

his sex-trafficking venture—and BANA knew that was the reason that Epstein was providing them with those financial benefits.

363.    For example, in or about February 2018, after Paul Morris joined BANA, Epstein directed Kahn to move an account belonging to Epstein's friend and influential philosopher to Merrill Lynch, a BANA subsidiary, under Morris's management. The benefit to BANA was obvious: BANA (through Merrill Lynch) earned management fees, commissions, and other financial gains from servicing the account of another prominent, high net-worth client. This account was part of a broader pattern in which Epstein referred his high-profile, high-net-worth friends and associates to BANA, creating a financial incentive for the Bank to continue funding and facilitating Epstein's sex-trafficking operation.

364.    BANA benefitted by receiving things of value from its participation in the Epstein sex-trafficking venture, including (1) connections with Epstein, his co-conspirators, and his wealthy friends and associates; (2) additional deposits from Epstein, his co- conspirators, and his wealthy friends and associates; (3) the opportunity to earn financial benefits from the funds that had been deposited with it. BANA knowingly and intentionally received these things of value as a direct result of its participation in the Epstein sex-trafficking venture.

## CLASS ACTION ALLEGATIONS

365.    Jane Doe brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class:

All women who were sexually abused or trafficked by Epstein or Epstein's co-conspirators during the time when BANA maintained bank accounts for Epstein, Epstein's co-conspirators, Epstein related-entities, and/or Epstein-related accounts (the "Class Period").

366.    Jane Doe reserves the right to seek leave to modify this definition, including the

addition of one or more subclasses, after having the opportunity to conduct discovery.

367.    **Numerosity:** The Class consists of dozens of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual Class members are ascertainable through records maintained by the Epstein Estate and Defendant, including but not limited to records for Epstein-related accounts (e.g., account ledgers reflecting payments from Epstein to Class members).

368.    **Typicality:** Jane Doe's claims are typical of the claims of the other Class members she seeks to represent. The claims of Jane Doe and the other Class members are based on the same legal theories and arise from the same unlawful pattern and practice of Defendant's participation in and funding of the Epstein's sexual abuse and Epstein's sex-trafficking venture.

369.    **Commonality:** There are many questions of law and fact common to the claims of Jane Doe and the other Class members, and those questions predominate over any questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

370.    Common Questions of Fact and Law affecting Class Members include, but are not limited to, the following:

a.    Whether Epstein ran a sex-trafficking venture;

b.    Whether the Epstein sex-trafficking venture caused its victims to engage in commercial sex acts in violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(1);

c.    Whether the Epstein sex-trafficking venture recruited, enticed, solicited, harbored, provided, obtained, and transported victims in ways that were in or

affecting interstate or foreign commerce;

d. Whether Epstein and his co-conspirators used means of force, fraud, coercion, and abuse of legal process, or a combination of such means, to sexually abuse the victims and to cause victims to engage in commercial sex;

e. Whether BANA knew or recklessly disregarded the existence of the Epstein sex-trafficking venture;

f. Whether BANA participated in the Epstein sex-trafficking venture;

g. Whether BANA knowingly and intentionally assisted, facilitated, and supported the Epstein sex-trafficking venture's pattern and practice of coercively forcing victims to engage in commercial sex acts;

h. Whether BANA benefitted financially or by receiving things of value from its participation in a venture which has engaged in sex trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1);

i. Whether BANA knew or should have known that the Epstein sex-trafficking venture had engaged in violations of the TVPA, 18 U.S.C. § 1591(a);

j. Whether BANA obstructed the enforcement of the TVPA with respect to Jeffrey Epstein's sex-trafficking venture;

k. Whether BANA owed a duty to Epstein's victims; and;

l. Whether BANA breached its duty to Epstein's victims by providing banking services to Epstein and his associates.

371.    Absent a class action, most of the Class members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of

common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

372.    **Adequacy:** Jane Doe will fairly and adequately represent and protect the interests of the other Class members she seeks to represent. Jane Doe has retained counsel with substantial experience in prosecuting complex litigation and class actions. Jane Doe and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Jane Doe nor her counsel have any interests adverse to those of the other Class members.

373.    This action has been brought and may properly be maintained as a class action against BANA pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from BANA's records.

