# EXHIBIT H

RON WYDEN, OREGON, CHAIRMAN

DEBBIE STABENOW, MICHIGAN
MARIA CANTWELL, WASHINGTON
ROBERT MENENDEZ, NEW JERSEY
THOMAS R. CARPER, DELAWARE
BENJAMIN L. CARDIN, MARYLAND
SHERROD BROWN, OHIO
MICHAEL F. BENNET, COLORADO
ROBERT P. CASEY, Jr., PENNSYLVANIA
MARK R. WARNER, VIRGINIA
SHELDON WHITEHOUSE, RHODE ISLAND
MAGGIE HASSAN, NEW HAMPSHIRE
CATHERINE CORTEZ MASTO, NEVADA
ELIZABETH WARREN, MASSACHUSETTS

MIKE CRAPO, IDAHO
CHUCK GRASSLEY, IOWA
JOHN CORNYN, TEXAS
JOHN THUNE, SOUTH DAKOTA
TIM SCOTT, SOUTH CAROLINA
BILL CASSIDY, LOUISIANA
JAMES LANKFORD, OKLAHOMA
STEVE DAINES, MONTANA
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
RON JOHNSON, WISCONSIN
THOM TILLIS, NORTH CAROLINA
MARSHA BLACKBURN, TENNESSEE

**United States Senate**

COMMITTEE ON FINANCE
WASHINGTON, DC 20510-6200

JOSHUA SHEINKMAN, STAFF DIRECTOR
GREGG RICHARD, REPUBLICAN STAFF DIRECTOR

July 24, 2023

Leon D. Black
c/o Brownstein Hyatt Farber Schreck LLP
410 Seventeeth Street
Suite 2200
Denver, Colorado 80202-4432

Dear Mr. Black,

      As Chairman of the Senate Finance Committee ("the Committee"), I write regarding the Committee's investigation into your financial dealings with Jeffrey Epstein. This effort is part of an ongoing set of investigations by the Committee into the means by which ultra-high net worth persons avoid or evade paying federal taxes, including gift and estate taxes. These investigations include the avoidance of billions of dollars in income, gift and estate taxes through the use of tax shelters such as Private Placement Life Insurance; the possible circumvention of laws related to gift taxes and deductions involving the complementary use of private aircraft/superyachts by public officials; and the use of Swiss banks by wealthy taxpayers to expatriate from the United States and evade gift taxes while concealing offshore accounts from the Internal Revenue Service (IRS).

      As you are aware, the Committee is investigating the $158 million in payments you made to Epstein for services related to a variety of tax and estate planning matters. In particular, the Committee seeks information on Epstein's participation in structuring trusts and other complex transactions designed to avoid federal gift and estate taxes on as much as $2 billion in wealth transferred to your children. The Committee also seeks information regarding Epstein's extraordinary compensation scheme, which involved amounts that far exceeded those paid to other professional advisors involved in your tax and estate planning.

      Unfortunately, the inadequate responses you have provided the Committee only raise more questions than answers, and fail to address a number of tax issues my staff has uncovered over the course of this investigation. This includes understanding the amount by which you were overpaid income from assets placed in a trust while devising a scheme to ensure that those assets, worth billions of dollars, would remain outside your taxable estate. Additionally, you have refused to answer questions or provide documents related to payments you made to Epstein or

substantiate how such payments were calculated or were compensation for services. Your failure to substantiate Epstein's compensation scheme has heightened the Committee's concerns about whether such payments were properly characterized as income or gifts for tax purposes.

## Background

As you know, on June 22, 2022, the Committee initiated an investigation into your business arrangement with Epstein. As part of the Committee's investigation, the Committee sent a letter to Apollo Global Management ("Apollo") with detailed requests for information regarding the findings of a review commissioned by Apollo's Board of Directors into your financial ties to Epstein.[1] The Board's review was initiated in response to Epstein's indictment in federal court on sex trafficking charges involving the exploitation and abuse of dozens of underage girls.[2] The findings of the Apollo board's review, compiled in a report prepared by the law firm Dechert LLP ("the Dechert report"), were published in a filing by Apollo with the U.S. Securities and Exchange Commission.[3]

The Dechert report indicated that you paid Epstein $158 million between 2012 and 2017 for his advice on several tax and estate planning matters.[4] These transactions included a "proprietary" solution Epstein devised to help you resolve issues with a grantor trust you created in 2006 to transfer assets to your children while avoiding approximately $1 billion in gift and estate taxes.[5] The Dechert report also claimed that Epstein assisted you with a "step-up-basis transaction" ("the step-up-basis transaction") designed to save you an additional $600 million in taxes.[6]

The Committee's initial letter, a copy of which is attached, asked detailed questions on the nature of Epstein's tax and estate planning services as well as details regarding payments to

---

[1] Letter from Senator Ron Wyden, Chairman, Senate Finance Committee to Apollo Global Management, Jun. 2, 2022.

[2] *Jeffrey Epstein Charged in Manhattan Federal Court With Sex Trafficking Of Minors*, U.S. Department of Justice, Jul. 8, 2019, https://www.justice.gov/usao-sdny/pr/jeffrey-epstein-charged-manhattan-federal-court-sex-trafficking-minors

[3] Apollo Global Management, Inc. *Investigation of Epstein/Black Relationship and Any Relationship Between Epstein and Apollo Global Management,* available online at https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex991.htm

[4] *Id.* at pg. 3: "Epstein regularly advised [Leon] Black on a variety of issues related to trust and estate planning, tax, philanthropy, and the operation of the Family Office" and at pg. 4: "[Leon] Black compensated Epstein for his work in amounts that were intended to be proportional to the value provided by Epstein. Those payments for work performed over the period 2012 through 2017 totaled $158 million."