374.    **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

a.    Joinder of all Class Members is impracticable;

b.    The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for BANA and result in the impairment of Class Member's rights and the disposition of their interests through actions to which they were not parties;

c.    Class action treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and

without the unnecessary duplication of effort and expense that numerous individual

actions would engender;

d.   Absent a class action, Class Members will continue to suffer losses and be aggrieved

and BANA will continue to violate New York and federal law without remedy;

e.   Class treatment of this action will cause an orderly and expeditious administration of

class claims, economies of time, effort and expense will be fostered, and uniformity of

decisions will be ensured;

f.   Jane Doe and her counsel are unaware of any class action brought against any

Defendant for the violations alleged in this action;

g.   The forum is desirable because Jane Doe conducted the subject business with Jeffrey

Epstein in this District and Class Members were consequently trafficked in this District;

and,

h.   This action presents no difficulty that would impede its management by the Court as a

class action.

## CAUSES OF ACTION

### COUNT I

**KNOWING BENEFICIARY IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF
THE TRAFFICKING VICTIMS PROTECTION ACT,
18 U.S.C. §§ 1591(a)(2), 1595**

375.   Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 374, as if

fully set forth in this Count.

376.   Jane Doe brings this Count individually and on behalf of the other Class Members

she respectively seeks to represent.

377.   BANA knowingly and intentionally participated in, assisted, supported, and

facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2).

378.    BANA took many concrete steps to aid Epstein's sex-trafficking venture, as outlined above. Among the concrete steps that BANA took to aid Epstein was providing financial services that made the sex-trafficking venture possible. BANA's willingness to provide these services was the quid pro quo for it receiving financial benefits from Epstein.

379.    Among the concrete steps that BANA took to aid and participate in the Epstein sex-trafficking venture were opening up accounts at BANA for Epstein, his related entities, and associates. By opening these accounts, BANA received many benefits from participating in Epstein's venture. The opening of these accounts was affirmative conduct that caused BANA to receive those benefits.

380.    Among the concrete steps that BANA took to aid the Epstein sex- trafficking venture, BANA willfully failed to timely file required SARs with the federal government, because doing so would imperil its ability to profit from the sex-trafficking venture. BANA's concealment of the cash transactions caused it to receive financial benefits through continuation of the Epstein sex-trafficking venture.

381.    Among the concrete steps that BANA took to aid the Epstein sex-trafficking venture were its failure to follow AML requirements. This failure was not just passive facilitation, but a deliberate omission by BANA. This omission was a specific act of concealment, which allowed Epstein to continue funding his sex-trafficking venture through suspicious transactions that would have otherwise been prevented.

382.    By taking the concrete steps outlined above (along with the others alleged in this complaint), BANA knowingly participated in sex trafficking and furthered the Epstein sex-

trafficking venture. The concrete steps above constituted taking part in the sex-trafficking venture and were necessary for its success. The concrete steps above constituted active engagement by BANA in Epstein's sex-trafficking venture.

383.    BANA knowingly and intentionally benefited financially from, and received value for, its participation in the sex-trafficking venture, in which Epstein, with BANA's knowledge, or its reckless disregard of the fact, that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

384.    BANA helped to conceal the names of Epstein's victims from the public and from law enforcement and prosecuting agencies by helping to conceal the existence of the sex-trafficking venture. Among the ways in which BANA helped to conceal the venture's existence was by providing services to avoid leaving a visible "paper trail."

385.    BANA's concealment included failing to follow through on enhanced monitoring that was required for someone like Epstein. BANA failed to implement that enhanced monitoring specifically to help conceal Epstein's ongoing sex-trafficking.

386.    BANA's concealment included failing to file required SARs for Epstein's suspicious transactions.

387.    In addition to having actual knowledge that it was participating in Epstein's sex trafficking venture, BANA had constructive knowledge that it was participating in Epstein's sex trafficking venture. BANA also had constructive knowledge that Jane Doe, as well as other Members of the Class, were being coercively sex trafficked by Epstein. Its constructive knowledge extended to the names of Epstein's victims, because Epstein and his associates knew the names of the victims.

388.    BANA had constructive knowledge of Epstein's sex-trafficking venture because of specific acts by Epstein that put it on notice of a particular and ongoing sex trafficking venture.