[5] *Id.* at pg. 9: "There was a consensus among witnesses that Epstein offered a unique solution to a potential estate planning problem that arose out of a trust known as the 2006 Grantor Retained Annuity Trust (2006 GRAT)" and at pg. 10: "Witnesses differed on what the value of the estate tax would have been today or in the future if the issues had not been resolved, but they believed the estate tax liability could have been as much as $1 billion or more… Epstein approached Black with his solution – which Epstein asserted was proprietary – and Black agreed to pay Epstein to implement this solution. Outside legal counsel described the solution as a "grand slam" and one that met all of Black's financial and estate planning goals."

[6] *Id.* at pg. 10: "Epstein appears to have provided significant value to a subsequent transaction that addressed certain loans between [Leon] Black and certain family trusts for the purpose of achieving a tax benefit for his children" and at pg. 11: "Epstein estimated that this transaction had saved $600 million in value and Black appears to have agreed with that estimate."

Epstein. Payments to Epstein, at an annualized rate of $23 to $26 million per year, was higher than the median CEO pay for Fortune 500 companies, which Fortune calculated at $15.9 million for 2021.[7] The Dechert report indicated that the amounts paid to Epstein far exceeded those which you paid to other professional advisors.[8]

Since then, members of my staff held several meetings with your outside counsel at Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") and Brownstein Hyatt Farber Schreck LLP ("Brownstein") to discuss your cooperation with the Committee's investigation. In those meetings, your outside counsel indicated that you were unwilling to answer questions regarding details of payments to Epstein. However, your counsel indicated you were willing to provide the Committee information related to tax issues involving the 2006 Grantor Retained Annuity Trusts ("the 2006 GRATs"), the remainder trust into which the assets from the 2006 GRATs flowed into ("the remainder trust"), and the step-up-basis transaction. The Committee subsequently directed follow up requests for information to you on January 13th, 2023 and February 6th, 2023, which you responded to on January 16th and February 21, 2023, respectively.[9]

While the Committee appreciates the information you have provided, the responses declined to answer several questions related to important tax issues concerning the assets held in the remainder trust, claiming that these requests were "outside the scope of the Committee's purview."[10] This claim is without merit, as the Senate Finance Committee has jurisdiction over all matters related to federal tax laws. Investigations into matters pertaining to the operation and enforcement of internal revenue laws are squarely within the Committee's legislative purview.

Among the issues you refused to address were the extent to which you received excess distributions of income from the assets held in the remainder trust, important details on the mutual release of claims strategy that Epstein may have devised, and the degree to which you retained voting powers with respect to assets held in the remainder trust.[11] This information is essential for the Committee to evaluate the means by which you retained income from your ownership of Apollo holdings while avoiding gift and estate taxes on the transfer of enormous wealth to your children.

The Committee also remains concerned by your continued refusal to answer questions related to payments to Epstein and how such amounts were calculated in relation to any services provided. To date, the Committee has not received a sufficient explanation as to why Epstein was paid amounts vastly exceeding that paid to other attorneys and accountants involved in these

---

[7] *The top 10 highest paid CEOs of the Fortune 500*, Fortune, May 28, 2022, https://fortune.com/2022/05/28/highest-paid-ceos-in-america-2021/.

[8] Apollo Global Management, Inc. *Investigation of Epstein/Black Relationship and Any Relationship Between Epstein and Apollo Global Management*, available online at https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex991.htm; (at pg. 17: "It is clear that the compensation paid by [Leon] Black to Epstein far exceeded any amounts Black paid to his other professional advisors.")

[9] Letter from Senator Ron Wyden, Chairman, Senate Finance Committee to Leon D. Black, Jan. 13, 2023; Email from Majority Staff, Senate Finance Committee to outside Counsel to Leon Black at Paul, Weiss, Rifkind Wharton & Garrison LLP, Feb. 6, 2023.

[10] Memorandum submitted on behalf of Leon Black by Paul, Weiss, Rifkind, Wharton & Garrison LLP to Senator Ron Wyden, Chairman, Senate Finance Committee, Feb. 21, 2023.

[11] *Id.*

transactions, and why you were willing to pay Epstein over $100 million without a written services agreement or contract.

### Overpayments of income and other issues arising from trust tax avoidance scheme

A central focus of the Committee's investigation is understanding what role Epstein played in solving an estate tax issue involving the 2006 GRATs. The Dechert report first described this issue as an estate tax "problem" that if left unresolved would lead to a potential estate tax liability for your children of $1 billion or more.[12] The Dechert report also claimed that Epstein offered a "proprietary" solution that helped address this problem and allowed you to keep the assets in the 2006 GRATs outside of your taxable estate. In order to better understand this transaction, the Committee sent several requests for information related to tax issues arising from the 2006 GRATs, the assets held in the 2006 GRATs, and the solution Epstein proposed to ensure the assets would not be subject to gift and estate taxes.