389.    BANA benefited from Epstein's sex trafficking venture. Among the financial benefits it received were the deposit of funds that Epstein and Epstein-controlled entities made to BANA.

390.    BANA knowingly received financial benefits in return for its assistance, support, and facilitation of Epstein's sex-trafficking venture.

391.    BANA knew, and was in reckless disregard of the fact, that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and transport young women and underage girls for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

392.    BANA and its employees had actual knowledge that they were facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

393.    Despite such knowledge, BANA intentionally paid for, facilitated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which BANA knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe, as well as other Members of the Class, to engage in commercial sex acts.

394.    In addition to actual knowledge that it was participating in and facilitating the Epstein sex-trafficking venture, BANA also should have known that it was participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C. § 1595(a).

395.    By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, BANA is liable to Jane Doe and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

396.    By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1595, BANA is liable to Jane Doe and other members of the Class for punitive damages.

## COUNT II

### PARTICIPATING IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(1), 1595

397.    Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 374, as if fully set forth in this Count.

398.    Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

399.    BANA knowingly and intentionally participated in, perpetrated, assisted, supported, facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

400.    Among other things, BANA knowingly and intentionally recruited, enticed, provided, obtained, advertised, and solicited by various means Jane Doe, as well as other Class Members, knowing that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

401.    BANA and its officers and employees had actual knowledge that they were perpetrating and facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe as well as other Members of

the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

402.    Despite such knowledge, BANA intentionally paid for, facilitated, perpetrated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which BANA knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe, as well as other Members of the Class, to engage in commercial sex acts.

403.    As part of perpetrating TVPA violations, BANA willfully failed to file required Suspicious Activity Reports (SARs) with the federal government.

404.    BANA's affirmative conduct was committed knowing, and in reckless disregard of the facts, that Epstein would use cash and the financial support provided by BANA as a means of defrauding, forcing, and coercing sex acts from Jane Doe as well as other Members of the Class. BANA's conduct was outrageous and intentional.

405.    BANA's knowing and intentional conduct has caused Jane Doe and the other Members of the Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

406.    BANA's knowing and intentional conduct has caused Jane Doe and the other Members of the Class harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

407.    This case does not involve mere fraud. Instead, BANA's conduct in perpetrating TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. BANA's conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal

indifference to civil obligations. BANA's conduct was directed specifically at Jane Doe and other members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

408.    By virtue of its knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, BANA is liable to Jane Doe and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

409.    By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, BANA is liable to Jane Doe and other members of the Class for punitive damages.

## COUNT III

### AIDING, ABETTING, AND INDUCING A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595

410.    Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 374, as if fully set forth in this Count.

411.    Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

412.    Acting through its officers and employees, BANA aided, abetted, and induced Epstein's sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

413.    Under 18 U.S.C. § 2, BANA is punishable as a principal under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18,

U.S. Code, when it aided, abetted, and induced Epstein's sex-trafficking venture and sex trafficking of Jane Doe, as well as other Class Members.

414.    Under 18 U.S.C. § 2, BANA committed and perpetrated crimes in violation of 18

U.S.C. §§ 1591(a)(1) & (a)(2) by aiding, abetting, and inducing Epstein's sex- trafficking venture and sex trafficking of Jane Doe, as well as other Class Members. As a consequence, Jane Doe, as well as other members of the Class, are victims of BANA's criminally aiding, abetting, and inducing Epstein's violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2).

415.    Acting through its officers and employees, BANA itself directly committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding, abetting, and inducing a sex-trafficking venture and the sex trafficking of Jane Doe, as well as other Class Members. BANA itself directly violated Chapter 77 by committing and perpetrating these violations.

416.    Among other things, BANA aided, abetted, and induced Epstein's sex- trafficking venture and sex trafficking of Jane Doe, as well as other Class Members, knowing that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

417.    By aiding, abetting, and inducing Epstein's sex-trafficking venture and sex trafficking of Jane Doe, as well as other Class Members, BANA knowingly benefitted, both financially both financially and by receiving things of value, from participating in Epstein's sex-trafficking venture.