In response to the Committee's investigation, you indicated that there were no issues or problems with the 2006 GRATs themselves. Instead, you clarified that there was a tax-related concern with the remainder trust which the assets held in the 2006 GRATs were to be transferred into upon the expiration of the 2006 GRATs.[13] It appears that because you were receiving income from assets held in the remainder trust, there was concern that the assets held in the trust would be included in your taxable estate.[14] Under Internal Revenue Code Section 2036(a)(1), if a taxpayer gives away assets to a third party while retaining the right to income from those assets, those assets are included in the taxpayer's gross estate at the taxpayer's death. A related tax provision under Section 2035(a) provides that gifts of property made within three years of the donor's death would be included in the decedent's taxable estate.[15]

---

[12] Apollo Global Management, Inc. *Investigation of Epstein/Black Relationship and Any Relationship Between Epstein and Apollo Global Management*, available online at https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex991.htm; (at pg. 9: "There was a consensus among witnesses that Epstein offered a unique solution to a potential estate planning problem that arose out of a trust known as the 2006 Grantor Retained Annuity Trust (2006 GRAT)" and at pg. 10: "Witnesses differed on what the value of the estate tax would have been today or in the future if the issues had not been resolved, but they believed the estate tax liability could have been as much as $1 billion or more."

[13] Memorandum submitted on behalf of Leon Black by Paul, Weiss, Rifkind, Wharton & Garrison LLP to Senator Ron Wyden, Chairman, Senate Finance Committee, Jan. 16, 2023 (at pgs. 1 & 2: "The memorandum respectfully proceeds on the belief that the premise of the question – that there were 'issues with the 2006 GRAT' is based on a misunderstanding. There were no issues or problems associated with the 2006 GRATs themselves. The 2006 GRATs functioned as intended, and were in no way out of the ordinary for such instruments, nor were they problematic. Instead, there was a potential tax-related concern with the trust ('the remainder trust') into which the assets held in the 2006 GRATs were to be transferred into upon the expiration of the GRATs.")

[14] *Id.* at pg. 2: "Under the terms of the remainder trust, the trustees were to distribute to Mr. Black income generated by certain specified assets. The trustees had a right to terminate Mr. Black's income interest. Under Internal Revenue Code Section 2036(a)(1), if a taxpayer gives away assets to a third party while retaining the right to income from those assets, those assets are included in the taxpayer's gross estate at the taxpayer's death."

[15] *Id.* at pg. 2: "A related estate tax issue involved Section 2035(a), which provides that if the decedent relinquished a power with respect to transferred property (which would include relinquishing an income interest of this nature) during the three-year period ending on his date of death, that property would also be included in his gross estate. Despite the fact that, as noted above, the trustees, rather than Mr. Black, would be terminating Mr. Black's income interest, and therefore Section 2035(a) would not be implicated, out of an abundance of caution, and given Mr. Black's age, all parties wanted to act promptly to resolve this issue (without a potential three-year tail)."

At the time the 2006 GRATs were funded, the assets in the remainder trust had an appraised value of approximately $585 million.[16] The assets in the remainder trust comprised of your interest in various Apollo partnerships prior to Apollo's initial public offering, which your advisors believed could reasonably be expected to increase in value over time to an amount exceeding $2 billion.[17] Operating on the basis of a tax rate of 40% to 50% for net federal and state estate taxes, the estimated tax liability resulting from these assets being included in your estate at time of death could have exceeded $1 billion. [18]

In order to prevent the Apollo assets in the remainder trust from being subject to gift and estate taxes, you consulted with Epstein and retained established trust and estate lawyers from Weil Gotshal and Paul Weiss to devise a solution. Epstein proposed that the trustees of the trust prepare an accounting to ascertain the amount of income that was distributable to you under the remainder trust agreement compared to the amounts that were in fact distributed to you.[19] That accounting revealed that you had been over-distributed income by the trustees of the remainder trust.[20] This review also revealed that the trustees distributed income to you from assets other than those identified in the remainder trust agreement.[21] As a result of these overpayments, your advisors believed that the trustees of the remainder trust agreement had a claim against you to claw back excess distributions.[22] Conversely, had the trustees removed you as a beneficiary of the remainder trust, you could have alleged a claim for breach of fiduciary duty.[23]

---

[16] *Id.* at pg. 4: "The 2006 GRATs were funded with: a 30.35% interest in Apollo Management III, LP, with an appraised value as of funding of $460,000; a 30.35% interest in Apollo Management IV, LP, with an appraised value as of funding of $1,420,000; a 30.35% interest in Apollo Management V, LP, with an appraised value as of funding of $3,690,000; a 30.35% interest in Apollo Management VI, LP, with an appraised value as of funding of $45,600,000; a 26.8% interest in Apollo Investment Management, LP, with an appraised value as of funding of $227,000,000; a 26.9% interest in Apollo Value Management, LP, with an appraised value as of funding of $9,600,000; a 44% interest in Apollo SVF Management, LP, with an appraised value as of funding of $87,000,000; a 44% interest in Apollo Asia Management, LP, with an appraised value as of funding of $20,800,000; a 44% interest in Apollo Europe Management, LP, with an appraised value as of funding of $98,800,000; a 44% interest in Apollo Alternative Assets, LP, with an appraised value as of funding of $80,500,000; and 142 points of each of Apollo Advisors VI, LP and Apollo Advisors VI (EH), with an appraised value as of funding of $10,535,335."
[17] Memorandum submitted on behalf of Leon Black by Paul, Weiss, Rifkind, Wharton & Garrison LLP to Senator Ron Wyden, Chairman, Senate Finance Committee, Feb. 21, 2023 (at pg. 5: "the values of the assets held in the remainder trust could reasonably be expected to increase to an amount exceeding $2 billion by the time of Mr. Black's death.")
[18] *Id.* at pg. 5: "Operating on the basis of an assumed tax rate of 40% to 50% for net federal and state taxes, the estimated tax liability savings as a result of those assets no longer being included in his estate was estimated to exceed $1 billion."
[19] Memorandum submitted on behalf of Leon Black by Paul, Weiss, Rifkind, Wharton & Garrison LLP to Senator Ron Wyden, Chairman, Senate Finance Committee, Jan. 16, 2023 (at pg. 3: "Mr. Epstein proposed that the trustees prepare an accounting to ascertain the amount of income distributable to Mr. Black under the trust agreement and the amounts that were in fact distributed to him.")
[20] *Id.* at pg. 3: "That accounting revealed that the trustees had inadvertently over-distributed income to Mr. Black."
[21] *Id.* at pg. 3: "Specifically, the trustees distributed to Mr. Black income attributable to assets other than those identified in the trust agreement as the source of Mr. Black's income interest."
[22] *Id.* at pg. 3: "For that reason, the trustees of the remainder trust had a claim against Mr. Black to claw back the excess distributions."
[23] Id. at pg. 3: "On the other hand, had the trustees removed Mr. Black as a beneficiary of the remainder trust, Mr. Black might have alleged a claim for breach of fiduciary duty."