418.    BANA and its officers and employees had actual knowledge that they were aiding, abetting, and inducing Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion. BANA knew, and should have known, that Epstein had engaged in acts in

violation of the TVPA.

419.    Despite such knowledge, BANA intentionally paid for and aided, abetted, and induced Epstein's violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), which constituted perpetrating violations of those laws under 18 U.S.C. § 2. BANA knew, and acted in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe, as well as other Class Members, to engage in commercial sex acts.

420.    BANA's affirmative conduct of aiding, abetting, and inducing Epstein's violations was committed knowingly, and in reckless disregard of the facts, that Epstein would use cash and financial support provided by BANA as a means of defrauding, forcing, and coercing sex acts from Jane Doe as well as other Class Members. BANA's conduct was outrageous and intentional.

421.    BANA's knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Jane Doe and the other Class Members serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

422.    BANA's knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Jane Doe and the other Class Members harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

423.    This case does not involve mere fraud. Instead, BANA's conduct in aiding, abetting, and inducing Epstein's TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. BANA's conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. BANA's conduct was directed

specifically at Jane Doe and other members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

424.    By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, BANA is liable to Jane Doe and the other members of the Class for the damages they sustained and reasonable attorneys' fees.

425.    By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, BANA is liable to Jane Doe and other members of the Class for punitive damages.

<u>**COUNT IV**</u>

**OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. § 1591(d)**

426.    Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 374, as if fully set forth in this Count.

427.    Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

428.    BANA and its officers and employees knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is hereinafter referred to collectively simply as "obstruction."

429.    BANA's obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and BANA thereby violated Chapter 77, Title 18. BANA's obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed Jane Doe, as well as other members of the Class, by directly resulting in them coercively being caused to engage in commercial sex acts and in other ways.

430.    As outlined above, the United States Department of Justice (including the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the Southern District of Florida) was investigating Epstein's federal criminal liability for violating (among other laws) the TVPA up to and following the return of an indictment against Epstein on or about July 6, 2019. On or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein. The federal criminal investigation of Maxwell included investigation of possible violations of the TVPA.

431.    By providing financing for Epstein's sex trafficking organization, BANA obstructed, interfered with, and prevented the federal government's enforcement of the TVPA against Epstein. To the extent that the federal government was able to ultimately charge Epstein with TVPA violations, the filing of those charges was delayed by BANA 's actions. Because of that delay, Jane Doe as well as other members of the Class, were coercively caused to engage in commercial sex acts.

432.    BANA provided its services to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA. As another example of how BANA obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, BANA did not follow AML and anti-structuring reporting requirements found in the Banking Secrecy Act and other laws. These requirements included an obligation that BANA would review transactions in Epstein's (and his associates') BANA accounts for a determination of whether they involved suspicious transactions. If BANA had observed these requirements imposed by law, then it would have prevented many of the

subsequent transactions committed by the Epstein sex-trafficking venture. BANA knowingly did not follow these requirements because it knew that doing so would have prevented Epstein's secret cash transactions that were necessary to his sex-trafficking operation escaping knowledge of federal investigative and prosecuting agencies.

433.    BANA obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, by failing to timely file with the federal government the required SARs that financial institutions must file with the FinCEN whenever there is a suspected case of money laundering or fraud. Timely filing of these reports is required by the Bank Secrecy Act and related laws and regulations. By intentionally failing to timely file the required SARs regarding Epstein's cash and other suspicious transactions, BANA obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA by actively concealing from the federal government's attention Epstein's cash transaction in aid of sex trafficking.

434.    BANA's failure to timely file SARs about Epstein's sex-trafficking venture, in spite of numerous red flags, was wrongful and purposeful.

435.    If BANA had filed timely SARs, as required, about Epstein's sex-trafficking venture with the federal government, the appropriate federal agencies would have been well positioned to investigate Epstein's sex-trafficking venture's TVPA violations. BANA's failure to timely file the required SARs obstructed the federal government's ability to investigate those TVPA violations, including violations harming Jane Doe and other Class Members. If BANA had timely filed the required SARs, it would have prevented the continuation of Epstein's sex trafficking venture, which required the ability to secretly use cash to payoff victims.

436.    By providing Epstein and his associates, with banking services, BANA intended

and knew that Epstein's coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies for some period of time.