According to your attorneys, it was at this point that Epstein allegedly proposed a solution, which involved a mutual release of claims by and between you and the trustees of the remainder trust. The settlement and mutual release provided that you would lose your right to income from the remainder trust while confirming that you would not assert any claim for being removed as a beneficiary of the trust, in exchange for the trustees agreeing to not seek to claw back any excess distributions of income.[24] You confirmed to the Committee that you and the trustees both formally agreed to a mutual release of claims, with each side "receiving consideration."[25] As a result of this scheme reportedly devised by Epstein, your tax advisors took the position that you no longer had the income rights from the remainder trust that would have caused the trust's assets to be included in your taxable estate (as outlined in Section 2036(a)(1)).[26] Your tax advisors also took the position that this solution eliminated any potential risks of inclusion of the assets in your taxable estate arising from the three-year tail caused by Section 2035(a).

In order to fully understand the tax implications of the trust scheme devised with Epstein's assistance, Committee staff sent a set of follow up questions on the matter to your counsel on February 6, 2023. Unfortunately, you have refused to answer or provide information regarding several important tax-related questions arising from this transaction, including the following:

- First, you have refused to answer questions regarding the amount by which you were overpaid income by the trustees of the remainder trust. You have also refused to answer questions on the period in which these distributions occurred and how the amount of income that was over-distributed was calculated. The Committee is concerned by the possibility that you may have received impermissible distributions of income worth millions of dollars beyond that allowable by the terms of the remainder trust.

- Second, you have refused to answer questions related to the consideration provided to the trustees or the consideration provided by the trustees as part of the mutual release of claims. As such, the Committee has no idea what financial exchange or other consideration was provided in order to keep assets worth billions of dollars out of your taxable estate. It is possible that, if your release of a right to income from the remainder trust was for less than full and adequate consideration, such release of claims could constitute an additional taxable gift.

- Third, you have refused to answer questions on the extent to which you retained voting control of shares in Apollo and its partnerships while shifting those assets into the

---

[24] *Id.* at pg. 3: "Mr. Epstein's solution contemplated a mutual release of these claims by and between Mr. Black, on the one hand, and the trustees of the remainder trust, on the other. The settlement and mutual release provided that Mr. Black would lose his income right, while confirming that he would not assert any claim for his removal as a beneficiary, in exchange for the trustees not pursuing claims to claw back the excess distributions."
[25] *Id.* at pg. 3: "Both sides thus agreed to a formal release of these potential claims, with each side receiving consideration."
[26] *Id.* at pg. 3: "The ultimate result was that Mr. Black no longer had the income rights that would have potentially caused the trust's assets to be included in his estate at death, without risking estate inclusion under Section 2035(a) (if he were to die within three years of the mutual releases)."

remainder trust to avoid gift and estate taxes. As you may be aware, under the principles of Section 2036 of the Internal Revenue Code, property transferred to a trust with respect to which the transferor retains enjoyment or retains certain voting rights may be includable in the transferor's taxable estate under certain circumstances.

- Lastly, you have refused to answer questions as to whether you borrowed heavily against the assets held in the remainder trust. The Committee requested information on whether you, or any entities you are affiliated with, including your family office (Elysium Management LLC), have taken out any loans against the value of the assets held in the remainder trust. This request included questions on the value of these loans as well as any powers you, the trustees or any other parties held with respect to the loans from the remainder trust.

This arrangement raises serious concerns that, in spite of significant violations of the terms of the remainder trust, you were potentially paid millions of dollars in excess income while keeping enormous amounts of wealth outside of your taxable estate. The Committee needs further information to assess how this scheme essentially served as a workaround to federal tax laws which clearly state that such distributions of income would cause the assets held in the remainder trust to be subject to gift and estate taxes.

Further, questions surrounding retained voting rights of business interests held in trust and the potential to borrow against those assets raises significant public policy concerns. Even if retained voting rights with respect to business interests fall outside of the scope of Section 2036(b), the possibility that wealthy individuals might assert to the IRS that they do not own business interests held in trust for gift and estate tax purposes, while simultaneously borrowing against those interests and retaining voting power, raise serious questions about the integrity of our gift and estate tax system.

You have confirmed to the Committee that the IRS has not reviewed the 2006 GRATs, the remainder trust or the mutual release of claims scheme as part of an audit, raising yet more concerns about the IRS's visibility into such transactions and the agency's compliance efforts.