437.    BANA's obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly. For example, BANA knew that Epstein was high risk—specifically, high risk to violate the TVPA through continuing criminal sex trafficking activities.

438.    BANA was well aware that Epstein had pleaded guilty and served prison time for engaging in sex with a minor—a crime closely connected with sex trafficking in violation of the TVPA. BANA was also well aware that there were public allegations that his illegal conduct was facilitated by several named co-conspirators. BANA's intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by federal investigators and prosecuting agencies.

439.    BANA's obstruction of the federal government's TVPA and other law enforcement efforts was intentional and willful and, therefore, BANA intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Jane Doe and other Class Members through its obstruction supporting the concealment of Epstein's sex-trafficking venture.

440.    BANA knew, acted in reckless disregard of the fact, and should have known, that its obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe and other Class Members. BANA's obstruction has caused Jane Doe and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

441.    BANA's obstruction has caused Jane Doe harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

442.    This case does not involve mere fraud. Instead, BANA's conduct in obstructing enforcement of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. BANA's obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. BANA's obstruction was directed specifically at Jane Doe and other members of the Class, who were the victims of Epstein's sex trafficking organization.

443.    By virtue of these violations of 18 U.S.C. § 1591(d), BANA is liable to Jane Doe and the other Members of the Class for the damages they sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. BANA perpetrated an obstruction of the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

444.    By virtue of its intentional and outrageous obstruction to prevent enforcement of the TVPA, in violation 18 U.S.C. § 1591(d), BANA is liable to Jane Doe and other members of the Class for punitive damages by operation of 18 U.S.C. § 1595.

## <u>COUNT V</u>

### NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE TO PREVENT PHYSICAL HARM

445.    Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 374, as if fully set forth in this Count.

446.    Jane Doe brings this Count individually and on behalf of the other Class Members

she respectively seeks to represent.

447.    In addition to any duties that might arise as a financial institution (as alleged in the next Count, below), BANA owed a duty to Jane Doe and the Class Members to exercise reasonable care to avoid conduct that created a risk of physical harm to them. BANA's duties included a duty to exercise reasonable care to avoid conduct that would combine with Epstein's (and others') crimes, and permit Epstein's crimes, in violation of Chapter 130.

448.    BANA's own conduct in providing financial and other support for Epstein's sex trafficking venture set forces in motion that directly and proximately injured and caused physical harm to Jane Doe and the Class Members. These forces that BANA set in motion caused Epstein's intentional tortious conduct and Chapter 130 Crimes against Jane Doe and the Class Members, causing physical harm and in themselves constituted physical harm to Jane Doe and the Class Members. BANA owed Jane Doe and the Class Members a duty not to set those forces in motion because they unreasonably created a risk of physical harm.

449.    BANA reasonably could foresee, and did in fact foresee, that its negligent failure to prevent physical harm would result in physical harm to Jane Doe and the Class Members. BANA owed a duty to prevent that physical harm.

450.    BANA failed to act objectively reasonably in failing to take precautions to prevent Epstein's intentional tortious conduct and sex-trafficking and sex crimes in violation of Chapter 130, which were committed against Jane Doe and the Class Members. If BANA had acted reasonably to prevent physical harm, it would not have supported and allowed Epstein's sex-trafficking and sex crimes to occur. BANA owed Jane Doe and the Class members a duty to act objectively reasonably.

451.    At the time of BANA's own negligent conduct, BANA both realized and should

have realized the likelihood that it was creating an opportunity for Epstein to commit intentional tortious conduct and Chapter 130 Crimes against Jane Doe and the Class Members. Indeed, BANA knew that its own conduct was necessary to create Epstein's and others' opportunities to engage in that conduct and commit those crimes. BANA owed Jane Doe and the Class Members a duty not to create those opportunities for Epstein and others.

452.    In aiding, abetting, and facilitating Epstein's tortious conduct and crimes, BANA committed intentional torts directed against Jane Doe and the Class Members. BANA's aiding, abetting, and facilitating Epstein's tortious conduct and crimes were its own wrongful acts and omissions. BANA had a duty not to commit tortious conduct and crimes—specifically aiding, abetting, and facilitating New York sex crimes as described above— directed against Jane Doe and the Class Members.