### Epstein's role in the step-up-basis transaction lacks substantiation

The Committee submitted detailed requests for information related to Epstein's role in a step-up-basis transaction involving certain family trusts created for the purpose of avoiding tax. According to the Dechert report, Epstein allegedly provided "significant value" to the step-up-basis transaction, which will apparently save you approximately $600 million in future gift and

estate taxes.[27] The Dechert report also stated that while the idea for the complex transaction did not originate with Epstein, Epstein "played an instrumental role in completing it."[28]

However, responses you provided to the Committee minimized Epstein's involvement in the transaction, stating that "the idea was in the public domain and originated with Black's other legal advisors. Nevertheless, Epstein tried to take credit for the idea and secure compensation."[29] Your attorneys further added that the dispute over compensation for the step-up-basis transaction contributed to your decision to terminate your professional relationship with Mr. Epstein.[30] The Committee is concerned that these responses are at odds with the Dechert report's claim that Epstein's role in the transaction was "significant" or "instrumental." In fact, your responses did not provide any information clarifying how Epstein contributed any value to the transaction outside of that provided by other legal advisors.

The responses you provided the Committee did not substantiate Epstein's services related to the step-up-basis transaction and cast further doubt on whether his efforts merited the payment of $20 million. Based on the information you have provided thus far, this is an extraordinary amount to pay any consultant or attorney, particularly without a formal services agreement or contract, written or otherwise. According to the Dechert report, there was an "understanding" between you and Epstein that Epstein would be compensated for some portion of the value conferred from any idea that "originated" from Epstein.[31] However, your responses made clear that the idea for the step-up-basis transaction did not originate with Epstein, but instead originated with other legal advisors.

Despite Epstein's limited and heavily disputed role in the step-up-basis transaction, Epstein demanded payment of $60 million.[32] The Committee still does not know how or why you settled on a payment of $20 million instead of the $60 million Epstein demanded for the

---

[27] Apollo Global Management, Inc. *Investigation of Epstein/Black Relationship and Any Relationship Between Epstein and Apollo Global Management,* available online at
https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex991.htm; (at pg. 10: "Epstein appears to have provided significant value to a subsequent transaction that addressed certain loans between [Leon] Black and certain family trusts for the purpose of achieving a tax benefit for his children" and at pg. 11: "Epstein estimated that this transaction had saved $600 million in value and Black appears to have agreed with that estimate.")
[28] *Id.* at pg. 11: "Outside counsel stated that this transaction did not originate from Epstein but that Epstein had nevertheless played an instrumental role in completing it."
[29] Memorandum submitted on behalf of Leon Black by Paul, Weiss, Rifkind, Wharton & Garrison LLP to Senator Ron Wyden, Chairman, Senate Finance Committee, Jan. 16, 2023 (at pg. 5: "Finally, the question assumes that Mr. Epstein formulated this proposal. This idea was in the public domain and originated with his other legal advisors. Nevertheless, Mr. Epstein tried to take credit for the idea and secure compensation.")
[30] *Id.* at pg. 5: "The resulting dispute, including over Mr. Epstein's compensation for his advice on this proposal, contributed to Mr. Black's decision to terminate his professional relationship with Mr. Epstein."
[31] Apollo Global Management, Inc. *Investigation of Epstein/Black Relationship and Any Relationship Between Epstein and Apollo Global Management,* available online at
https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex991.htm; (at pg. 18: "There appears to have been an understanding between Black and Epstein that Epstein would be compensated for some portion of the value conferred from any idea that originated from Epstein.")
[32] *Id.* at pg. 18: "Epstein claimed full credit for the transaction and demanded payment of $60 million, which would have been 10% of a perceived benefit of $600 million that Epstein asserted the basis transaction provided."

transaction.[33] To date, you have not provided any explanation as to how payments to Epstein with respect to the step-up-basis transaction were determined and whether any statements of work or other documents properly substantiating Epstein's role in the transaction even exist.

The Committee believes that payments to Epstein with respect to the step-up-basis transaction merit further investigation. Compensation at these amounts in an estate and tax planning matter is irregular and unusually high, particularly since Epstein's contributions to the transaction relied on the guidance of other legal advisors. In this case, Epstein's compensation with respect to the transaction was documented to have been significantly higher than your other advisors on these matters.

### Refusal to provide information regarding Epstein's compensation scheme

The Committee remains concerned about the payments to Epstein in amounts that would represent a highly unusual compensation scheme. Unfortunately, you have refused to cooperate with inquiries into payments to Epstein, raising serious concerns regarding the lack of substantiation for the extraordinary amounts of such payments.

According to the Dechert report, you paid Epstein $158 million between 2012 and 2017, an amount that seems inexplicably high based on currently available information. This compensation scheme, which averaged approximately $25 million per year, appears to be well in excess of expected compensation for tax and estate planning services – particularly in a case where Epstein's work was required to be vetted by other legal and accounting professionals, at times was not viewed as useful, and included instances of substantial misrepresentations of tax laws.[34] Despite not being a certified public accountant or licensed tax attorney, Epstein was paid amounts that far exceeded what you paid other professional advisors, including some of the most high-priced legal counsel in the nation.[35]

In order to better understand Epstein's compensation scheme, the Committee submitted a detailed set of questions and document requests. These requests included copies of any signed or unsigned agreements with Epstein, the written service agreement you entered into with Epstein on February 13, 2013 and documents related to payments made to Epstein as part of these agreements. This request specified that these documents should include any statements of work or descriptions of the services rendered by Epstein for which he was compensated as part of these agreements.

---

[33] *Id.* at 19: "As discussed previously, Black agreed to pay Epstein $20 million rather than the $60 million demanded by Epstein."