453.    BANA's breaches of its legal duties were the direct—*i.e.*, the but-for— cause of physical and psychological injuries to Jane Doe and the Class Members. Without BANA's breaches of legal duties, those injuries would not have occurred. The injuries that occurred were readily foreseeable to BANA and proximately caused by BANA's breaches.

454.    Jane Doe and the Class Members were easily within the zone of foreseeable harm from BANA's negligent acts and omissions. BANA's negligent acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact. Tragically, Jane Doe and the Class Members fell within that zone.

455.    Because of BANA's negligent failure to prevent physical harm to Jane Doe and the Class Members, it is liable to Jane Doe and the Class Members for damages suffered as a direct and proximate result.

456.     As a direct and proximate result of BANA's negligent failure to prevent physical

harm, Jane Doe and the Class Members have in the past and will in the future continue to suffer

substantial damages from psychological and physical injury, including extreme emotional distress,

humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy.

BANA's aiding, abetting, and facilitating Epstein's tortious conduct and sex crimes in violation of

Chapter 130 directly and proximately caused Epstein's sex crimes.

457.     By virtue of acting intentionally, outrageously, and with a high degree of moral

turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil

obligations, Defendant is liable to Jane Doe and other Members of the Class for punitive damages.

## <u>COUNT VI</u>

**NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE AS A BANKING
INSTITUTION PROVIDING NON-ROUTINE BANKING**

458.     Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 374, as if

fully set forth in this Count.

459.     Jane Doe brings this Count individually and on behalf of the other Class Members

she respectively seeks to represent.

460.     BANA owed a duty to Jane Doe and the Class Members not to knowingly provide

non-routine banking assistance to Epstein that it knew, and had reason to know, would lead to and

support intentional tortious conduct and Chapter 130 Crimes by Epstein (and others) against Jane

Doe and the Class Members.

461.     BANA participated in, aided and abetted, and facilitating his sex- trafficking

venture and his commission of intentional tortious conduct and Chapter 130 crimes. BANA also

knew, and was willfully blind to the fact, that it was going beyond providing routine banking by

facilitating Epstein's sex-trafficking venture and his commission of Chapter 130 crimes.

462.    BANA deliberately failed to follow numerous banking requirements in connection with financial dealings with Epstein, including AML rules, KYC rules, and anti- structuring rules. In deliberately ignoring and failing to follow those rules, BANA acted in a non-routine way to facilitate and support Epstein's and his co-conspirators' intentional torts, sex-trafficking and commission of Chapter 130 Crimes.

463.    BANA failed to act objectively reasonably by failing to comply with relevant banking laws and regulations with regard to its interactions with Epstein and his co- conspirators. BANA owed a duty to Jane Doe and the Class Members to act objectively reasonably in its interactions with Epstein and his co-conspirators and to exercise reasonable care to prevent them from engaging in foreseeable intentional torts and criminal activity by using BANA's exceptional and non-routine banking assistance.

464.    BANA owed a legal duty to Jane Doe and the Class Members to act objectively reasonably and to not deliberately ignore banking obligations, including KYC and AML laws and regulations described above, so as to provide Epstein and others with an opportunity to engage in coercive sex-trafficking and Chapter 130 Crimes.

465.    Under KYC, AML, and related laws and regulations, BANA had special duties not ignore crimes being committed by its customers—duties above and beyond any duties that the general public may have. The inquiries that banks must make include duties to inquire about specific individuals who banks know are being harmed. The regulations establish a duty of care that must be followed by banks, including BANA. These duties exist at least in situations where a bank is knowingly going beyond offering routine banking to its customers and offering bank accounts, currency, and other assistance specially adapted to facilitate crimes.

466.    BANA also owed Jane Doe and the Class Members a duty of care because it knew,

and had reason to know, that Epstein and his co-conspirators were using BANA to facilitate a sex-trafficking venture, raising a duty to make a reasonable inquiry about suspicious activity.

467.    BANA owed Jane Doe and the Class Member a duty not to deliberately and purposely fail to file SARs, which would have alerted federal authorities to Epstein's and his co-conspirators' illegal activities, including committing Chapter 130 Crimes.