[34] Apollo Global Management, Inc. *Investigation Of Epstein/Black Relationship And Any Relationship Between Epstein and Apollo Global Management*, available online at https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex991.htm (At page 3, "not all of Epstein's advice was useful"; at page 4, "such advice was vetted consistently by Blacks' other advisors, including Family Office employees, Paul Weiss, and other outside legal, accounting, and tax professionals"; at page 11, "[Mr. Epstein's] ideas would appear plausible at face value, but did not hold up under scrutiny"; at page 17, "Black was under the misconception that his payments to Epstein would be tax deductible ('sixty cent dollars') because this is what Epstein had told Black.")

[35] *Id.* at pg. 17: "It is clear that the compensation paid by [Leon] Black to Epstein far exceeded any amounts Black paid to his other professional advisors."

Additionally, the Committee requested information and documents on subsequent payments that were made to Epstein after 2013 on an *ad hoc* basis, without negotiating written services agreements.[36] This request asked for documents related to the $70 million Epstein was paid in 2014 and the $30 million was paid in 2015, and asked for statements of work or descriptions of services rendered by Epstein related to his work on the step-up-basis transaction and estate, tax planning, tax audits and filings, or any other work provided by Epstein. The Committee also requested an explanation of how compensation amounts for Epstein were decided in payments made on an *ad hoc* basis where no formal services agreement was negotiated.

At every stage of the Committee's investigation, you have refused to answer these questions or provide any documents related to how Epstein's compensation was determined or justified. First, you refused to answer the questions regarding Epstein's compensation included in the Committee's letter submitted on June 22, 2022. Following a briefing with Committee staff and your outside counsel on August 1, 2022, Committee staff submitted a second set of questions regarding Epstein's compensation scheme.[37] These questions also inquired about advice Epstein provided in relation to your private art collection, which your outside counsel confirmed in a briefing has a value of more than $1 billion. Again, you refused to provide answers to those questions.

Subsequently, Committee staff met with your outside counsel at Paul Weiss and Brownstein at the Finance Committee's offices, where your counsel again reiterated your unwillingness to cooperate with any requests related to Epstein's compensation scheme, including information on how Epstein's compensation was determined and evidence substantiating the services he provided on tax and estate planning matters. They also reiterated that you were unwilling to describe to the Committee how these payments were categorized for tax purposes.

**Arrangement with Epstein raises concerns of whether such amounts represented services income or a gift**

The Committee remains deeply concerned by your continued refusal to substantiate and explain Epstein's compensation scheme. The lack of transparency surrounding payments to Epstein, the extraordinary amount of such payments, the apparent lack of a formal services agreement, and the fact that you apparently did not claim such compensation as a tax-deductible expense raises questions about whether such payments would be properly characterized as a taxable gift, or as payment for services rendered. The Dechert report states that you retained

---

[36] *Id.* at pg. 16: "Starting in 2014, Black began to pay Epstein for his ongoing services on an ad hoc basis, without negotiating written service agreements. In total, Black paid Epstein $70 million in 2014 and $30 million in 2015. Of these amounts, Black attributed $20 million to Epstein's work on the step-up basis transaction and attributed the remainder to the various other matters including his advice about estate, tax planning, tax audits, and filings, managing Black's artwork, Family Office management, and advice regarding Black's yacht and airplane as set forth above."

[37] Email from Majority Staff, Senate Finance Committee to outside counsel to Leon Black at Paul, Weiss, Rifkind Wharton & Garrison LLP, Sep. 20, 2022.

Epstein to advise you and your Family Office on a "variety of topics related to trust and estate planning, tax issues, philanthropic endeavors, and the operation of the Family Office."[38]

As noted previously, the amounts paid to Epstein were shown to be far in excess of payments to your other advisors, and even customary compensation of Fortune 500 CEOs. Based on what is known about the services Epstein performed, payments to Epstein, which equated to an average annualized amount of $25 million, would likely represent payments well in excess of reasonable compensation. IRS audit guidance indicates that questions around reasonable compensation typically arise in family businesses and closely-held business arrangements, in which the firm pays compensation in amounts determined to exceed what would reasonably be charged for those services.[39] The guidance states that such cases may also implicate gift and estate tax avoidance.

According to IRS guidance, factors considered in determining reasonable compensation include: possible conflicts of interest and relationships to the company, an individual's role at the company, internal consistency in the company's compensation to other individuals, and external comparisons of compensation with that of similar companies for similar services, among others.

In addition, the IRS defines a "gift" as any transfer to an individual, either directly or indirectly, where full consideration (measured in money or moneys worth) is not received in return.[40] IRS regulations further provide that transfers made in the ordinary course of business are not considered gifts, provided the transaction is "bona fide, at arm's length, and free from any donative intent."[41]

Generally, business payments to an employee or contractor are deductible as reasonable and necessary expenses under Section 162. While personal expenses are generally not tax-deductible, certain expenses involving a family office may be deductible under Sections 162 or 212. In addition, the Internal Revenue Code specifically denies deductions for amounts not representing reasonable compensation.[42]

The Internal Revenue Code also denies deductions of any amount treated as a gift.[43] Gifts in excess of the annual exclusion amount reduce any remaining amount of a taxpayers' lifetime unified exclusion against the gift and estate tax, and are subject to the 40% gift tax to the extent such gifts exceed that exclusion amount.[44]

---

[38] Apollo Global Management, Inc. *Investigation Of Epstein/Black Relationship And Any Relationship Between Epstein and Apollo Global Management*, available online at https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex991.htm (At page 3, "Black retained Epstein to advise Black and the Family Office on a variety of topics related to trust and estate planning, tax issues, philanthropic endeavors, and the operation of the Family Office..")