468.    BANA also owed Jane Doe and the Class Members a duty to prevent physical harm to them when confronted with explicit information that Epstein and his co- conspirators were using BANA's non-routine assistance to further a sex-trafficking venture harming Jane Doe and the Class Members. Once BANA had information about Epstein's use of BANA for a sex-trafficking venture that was physically harming Jane Doe and the Class Members, it owed them a duty of care to investigate and prevent Epstein's and his co-conspirators' suspicious and criminal activities.

469.    In the exercise of reasonable care, BANA and its employees knew, and should have known, of the dangerous propensities of Jeffrey Epstein to commit violations of article 130 of New York Penal Law against women and girls with whom he was in close proximity, including Jane Doe and the Class Members.

470.    BANA breached its legal duties to Jane Doe and the Class Members as described above. BANA's breach of its duties led to it failing to prevent Epstein from committing Chapter 130 Crimes against Jane Doe and the Class Members. BANA realized that Epstein were committing Chapter 130 Crimes against Jane Doe and the Class Members. The criminal activity that harmed Jane Doe and the Class Members included foreseeable TVPA and Chapter 130 Crimes committed by Epstein.

471.    As a direct and proximate result of the breach of legal duties by BANA, Jane Doe and the Class Members repeatedly suffered direct and foreseeable injuries from Epstein and his

co-conspirators, including federal and state sexual offenses (including sexual assaults) and resulting emotional distress, mental pain and suffering, and other physical, psychological, and other injuries.

472. The breaches of legal duties were the direct—*i.e.*, the but-for—cause of these physical and psychological injuries to Jane Doe and the Class Members. Without BANA's breaches of legal duties, those injuries would not have occurred. The injuries that occurred were readily foreseeable to BANA.

473. The injuries that Plaintiff Jane Doe and the Class Members suffered included injuries directly and proximately suffered while they were adults who were present in this District. These injuries are permanent in nature and Jane Doe and the other Class Members will continue to suffer these losses in the future.

474. BANA could reasonably foresee that their actions and omissions in facilitating Epstein's sex trafficking venture would lead to intentional torts and sex offenses against Jane Doe and the Class Members. Indeed, BANA was aware, and should have been aware, that Epstein was a high risk to commit sex offenses against young women and girls.

475. Jane Doe and the Class Members were easily within the zone of foreseeable harm from BANA's negligent acts and omissions. BANA's acts and omissions foreseeably created substantial risk of Jeffrey Epstein committing sex crimes against young women with whom he was in contact. Tragically, Jane Doe and the Class Members fell within that zone.

476. While the foregoing allegations easily make out a clear case of negligence, this case does not involve mere negligence. Instead, Defendant's tortious conduct in this case evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. It also involved outrageous and intentional acts and omissions,

because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization. Defendant's tortious conduct was directed specifically at Jane Doe and other Members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

477.    As a result of BANA's negligent actions and omissions described in this Count, Jane Doe and the Class Members have sustained both general and specific damages from physical and psychological injury in substantial amounts.

478.    By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, BANA is liable to Jane Doe and other Members of the Class for punitive damages.

## REQUEST FOR RELIEF

Jane Doe respectfully requests that the Court enter judgment in her favor, and against BANA, as follows:

a.  That the Court certify the Class, name Jane Doe as Class Representative, and appoint her lawyers as Class Counsel;

b.  That the Court award Plaintiff and the other members of the Class compensatory, consequential, general, nominal, and punitive damages against Defendant in an amount to be determined at trial;

c.  That the Court award punitive and exemplary damages against Defendant in an amount to be determined at trial;

d.  That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e.  That the Court award pre- and post-judgment interest at the maximum legal rate; and

f.  That the Court grant all such other and further relief as it deems just and proper.

**JURY DEMAND**

Plaintiff and the Class demand a trial by jury on all claims so triable.

Dated: December 29, 2025

By: /s/ David Boies

David Boies
Boies Schiller Flexner LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 446-2300
dboies@bsfllp.com

Sigrid McCawley
Boies Schiller Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33316
(954) 356-0011
smccawley@bsfllp.com

Bradley J. Edwards
Brittany N. Henderson
Edwards Henderson
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
(954) 524-2820
brad@cvlf.com
brittany@cvlf.com