[39] *Reasonable Compensation Job Aid for IRS Valuation Professionals*, Internal Revenue Service, Oct. 29, 2014; available online at https://www.irs.gov/pub/irs-utl/Reasonable%20Compensation%20Job%20Aid%20for%20IRS%20Valuation%20Professionals.pdf

[40] *Frequently Asked Questions on Gift Taxes*, Internal Revenue Service, https://www.irs.gov/businesses/smallbusinesses-self-employed/frequently-asked-questions-on-gift-taxes

[41] Treas. Reg. § 25.2512-8.

[42] I.R.C. § 162.

[43] I.R.C. § 274 (b).

The Dechert report states that from 2013 through 2017, you were under the misconception that your payments to Epstein would be tax-deductible, based on advice from Epstein.[45] During that same period, you paid Epstein $158 million. It appears that you determined at some point that such amounts were not tax-deductible, however, the Dechert report does not provide any details on when that determination was made, why you determined those payments were not tax-deductible, or how such payments were characterized for tax purposes. The Committee requested information and documents to determine how such deductions were treated on previously-filed tax returns or whether any payments to Epstein were characterized as gifts.

As Chairman of the Senate Finance Committee I have long been concerned that ultra-high net worth individuals frequently employ sophisticated tax avoidance schemes to circumvent federal gift and estate tax laws. With the assistance of sophisticated advisors, the wealthiest one percent of Americans often exploit estate planning and loopholes in the tax code to avoid paying hundreds of millions, or billions, of dollars in gift and estate taxes. As a result, this select group of Americans is able to use trusts and other structures to transfer enormous untaxed sums of wealth to their children.

I am also concerned that the decimation of IRS enforcement resources over the last decade has led to a decline in compliance with federal gift tax filing requirements. As IRS audits of gift tax returns have plummeted, the Committee's investigations have identified several instances where gifts far exceeding the annual gift tax exclusion may not have been properly reported on federal tax filings.

The Committee is conducting several investigations into the means by which ultra-high net worth persons avoid or evade paying federal taxes, including gift taxes. These investigations will help inform legislation to address loopholes in the tax code. For example, the Committee has been investigating the growing use of Private Placement Life Insurance by the wealthiest Americans as a tax shelter to avoid paying billions of dollars in income, gift and estate taxes. The Committee's investigations into offshore tax evasion schemes involving individuals with dual citizenship have also uncovered other challenges related to the enforcement of gift tax laws. For example, the Committee's investigation into Credit Suisse identified several situations where expatriating from the United States was part of a strategy to evade gift taxes while concealing offshore accounts from the IRS.

The facts and circumstances surrounding your business arrangement with Epstein present a variety of novel issues as they relate to circumventing gift and estate tax laws. Due to the limited information you have provided the Committee, a significant number of open questions remain regarding the tax avoidance scheme you implemented with Epstein's assistance,

---

[44] For 2013 to 2017 the annual gift tax exclusion was $14,000 and the lifetime exclusion amount was approximately $5 million.

[45] Apollo Global Management, Inc. *Investigation Of Epstein/Black Relationship And Any Relationship Between Epstein and Apollo Global Management*, available online at https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex991.htm (At page 17, "Black was under the misconception that his payments to Epstein would be tax deductible ('sixty cent dollars') because this is what Epstein had told Black.")

including whether the exorbitant amounts paid to Epstein should have been classified as a gift for federal tax purposes. The Committee also needs more information to assess whether billions of dollars in assets are being improperly kept out of your taxable estate. In order to better understand your business arrangement with Epstein, please provide answers to the following questions no later than September 1, 2023:

1. The response provided on January 16, 2023 indicated that the trustees of the remainder trust prepared an accounting to ascertain the amount of income distributable to Mr. Black under the trust agreement and the amounts that were in fact distributed to him. Please provide the total amount that was distributed to Mr. Black from the remainder trust, as well as the amount that was intended to be distributed to him under the terms of the trust agreement. Please also provide the period in which these distributions occurred and describe how the amount over-distributed was calculated.

2. The response provided on January 16, 2023 indicated that the mutual release of claims resulted in both sides receiving consideration. Please describe the value and nature of the consideration involved in the mutual release.

3. The response provided on January 16, 2023 indicated that the 2006 GRATs were funded with a 30.35% interest in Apollo Management III LP; a 30.35% interest in Apollo Management IV, LP; a 30.35% interest in Apollo Management V, LP; a 30.35% interest in Apollo Management VI, LP; a 26.8% interest in Apollo Investment Management, LP; a 26.9% interest in Apollo Value Management, LP; a 44% interest in Apollo SVF Management, LP; a 44% interest in Apollo Asia Management, LP; a 44% interest in Apollo Europe Management, LP; a 44% interest in Apollo Alternative Assets, LP; and 142 points of each of Apollo Advisors VI, LP and Apollo Advisors VI (EH). Please answer the follow questions related to the interests that funded the 2006 GRATs:

    a. Are any of these assets still held by the remainder trust? If so, please provide an up to date accounting of the capital and/or profit ownership percentage and estimated dollar value of the interest held by the remainder trust in Apollo Management III LP, Apollo Management IV, LP Apollo Management V, LP; Apollo Management VI, LP; Apollo Investment Management, LP; Apollo Value Management, LP; Apollo SVF Management, LP; Apollo Asia Management, LP; Apollo Europe Management, LP; Apollo Alternative Assets, LP; Apollo Advisors VI, LP and Apollo Advisors VI (EH).

    b. Please provide the most recent appraisal of the remainder trust's interest in Apollo Management III LP, Apollo Management IV, LP Apollo Management V, LP; Apollo Management VI, LP; Apollo Investment Management, LP; Apollo Value Management, LP; Apollo SVF Management, LP; Apollo Asia Management, LP; Apollo Europe Management, LP; Apollo Alternative Assets, LP; Apollo Advisors VI, LP and Apollo Advisors VI (EH).

4. Have you, or any entities you are affiliated with, including Elysium Management LLC, taken out any loans against the value of the assets held in the remainder trust (whether held directly or indirectly through ownership of partnerships)? If so, please provide the dollar value of those loans, as well as any loan terms (including interest rates, security, and amounts repaid), and please describe any powers you, the trustees or any other parties have held or exercised with respect to loans from the remainder trust. Do you have a share of recourse debt or guarantee any debt of the entities described in question 3?

5. How many shares of Apollo Global Management, Inc. stock are held by the remainder trust? Please describe the number, value, and class of these shares.

6. Please describe whether you have retained (or previously retained) any voting powers with respect to the assets in the remainder trust. If so, please describe the percentage of voting power you have retained for each of the funds described in question 3, and any other voting powers you have retained with respect to the assets in the remainder trust. Please also describe what percentage of voting power you have retained related to assets held in the remainder trust with respect to Apollo Global Management, Inc., calculated under the principles of IRC 2036(b)(2) as of today or the most recent accounting. Please also confirm whether you are, or previously were, a general partner of, or member of the management company for, any of the funds described in question 3.

7. The Dechert report claims that "in 2013, payments (to Epstein) were memorialized in signed and unsigned agreements." Please provide copies of any compensation agreements you signed with Epstein. Please also describe any "unsigned agreements" between you and Epstein where Epstein was compensated for work related to trust and estate planning, tax issues, issues relating to artwork, your airplane, your yacht, and other similar matters.

8. The Dechert report claims that you and Epstein negotiated a "written service agreement" that was signed on February 13, 2013. Please provide a copy of this agreement, as well as any documents related to payments made to Epstein as a result of this agreement. These documents should include any statements of work or descriptions of the services rendered by Epstein related to payments made under the agreement.

9. The Dechert report claims that Epstein was paid $56.5 million in five installment payments over 2013 and 2014 as part of an agreement that was never signed. The agreement was apparently renegotiated and the total amount paid was apparently $50 million. Please provide all documents related to payments you made to Epstein resulting from this unsigned agreement, including any statements of work or descriptions of the services rendered by Epstein as part of the agreement.

10. The Dechert report claims that starting in 2014, you began to pay Epstein for his ongoing services on an ad hoc basis, without negotiating written service agreements. As part of this, Epstein was paid $70 million in 2014 and $30 million in 2015. Please provide all

documents related to payments made to Epstein in 2014 and 2015, including any statements of work or descriptions of services rendered by Epstein related to his work on the step-up-basis transaction and estate, tax planning, tax audits and filings, or any other advice provided to you and your family office.

11. The Dechert report claims that "it is clear the compensation paid by Black to Epstein far exceeded any amounts Black paid to his other professional advisors." Please explain how Dechert LLP made this assessment. Please also provide documents showing how Epstein's compensation compared to other professional advisors, including attorneys providing tax, trust and estate planning services and certified public accountants who assisted you with tax matters.

12. The Dechert report claims that "after 2013 payments were made by Mr. Black to Mr. Epstein on an ad hoc basis based on Black's perceived value of Epstein's work." Please provide a detailed description of how compensation amounts were decided for Epstein, including any documentation of trust and estate planning and tax consulting services rendered by Epstein for you or your family office.

13. In a briefing with the Committee on August 1, 2022, your outside counsel indicated that Epstein would often demand compensation from Black that far exceeded what you were initially willing to pay for his services. Despite the absence of a written services agreement or other contract, it appears that you made large payments to Mr. Epstein in 2014, 2015, and 2017. Please provide a detailed written description of the amounts Epstein initially requested he be paid during those years, the process by which you and Epstein negotiated and agreed to a payment amount, and why you agreed to pay such substantial sums to Epstein despite the absence of a written service agreement. Please also provide copies any relevant documents related to decisions regarding how much Epstein was paid for his services.

14. The Dechert report claims that from 2013 through 2017, you were under the misconception that your payments to Epstein would be tax-deductible, based on advice from Epstein.

    a. Please describe whether you claimed income tax deductions for payments to Epstein for any taxable year during this period, as well as when and why you determined that such payments were nondeductible.
    b. Please describe whether you amended your tax returns after learning that the payments to Epstein were not tax-deductible.
    c. Please include all substantiation documents with respect to any income tax deductions you previously claimed.
    d. Please describe whether any payments you made to Epstein were characterized as gifts for tax purposes, and please provide any documents, including tax returns, related to any reportable gifts made to Epstein.

15. In a briefing with the Committee on August 1, 2022, your outside counsel indicated that Epstein provided substantial advice related to your private art collection, which is worth over $1 billion. This advice reportedly included helping you form a new art partnership as well as assistance in connection with the sale of certain pieces of artwork. Please provide detailed answers in writing for the following items:

    a. What was the purpose of the new art partnership you formed with Epstein's assistance? How did Epstein assist in the formation of that partnership?
    b. Please provide more details regarding any art loans that involved Epstein, including Epstein's role related to those loans.
    c. Please provide a list of any like-kind exchange transactions Epstein helped execute for any pieces you owned valued at over $1 million, including a detailed description of the tax benefits obtained through the execution of these transactions.
    d. Please provide a list of art sales valued at over $1 million Epstein assisted you with.

Thank you for your attention to this important matter.

Sincerely,

Ron Wyden
United States Senator
Chairman, Committee on Finance